IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DAVID W. RUSH, | ) |
|    Plaintiff, | ) |
| v. | )    C.A. 07-514-SLR |
| CORRECTIONAL MEDICAL SERVICES, Inc, et al, | ) |
|    Defendants. | |

FILED OCT 19 2007 U.S. DISTRICT COURT DISTRICT OF DELAWARE

PLAINTIFF'S REPLY TO DEFENDANT'S OPOSITION TO PLAINTIFF'S MOTION FOR TRO/PI

Rush objects/replies to defendant CMS's Response in opposition to plaintiff's reasonable request for needed medical care ("TRO/PI"). Rush is pro se and he seeks pleading leniency under Haines v. Kerner, 404 U.S. 519 (1972). Rush offers the following:

### Nature and Stage of TRO/PI

On or about 8-22-07 Rush filed his complaint against defendant CMS, et al (D.I. 2), and subsequently filed on 9-12-07 with his emergency request for immediate medical care for several serious medical conditions ("TRO/PI") (D.I. 7-8). On 9-12-07 this Court Ordered CMS and the Attorney for the State of Delaware ("DDOC"), to respond to Rush's TRO/PI, and the Court Ordered CMS to provide the Court Rush's Medical records for review. CMS and DDOC responded on 9-19-07 ("CMS's Res"). CMS did not provide Rush's medical records either in whole or in pertinent part. Alternatively, CMS provided only a piece meal of Rush's medical records which only covered some eleven months and which ostensibly supported its narrow view of the on going problem. Rush objects and requests the Court to reiterate its 9-12-07 Order to the non-compliant CMS. Moreover, CMS's opposition is without merit due to the following:

a) CMS's legal conclusions are fatally flawed in that they a rely upon misstatements of facts/omissions of key facts; and/or they are conclusory allegations;

b) CMS's legal conclusions are fatally flawed in that CMS misapplies the "Some treatment" defense; and

c) CMS's response fails to refute a single fact that would warrant relief.

### Argument

First, CMS opposes Rush's request for treatment of his Hepatitis C/Liver disease-cirrhosis ("HCV/CDL"), because CMS claims this matter is moot. CMS failed, however, to address Rush's chronic liver disease/cirrhosis and the mandatory weekly lab work monitoring, which doctor Hall explicitly stated was critical due to Rush's chronic condition (i.e. advanced stage). Thus, the HCV/CLD issuer is not moot. Also, CMS opposes Rush's request to have his multiple Lipomas removed because CMS claims they are not life-threatening and excision would be merely cosmetic/elective. (See CMS's Res. At 2). Note, CMS failed to dispute, refute, or even address

1

Rush's request regarding his atrophied/injured right shoulder and has therefore waived its ability to bring this claim into issue.

Second, the DDOC [1] "concede[d] that plaintiff's *medical conditions are serious*. Therefore, [that] prong of the test is satisfied." (See DOC's Res. At 15) (D.I. _____). (emphasis added).

### I. Hepatitis / Liver Cirrhosis Treatment

CMS claims this matter is moot, thus the Court need not intervene. Also, CMS makes an attempt to establish a defense of "some treatment" by claiming the continued "monitoring", etc of Rush's condition, and/or that the inordinate delay CMS created was no fault of its own but the result of intervening medical factors. Both are without merit. Rush submits that the matter is not moot and even if CMS commences treatment, the Court is nevertheless warranted in ordering the following minimal conditions:

  a) A reliable independent entity to monitor and report on the HCV/CDL treatments and more importantly Rush's mandatory weekly labs, or
  b) Establish some other type of reliable follow up (i.e. checks); to ensure the proper administration, adjustments, and labs monitoring is actually conducted.

Literary speaking, one misstep will cause Rush's HCV/CDL treatment to be unsuccessful and thus cause early discontinuation of the needed treatments and premature death. Rush has already experienced significant liver cirrhosis (i.e. permanent injury), and CMS has demonstrated a pattern of malfeasance that warrants oversight. Also, Rush's HCV/CDL treatments did not begin on 9-29-07 as attested to by CMS, and what did occur on 9-29-07 (instructions concerning the Ribavirin/Interferon), explicitly violated the drug manufacture's (Roche pharma), **posted warning for use**. If Rush followed McDonald's directions to take the Ribavirin for the first week –alone without the Interferon- Rush would have an adverse reaction, because Roche specifically prohibits the use of Ribavirin alone without the Interferon. It appears that either McDonald is completely incompetent or he is attempting one last chance to ensure that Rush experiences early failure and early discontinuation. Rush received the Ribavirin on 10-06-07. McDonald had instructed Rush on 9-29-07 to begin the Ribavirin for the first week and then he would begin the Interferon injections thereafter. Rush read the Roche's warning and did not take the Ribavirin. As of 10-11-07 no Interferon injections have begun.

This issue is clearly not moot and it requires the Court's intervention or oversight, but first Rush will refute defendant's frivolous claims/defenses, and then he will address the moot claim in detail.

---

[1] DDOC did respond to Rush's TRO/PI and it largely mirrors CMS's opposition; however, DDOC is not a named defendant to Rush's Action. Therefore, Rush will not waste judicial resources by replying to DDOC's opposition, unless or course the Court directs otherwise.

v. Patients who experience liver cirrhosis (i.e. Stage three or four), (Rush was notified he had stage three liver disease/cirrohis on  1-22-07  ). (Note that of those diagnosed with HCV, only one in five will actually experience the more sever liver cirrhosis. HCV cirrhosis cause liver failure and liver cancer; it is the number one cause of fatal liver disease in the U.S. and it is the number one cause for developing type two diabetes. Consequently, only 20 percent of the diagnosed HCV patients will experience premature death due to liver cirrhosis.)(Rush now falls into that 20 percentile and will experience premature death as a result of his advanced liver disease); and

vi. Any actual diagnosis of HCV/LDC (Rush was diagnosed with HCV as early as March 2005).

c) The minimal medical requisites ('protocol"), for HCV diagnosis/treatment for a high risk/chronic case.

  i. Referral to a gastroenterologist or hepatologist;
  ii. Labs for a baseline and damage assessment (e.g. liver viral load, liver enzyme and platelet count, tumor markers, and HCV genotype);
  iii. Liver biopsy to determine damage to liver; and
  iv. EKG, Chest X –ray, and eye exam.

Also, if diagnosed with HCV, the hepatologist is required to explain to the patient the following:

  v. Amount of liver damage present;
  vi. Patient's risk category and chances of successful HCV treatment; and
  vii. The risks and benefits in beginning HCV treatments (i.e. Interferon/Ribavirin).

Accordingly, acute high risk cases require immediate aggressive HCV treatment. Rush is both a high risk and chronic case patient, and his advanced stage required immediate and aggressive HCV/LDC treatments, but CMS created an inordinate delay in providing same –absent any legitimate medical factors- and exposed Rush to unnecessary and preventable permanent injuries and a near fatal emergency episode. Indeed, as early as March 2005, Rush exhibited most of the high risk/chronic case markers, but CMS did not act in accord with the minimal HCV protocol or even nominal care.

Defendants claim to have worked to "stabiliz[e]... Plaintiff's condition such that the Interferon protocol would be in Plaintiff's best interests." (CMS's Res. At item 3), And that '[f]ollowing Dr. Scott's opinion, Plaintiff was seen and/or orders entered regarding his suitability for Hepatitis C treatment ... on February 13, March 24, April 18, May 25, August 18, and August 23, 2007. Exhibit C. 'Each time additional tests were ordered. Exhibit D. *Plaintiff may have begun treatment earlier, but for thyroid problems and an upper gastrointestinal hemorrhage that required hospitalization in June 2007*. Exhibit E. (Id.) (Emphasis added).

Essentially defendants assert that but for intervening medical factors, they would have begun Rush's needed HCV/LDC treatments earlier and that they were "monitoring" and "testing" his

4

condition for an opening to begin said treatments. In support, CMS includes a small snap-shot of Rush's medical records (i.e. January 2007 to August 2007), and DDOC flied records that begin in September 2006 thru August 2007. Even this small window belies CMS's assertions. Moreover, each and every one of defendants' ostensible intervening medical factors is false and the records demonstrate a clear pattern of CMS actually creating pretexts of fanciful medical factors in order to deny Rush the HCV treatments.

Rush's Records Reveal the Following:

- As early as March 2003, Rush exhibited the classic and elemental markers indicative of HCV –as well as high risk because he was 43 then- (e.g. low platelets of 131 and high liver enzymes: AST 53 & Alt 91) (See TRO/PI Ex. Section II at B 6-7);

[These objective medical factors mandate HCV protocol to begin then –mid 2003- but CMS conveniently omits this damning fact].

- As early as March 2005, defendant FCM had recorded in Rush's medical records Rush's diagnosis for HCV, but withheld that information from Rush; (See EX-A 2003 LABS & HCV Positive March 2005 );

- As early as 9-08-05, Labs re-confirmed Rush's HCV diagnosis and also illustrated the high risk factors of rapidly progressive counts (e.g. liver enzymes ALT #1 at 91, ALT #2 at 145) (See Ex-B 2006 LABS )

[Progressively negative progression and Rush's age of 45 were objective medical factors that required immediate, aggressive HCV care then];

- As early as 1-30-06, Rush had filed a formal medical grievance against defendants CMS, which claimed CMS was creating a denial/inordinate delay in providing Rush the needed HCV care; (See TRO/PI, Ex Section II at D-1);

[Rush had repeatedly requested the HCV protocol from defendant Niaz, but he refused. Also, CMS began its contract as Delaware's prison medical vendor in mid-July 2005, so CMS was well aware of Rush's diagnosis and risk factors then]

- As early as 3-01-06 thru 3-14-06, labs reconfirmed Rush's HCV diagnosis. (See TRO/PI, Ex Section II at Item B 1-3);

[Therein, labs again disclosed Rush's rapid negative progression: Liver enzymes AST at 67, ALT at 145 & positive HCV diagnosis. (See TRO/PI Ex, Section II at B 1 -2) CMS conveniently fails to address why -in March 2006- it failed to initiate the HCV protocol, before Rush was exposed to permanent injury and a life threatening hemorrhage.];

- On 03-18-06, Niaz categorized Rush's HCV as "Chronic";
- As early as 03-31-06 labs disclosed positive high count for AFP Tumor marker at 9.5 (See TRO/PI, Ex, Section II at B-8) Niaz finally ordered the requisite liver biopsy, though it was not performed until 12-15-06;

> ➤ On 5-12-06, Niaz finally disclosed to Rush that his viral load was 4 million, but would only say that this was "very high."

[Thus, CMS was well aware of all these legitimate medical factors that clearly demonstrated the Rush was a high risk/chronic case as early as March 2005-May 2006, and Niaz never as yet disclosed Rush's liver damage level, Rush's high risk category, or Rush's rapidly decreasing chance of successful HCV treatments –or the Intreferon/Ribaviron risks and benefits the intervening year.];

> ➤ On 5-30-06, Rush filed a formal medical grievance (i.e. #46223) in which Rush charged that CMS refused to provide Rush the HCV drug information ("Interf. Ed"), in bad faith to create an inordinate delay in beginning the actual HCV treatments.

**[This was the first of many bad faith tactics that CMS would employ to deny/delay Rush the needed HCV care. For example, Rush was promised the requested Interf Ed. by Niaz on 05-12-06, by Debby Rodweller on 08-30-06, by Gail Eller on 09-27-06, and at the Formal Grievance Hearing (e.g. #466223), on 10-04-06, but CMS never provided it. Interestingly though, Niaz made an entry into Rush's medical records that states to have conducted the Interf. Ed. with Rush on 09-09-06. It was false of course, because Rush never received Interf. Ed from Niaz and Rush never signed the mandatory "Consent Form" until 03-27-07, which would confirm Interf. Ed. But, in view of Rush's formal grievance regarding this very matter, Niaz's entry would appear to have resolved the grieved matter, yet Rodweller nor Eller made use of the entry on 08-30-06/09-27-06 or on 10-04-06 to claim that the matter was resolved. CMS appears content to keep its stalling tactic alive for as long as possible. Indeed, CMS was content to fend treatment and "monitor" Rush's quickly deteriorating condition until either Rush became ineligible for the HCV treatments or he simply died a painful death from liver failure or collateral complication.]**

> ➤ On 10-06-06, Rush filed a Formal Notice to CMS that he (a) no longer needed CMS to provide the Interf. Ed. because he had acquired it from Roche pharma, and (b) Rush requested immediate commencement of the HCV treatments. (See TRO/PI, Ex, Section II at D-4);

[Thus, CMS could no longer employ that particular bad faith tactic to deny Rush the HCV treatments. CMS, however, quickly employed an alternative pretext: specifically defendant S. Altman of CMS wrote Rush a response to the 10-06-06 Notice/Demand letter and Altman falsely claimed the 5/3, 5/15, and 9/15-06 labs demonstrated Rush's "liver function tests were not increasing but decreasing." (i.e. Thus Rush did not require the long sought after HCV treatments). (See TRO/PI Ex-section II at E-1). Altman's claim was patently false. Rush's medical records disclose the exact opposite --and in fact- they disclose a rapid progression which mandates

immediate and aggressive HCV care, not more pretext and more erroneous delays. Niaz would also manufacture a false pretext].

> On or about 11-18-06, Niaz conducted a Clinic and announced Rush's platelets were too low to begin the liver biopsy or the HCV treatments (i.e. contraindicative), (See TRO/PI Ex, Section II at C 1-2 at items 5-18),

[Niaz's claim was patently false. On 1-22-07, an Outside Hep C/Liver Specialist, Doctor Scott Hall, noted that the low platelets needed to be monitored during the Interferon treatments, but that "*there is no contraindication... to consideration of the hepatitis C therapy going forward... I do not feel that Rush needs any further testing or follow up.*" (See CMS's Res. At EX-b) (emphasis added) Therein, Rush's hypothyroidism was also considered and thus found not to preclude the HCV treatments. Also, Rush's rapidly falling platelets mandated immediate, aggressive HCV treatments, not more delay or denials. Indeed, like Altman's false claim, Niaz's also was the exact opposite of what Rush's documented objective medical factors mandated.]

> On 11-21-06, Rush challenged CMS's pretexts via letter to Altman. (See TRO/PI Ex, Section II at D-5), and on 12-01-06, Altman maintained the "Low platelets are a contraindication to the combination Interferon/Ribavirin treatment ...." (Id at II , D-6);
> December 2006, Vandusen conducted a HCV Clinic and continued CMS's bad faith pretext. (See TRO/PI Ex. Section II at C-2 items 14-26);

[Recall that Rush's labs disclosed low platelet counts as early as March 2003 and thereafter, between mid-2005 and May 2006, these same "low platelets" began a rapid negative progression, yet CMS did nothing to address the matter. However, as soon as defendants' first pretext fails and Rush demands the HCV treatments, miraculously defendants became concerned with the low platelets. Moreover, instead of commencing immediate, aggressive HCV treatments, ironically defendants' response is more of the same: denial/delay of care.

> On 12-14-06, Rush received the belated liver biopsy that Niaz had ordered on 3-25-06, and this occurred absent any ostensibly needed platelet care;
> December 2006 (circa) defendant McDonald began Rush on thyroid replacement hormones for his hypothyroidism;

[Defendants wasted no time employing Rush's hypothyroidism as yet another pretext to deny/delay HCV care. Of course, this too proved patently false, because there is no relationship or contraindication between Synthroid (thyroid hormones) or hypothyroidism and the HCV treatments. Moreover, specialist Hall unequivocally confirmed the same on 1-22-07 and Vandusen concurred on 05-25-07. (See CMS's Res. At Ex-B & TRO/PI Ex Section II at A-3, items 2-11).

> On 1-22-07, outside specialist Scott Hall, M.D. ("Hall") unequivocally and conclusively refuted each and every one of defendants pretexts, and Hall explicitly stated that there

7

was nothing to prevent Rush "from going forward" and "testing or follow up" was not needed. (See CMS's Res. At Ex-B).

[Thus, Hall's repost/recommendation for Rush to begin HCV treatment conclusively refuted: (a) Niaz and McDonald's claims that Rush's platelets were too low to conduct the liver biopsy/HCV treatments; and (b) McDonald's claim that Rush's hypothyroidism precluded the HCV treatments. Also, we know that Rush's concurrent labs proved Altman's claims relating to Rush's ostensible improving liver numbers. Consequently, two disturbing and clear patterns emerge: 1. Defendants employed multiple claims that were not supported by legitimate medical factors; and 2. Each and every one was demonstrated as erroneous (i.e. not a legitimate medical factor). Perhaps defendants will now claim medical prudence or simple negligence (i.e. that until 1-22-07, they simply were not aware of the legitimate medical factors), but defendants subsequent act/omissions to act are more damning then the preceding. Any prudence/negligence claim is belied by the record. For example,

   a. CMS began its contract in mid-July 2005;
   b. As early as September 2005 Rush was diagnosed with HCV;
   c. Labs between March 2003 and May 2006 conclusively demonstrated a rapid negative progression in Rush's counts; and
   d. Rush was already over forty, difficult genotype, and had already demonstrated signs of early liver cirrhosis by late 2006.

September 2005 till Hall's January 2007 report/recommendation is a span of 15 months, in which defendants had a viable opening to begin Rush's HCV treatments, but defendants merely "monitored" Rush's high risk/chronic condition –a rapidly deteriorating condition- yet failed to take appropriate action to provide immediate, aggressive HCV treatments. CMS's act/omissions to act were not the result of legitimate medical factors or of any informed professional medical judgment. It is no surprise CMS/defendants fail to respond to these particular claims in Rush's TRO/PI, but alternatively provides a small snap-shot from January 2007 to August 2007. These facts are damning and they conclusively refute defendants' assertion that they were working on stabilizing Rush's condition before beginning the HCV treatments. Simply put defendants' acts/omissions to act were in conflict with the legitimate and known medical facts. Thus, the "some treatment" defense is distinguished. (See *Durmer v. O'Carroll*, 991 F.2d 64 (3d Cir. 1993)( …the fact that plaintiffs were provided with treatment is not, by itself, enough to preclude an Eighth Amendment claim): *Greeno v. Daley*, 414 F.3d 645, 58-59 (7th Cir. 2005)(… defendants argue since he received on-going medical care, his claim is nothing more than a disagreement with a prescribed course of treatment…[but] a prisoner is not required to show that he was literally ignored…Likewise the **some treatment argument misses the possibility that the treatment Greeno did receive was "so blatantly inappropriate as to evidence intentional**

8

mistreatment likely to seriously aggravate" his condition....); *(Monmouth County Corr' Inst' Inmates of Allegheny County Jail v. Pierce*, 612 F. 2d 754, 762 (3d Cir. 1979)( restrictions unrelated to individual treatment needs states cause of action); cert. denied 486 U.S. 1066 (1989); *Tillery v. Owens*, 719 F.2d 418 (3d Cir. 1990) (As one court put it, "We will defer to the informed judgment of ... officials as to an appropriate form of medial treatment. But if an informed judgment has not been made, claim has been stated."); *Hamilton v. Endel*, 981 F.2d 1063 (9th Cir 1992) (Officials ... may not intentionally rely on medical opinion that is without adequate basis). Not only were defendants' medical opinions precluding HCV care without adequate basis, but they were actually false and evidence of bad motives can be inferred as subjective deliberate indifference. (See *Hughes v. Joliet Corr' Center*, 931 F.2d 425, 428 (7th Cir. 1991); and *Mullen v. Smith*, 738 F.2d 317, 318-19 (8th Cir. 1984).

Indeed, in Durmer, our Circuit held: (...material fact existed as to whether physician...knew that prisoner should receive physical therapy and deliberately failed to provide it for non-medical reasons....) *Durmer, supra*, at 64. The keys facts in Durmer were that patient suffered a stroke and his condition was deteriorating –similar to Rush's rapidly deteriorating liver enzymes, platelets, and viral load counts and cirrhosis- that a specialist recommended physical therapy –similar to Hall's report/recommendation for Rush to begin the HCV treatments & no further test or follow up needed- but that prison physicians ignored the specialist recommendation and instead sent Durmer to still more doctors in an attempt to fish out different medical opinion that would deny the physical therapy –similar to defendants' doctors ignoring Hall's recommendation to begin HCV care and no further testing, but conducting more testing for another five months. The district Court denied Durmer's claim based on the "some treatment" theory (i.e. That because Durmer received scheduling, tests, and that his condition was monitored), but the Circuit Court reversed in part and remanded because a reasonable juror might find that officials ignoring a specialist recommendation and alternatively doctor shopping for a more desirable recommendation could find said acts were a pretext t deny an inmate the recommended care. Rush's key facts are substantially similar to Durmer's, because (a) Rush's observable and objective medical factors mandated immediate, emergency HCV care (mid 2005 thru September 2006 & Without Doubt by January 2007):

    i.     Because Rush was diagnosed by a doctor as HCV positive;

    ii.    Because Rush's liver enzymes, platelets, and viral loads numbers were quickly deteriorating;

    iii.   Because on 1-22-07 a liver specialist completely settled Defendants erroneous delaying tactics (no contraindication & no need for further testing);

    iv.    Because Defendants ignored the specialists recommendations, and alternatively continued to perform unnecessary labs and delayed HCV treatment, which caused a marked deterioration in Rush's condition; and

    v.    Because Rush's deteriorating condition led to permanent liver cirrhosis and the life threatening esophagus hemorrhage.

Our Circuit held that a serious medical need is one diagnosed by a doctor as mandating treatment. (See *Monmouth County, supra*, at 347). Rush was diagnosed with HCV by a doctor in 2003, 2005, and 2006. Because Rush exhibited multiple high risk factors, his HCV condition mandated immediate, aggressive treatments. (e.g. Rush's rapidly negative progression of lab numbers). Defendants were well aware of these facts by virtue of Rush's persistence and Rush's medical records, but defendants failed to act in accord with the legitimate medical factors and continued to fail to act in accord with the specialist's explicit recommendations. Rush stated a sufficient claim and supported same with objective evidence. (See Young v. Harris, 509 F. Supp 1111, 1113-14 (S.D. NY 1981) (Allegations state a claim on theory that defendants' failed to provide Young whit *prescribed treatment* or that they have unreasonably delayed his access to such treatment); *Johnson v. Lockhart*, 941 F.2d 705, 706-7 (8th Cir. 1991) (10 month delay in surgery that doctor recommended be done within days is a failure to act on medical recommendation and is actionable); and *Hamilton v. Endel, supra* at 1066-67 (Holding that Officials' disregarding a surgeon's recommendation on non-medical grounds could state claim). It is undisputable that as of 1-22-07, defendants had no legitimate medical factor to continue to deny/delay Rush his needed HCVLDC treatments, and alternatively did have multiple legitimate medical factors that mandated immediate, aggressive HCV care. Defendants failed to provide the mandated HCV care and thus exposed Rush to an unnecessary life-threatening emergency and permanent injuries in June 2007.]

- On 3-27-07, Rush is finally provided the Interf. Ed. and actually signed the accompanying "Informed Consent" form (See DDOC's Resp. at Ex-D);
- On 4-18-07, defendant Chuks had to reorder the "unnecessary labs" which were noted by defendants as required before any HCV care; however, was in complete conflict with Hall's specialized opinion;
- On 5-25-07, Rush met with defendant Vandusen who entered the following: "*Scheduled ASAP with Dr. McDonald to resolve issue of starting Hep C meds.*" (See CMS's Res. At Ex-C);

[Note that Rush was experiencing an acute outbreak of jaundice between 05-14-07 and early June 2007, which was likely a precursor and or warning of Rush's upcoming esophagus rupture. Vandusen failed to address Rush's obvious serious symptom and no entry appears in Rush's

medical records on 5-25-07 of the acute jaundice. Vandusen did request an "Ammonal level/PT/INR" but it is unclear why) (See CMS's Resp. at Ex-C)].

> On 6-24-07 (circa) Rush experienced a needless and/or preventable massive hemorrhage to his esophagus as a direst result of his failing liver and quickly deteriorating condition. Indeed, post op definitively revealed this fact. (See CMS's Resp. at Ex.-E);

[Thus, Rush was exposed to a near fatal emergency episode some five months after Hall's 1-22-07 recommendation to begin HCV treatments, but HCV treatments typically last six months, and had defendants not ignored and acted in conflict with Hall's recommendation, it is likely Rush's rapid progressive deterioration would have been arrested and likely that Rush's esophagus would not have ruptured causing massive hemorrhaging. CMS's claim to have worked to "stabilize" Rush's condition on Feb. 13, March 24, April 18, May 25, and August 2007, is absolutely false and in irreconcilable conflict with the undisputable facts. Rush's esophagus did not rupture until late June 2007 and Hall explicitly stated No contraindication or nothing present to preclude Rush's HCV treatment from beginning --on 1-22-07. Rush's condition was already stablelized and CMS's claims are incongruous and disingenuous.]

> On 8-18-07, Rush's first HCV Clinic since his June esophagus rupture, McDonald confirmed the post op's findings: esophagus was likely caused by Rush's HCV/LDC condition. McDonald then noted alarming facts that should have alerted any physician who was actually conducting meaningful "monitoring" : (a) That Rush's blood showed elevated protein levels and that this was a classic symptom and/or precursor to the esophagus incident, and (b) That the massive doses of Motrin -these very same doctors who were so good at "monitoring" Rush's condition- had actually aggravated Rush's condition because it is a prohibited class of drugs for Rush's advanced HCV/LDC condition.

[Defendants began to prescribe this prohibitive class of pain killers back in Mach 2006 (at 800 and 600 mg doses), for Rush's painful Lipomas and his injured right shoulder. Not only were they ineffective at managing Rush's pain –and Rush alerted defendants to same- it actually aggravated Rush's deteriorating condition and esophagus rupture. This is shocking. Defendants' claim to be monitoring Rush's condition and claim to be concerned about stabilizing his condition, but actually work at aggravating the condition and denying needed treatment for erroneous medical factors. (See TRO/PI Ex-Section II at A 1-2) Moreover, McDonald stated that t Rush was no longer a candidate for any HCV care because he had likely evolved into the final fourth stage of liver cirrhosis and McDonald even document same: "Not a candidate... cirrhosis ...VPLTCT." McDonald did not reschedule Rush for any return Clinic, however, all prior Clinics had a note for the Next Clinic (i.e. 30, 60, or 90 days) (See CMS's Resp. at Ex-C). The final result of defendants' malfeasance is inescapable: Rush's rapidly deteriorating condition evolving past the

point of permissible treatment and/or end organ failure and premature death. This entire time, defendants had "monitored" Rush's rapidly deteriorating condition: conducting unneeded labs and scheduling mock Clinics in order to fend providing care; however, defendants ignored a specialist's recommendation and ignored classic and elemental markers that mandated immediate, aggressive treatment. This is clearly deliberate indifference and Rush enjoys a substantial likelihood of success on the merits.

Indeed, the Jackson Court is instructive (See *Jackson v. Fauver*, 334 F.Supp.2d 697 (D.NJ 2004), Therein, several prisoner plaintiffs sued the same medical vendor CMS. One plaintiff, Dunkard, suffered HIV, diabetes, high blood pressure, and Hep C, but because he did not show that the alleged med lapses actually occurred, nor did he provide evidence that improper meds administration allegedly damaged his liver, that his claim could not survive summary judgment. (Id at 9-12, p.p. 713-15). And another plaintiff with AIDS suffered the same plight because he could not show injury. (Id at 718).
But plaintiff Castellano –who suffered from diabetes-, claimed CMS's failure to control his blood sugar had resulted in irreversible damage to his kidneys, heart, and placed him a greater risk for damage to his eyesight....kidneys began to fail in 2001. (Id at 711-72). The distinguishing facts with Castellan's claims and other plaintiffs' claims were (a) failure to treat appropriately, and (b) tangible and/or irreversible injuries.

Consequently, Rush's claim is on point with the successful plaintiff –Castellano- and evidence shows repeat failures by defendants to treat appropriate –even to the extent of ignoring the specialist and classic high risk markers- Rush's condition. And consequently, Rush did experience tangible injuries (e.g. irreversible liver damage and esophagus rupture). Luckily, Rush survived defendants' malfeasance, but then defendants on 8-18-07 completely disqualified Rush from any HCV treatment whatsoever.]

- On 8-22-07, Vandusen noted: "Stop NSAIDS" "Schedule repeat ammonia level" and "Have Deb R. schedule follow up ccc. (See CMS's Resp. at Ex-C);
- On 8-23-07, Vandusen noted in the Plan: Medication changes section of the Clinic report: "Stop Protocol", Stop NSAIDS" F/U 2 months ccc 10-19-07."
  (i.e. Next scheduled Clinic on 10-19-07) (Id).

[Consequently, McDonald specifically entered into Rush's records on 8-18-07 "Not a candidate...cirrhosis," and intentionally refused to reschedule Rush for any further HCV Clinics. Subsequently, Vandusen sees Rush for his thyroid Clinic and he also enters "Stop Protocol." Clearly, as of August 2007, defendant had explicitly written off providing any HCV treatment to Rush once and for all. Defendants were content to simply "monitor" his dire condition with some morbid fascination until Rush died a painful and agonizing death. No other Clinic was schedule, and the only one that was, was with Vandusen for another matter on 10-19-07. The records are

12

conclusive on this matter. Thus, defendants' claims to be working to stabilizing Rush's condition throughout Aug 2007 was also false, and their claim to this Court to have scheduled Rush for begin HCV treatments on 9-29-07 is equally false. No such record existed prior to the Court's intervention on Rush's behalf and in response to his TRO/PI. Indeed, Altman even documented McDonald's final August 2007 denial. (See Ex- C). The records refute and belie defendants' claims and they have no credibility whatsoever.

Rush claimed that it was CMS's custom/policy which was the moving force behind all the denial/delays that were not supported by legitimate medical factors. (See *Swan v. Daniels*, 923 F.Supp. 626, 633 (D. Del 1995). And a reasonable juror could find under any of the following theories: (a) That it was likely a custom/policy in which existed to deny Rush the HCV care in view of Niaz, Vandusen, and McDonalds' consistent and on going employment of the substantially same shocking behavior –that was in conflict with known legitimate medical factors; and/or (b) That there was a known breakdown in needed services that obviously mandated corrective action, but defendants failed to do so despite a likely violation to Rush's constitutional rights. (See *Moody v. Kearney*, 380 F. Supp 2d 393 (D. Del 2005); and White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990). Or finally, (c) That "A pattern of similar instances presumptively, indicates that officials have through their programs and procedures, created an environment in which negligence is unacceptably likely." (See *Robert E. v. Lane*, 530 F.Supp. 930, 940 (N.D. Ill. _____).

Only, one ugly and inescapable conclusion presents itself here: That defendants were culpably deliberately indifferent to Rush's serious medical condition and it caused Rush permanent injuries.

Lastly, returning to the issue of mootness. CMS has demonstrated a pattern of malfeasance that warrants oversight. Also, Rush's HCV/CDL treatments did not begin on 9-29-07 as attested to by CMS, and what did occur on 9-29-07 (instructions concerning the Ribavirin/Interferon), explicitly violated the drug manufacture's (Roche pharma), **posted warning for use.** (See Ex-D) If Rush followed McDonald's directions to take the Ribavirin for the first week –alone without the Interferon- Rush would have an adverse reaction, because Roche specifically prohibits the use of Ribavirin alone without the Interferon. It appears that either McDonald is completely incompetent or he attempting one last chance to ensure that Rush experiences early failure and early discontinuation.

It is unclear why an experienced infectious disease doctor would specifically violate Roche's explicit warnings, but in view of defendants' history of malfeasance and erroneous acts/omissions to act, it is clear that the issue is not moot, and that the Court is warranted in ordering an independent monitor, etc. Perhaps this is defendants' last stab at sabotaging Rush's HCV treatments, but Rush cannot say as yet, but one thing remains absolutely clear: One misstep and Rush will likely die, so the risk is to grave to gamble on defendants' good faith. Rush respectfully submits that only the light of justice can remove the cover of darkness in which defendants thrive.

13

II. Rush's Acute Late-stage Lipomas

Defendant's claim that Rush's Lipomas are "not' life threatening and their removal would be cosmetic and elective. (See CMS'S Response at item 2) thus, Defendants' claims Lipomas do not constitute a serious medical condition. Defendant's presented on affidavit by (Colon's Affidavit) John Conlon's, M.D. (Ex-F.), who fails to lay any foundation that he reviewed Rush's medical records (e.g. late-stage, painful Lipomas, in which a doctor prescribed their excision), but offers general medical opinion relating to Lipomas, and lastly, defendants employ their favored ruse that they "have monitored and treated his condition." (CMS'S response at item 5). Defendant's claims are without merit for the following:

   a) Defendants fatally misapprehend Rush's claim: First Rush concedes that normally skin Lipomas are not life threatening, but Rush never stated his were life threatening. Alternatively, Rush claimed the following:

      1) Rush's Lipomas growth are on-going and a continuous medical condition about September 2005...;

      2) Rush's Lipomas have steadily increased in size, frequency, and severity to the extent that Rush experiences the following on a daily basis.

        a) Acute pain & suffering...
        b) Significant collateral residual permanent injury.
        c) Frequent ruptured blood vessels.
        d) Significant mental & emotional distress...
        e) Threat to Rush's future health (See TRO/PI. at items 3&4).

Thus, Defendants mistakenly rely on the fact that Lipomas are generally not life-threatening Moreover, Defendant's failed to dispute, refute, or challenge any of Rush's above claims, which -if proven- would entitle relief and succeed on the merits.

For example Rush claimed significant impairment of his "normal daily functions" which shall mean as it specifically related to Rush's acute-late stage Lipomas: "( Significant impairment of Rush's normal daily functions shall mean the following: (a) A substantial impairment of grip, mobility, and range of motion in both of his arms; (b) A substantial impairment of his ability to lift or carry nominal weights exceeding ten pounds; and (c) A substantial impairment in his ability to bath, sleep, work, and/or promote good health via meaningful exercise. (See TRO/PI at item 4 and foot note 1). Rush supported same w/objective documentation of collateral injuries (Head injury and employment incident) that resulted in loss time of work. (TRO/ PI, Ex. Section I at G item 1-4) and multiple notices of same (Id at H item 1-10). Again Defendant's conveniently omit these documented facts from their claim: that Rush's Lipomas are not a serious medical condition. But under these facts, the appropriate standard finds that a medical condition is serious if it "significantly affects an individual's daily activities. " (See *Tillery v. Owens*, 719 F Supp. 1256, 1286 ( W.O. Pa 1989) Affirmed, 907 F2d 418 ( 3rd Cir. 1990), 930 F2d 1150, 54-55 ( 6th Cir. 1991) ( "Conditions that cause pain, discomfort, or threat to good health states a claim.), and *Jones v. Evans* 544 F. Supp. 769,775 at note 4 ( N.D.Ga. (1992) (and serious cumulative effects from repeated denial of

care with regard to even minor needs may state a claim). Indeed, Rush claimed that his significant impairment resulted in his injured right shoulder- a residual and tangible injury. (TRO/PI at item 4 (b) and exhibits). Regardless, Rush claimed significant impairment in his ability to sleep, work, promote good health vise meaningful exercise, and grip, carry, lift objects in excess of ten pounds, and that the range of motion in his arms is severely limited – so much so- that Dr. Durst mistook his residual, right shoulder injury for a torn rotator cuff. At Durst's examination Rush was unable to lift his arm beyond horizontal. In *Jackson,* a medical condition that threatens one's ability to walk, even it ultimately reversible, is unquestionably a serious matter. (See *Jackson v. Fauver*, 334 F. Supp. 2nd 697 _____ ( D.N.J. 2004). Here Rush can walk but his ability to lift, carry, manipulate his arms and/or shower and bath himself absent excruciating pain and suffering is threatened and thus a serious medical condition.

The Court does not have to accept Rush's subjective or objective proof of his significant pain and suffering and impairment of normal daily functions as establishing the first prong (i.e. serious medical condition) because Rush's claims have been objectively verified repeatedly.

For example, Rush's late stage acute Lipomas were diagnosed by doctors/surgeons as requiring excision on the following.

a) 2/10/06 Lipomas excision, Messinger ("General Surgery" (Excision per Lee Ann").

b) 4/17/06 Surgery consult request, Messinger, (Please Reprocess).

c) 4/28/06 by Bolansy (outside surgery Surgeon recommendation). For general surgery."… reschedule for excision… 2 upper arm + 1 forearm Lipomas". ( this was also signed off by Durst on 5/1/06, ( See TRO/PI, EX Section I at K p.p. 1-4).

d) 3/16/05 Dr. Alie for "further evaluation or excision" and this Consult was coded "*Urgent*" (1-2 week) (See TRO/PI ex, Section I at I. p.p. 1-6).

Consequently, Rush's Lipomas were recommended for excision five times ( e.g. 3/16/05, 2/10/06, 4/17/06, 4/28/06, 5/1/06), but never provided. Moreover, the 4/28/06 recommendation to "reschedule for excision" was from an outside surgeon/specialist, Defendant's ignored the specialist's diagnosis and recommendation for excision despite the legitimate medical factors and in conflict with same. Such act/omissions to act support the second prong of Defendant's subjective denial & needed care. (See *Johnson v. Supra* at 706-07 (10 month delay in surgery that doctor recommended be done within days state claim), and our Circuit added that a patient who experienced pain while awaiting a delayed operation stated claim. (See *West, Supra* at 161-62). Here a specialist recommended surgery to remove Rush's painful Lipomas on 4/28/06. It is now 10/06/07 and seventeen months have elapsed, yet Rush still suffers needless pain. Rush's pain and impairment has been noted by the above physicians and layman alike (see TRO/PI at ex-Section I, at F-2). It is not surprising Defendant's failed to address the claims Rush actually made and supported with his medical records and other relevant documentation, but alternatively created a phantom claim to refute. Defendant's engage in a classic red herring tactic and their averments are factually and legally frivolous.

15

Moreover, it is incongruous for Defendants' to now claim that Rush's acute late stage Lipomas are not a "serious medical condition.", because CMS and the DDOC have both admitted to the contrary. For example, Rush filed an Emergency Medical Grievance ("EMG") # 21535 in which Rush made all of the above claims and also added that CMS had employed a custom/policy to deny the needed care absent legit medical factors. DDOC agreed and "*Upheld*" Rush's EMG requesting excision (See TRO/PI ex. I at H p.p. 3-10). Also, Rush sent a complaint/notice to CMS on 2/20/06 – complaining of pain etc- and CMS found Rush's complaint/claim "*to be with merit*". (Id at J-1). Despite Defendant's conceding the merit of Rush's claims and despite the surgeon's recommendation, Defendants' actually documented "their" unilateral finding –in conflict with the specialist- that the surgery was "elective" and Defendants' consequently *informed the outside specialist that his diagnosis was therefore incorrect.*. (I.D at H-5). This is clearly contrary to the legit Medical factors and it clearly supports Defendants' culpable conduct. Rush enjoys a likelihood of success on the merits.

Additionally, Defendants' claim to "have monitored and treated his condition (CMS'S Response at item 5). It is true that Defendant's monitored Rush's needless suffering and impairment over an inordinately long time period (e.g. September 05 to the present) (some 25 months), but Defendants' clearly did not provide the needed or recommended treatment. Alternatively Defendants' continued a course of treatment ( e.g. prescribed massive doses of Motrin) that they know were ineffective, painful, and/or entailed substantial risk of serious harm to Rush. (See *White, supra* at 109). For example, the same doctors – Defendants- who were intimately aware of Rush's acute HCV/LDC condition, nevertheless prescribed a class of pain-killers that is prohibited and/or aggravated said condition. ) Rush incorporates pertinent claims above, herein). McDonald even admitted as much!

Also, the fact that Defendants' continuously prescribed Rush pain Meds, demonstrates that Defendants' knew Rush was suffering and that his condition required constant meds to manage the pain. Our Circuit in *Spruill v. Gillas*, 372, F3d 218, 235-236 (3rd Cir. 2004) (held that inmates "back condition itself that allegedly required significant and continuous medication, causing excruciating pain and a tangible threat of falling or collapsing incidents, stated a cause of action) Moreover Spruill's alleged pain/back condition was purely subjective, but here Rush enjoys objective independent evidence of his suffering and impairment and related accidents.

Consequently Defendant's claim of cosmetic/elective surgery is without merit and is in conflict with Rush's legit objective medical factors. So is their claim of incurring incredible expense because Lipoma excision merely involves a local anesthetic and outpatient minor surgery. Indeed had Defendant's provided the recommended excision in a timely manner, Rush would not now have to experience permanent nerve or tissue damage as a result of the delayed excision.

Indeed an inmate named Flynn had a "golf-ball sized" fatty tissue lump (i.e. Lipomas) removed June 2006- one year after diagnosis on June 2005- and the district court found Flynn stated a cause of action, because it had caused irreparable nerve and tissue damage ( i.e. scar tissue from the delayed procedure). (See *Flynn v. Doyle*, C.A. No. 06c-537-RTR (May 1, 2006) (U.S.D.C ED. WI). Reliance on some treatment is fatally flawed.

Lastly, Defendant's offer Conlon's Aff't, however, he does not state the requisite under F.R.E. 602 of having personal knowledge of Rush's particular Lipoma condition, thus his opinions violate F.R.E. 602 and is

immaterial as it relates to Rush's acute condition. Alternatively, if the Court gives Conlon's Aff't. consideration, then it is under a general medical opinion and because this matter is highly disputed, Rush would face manifest injustice, If Defendants were permitted to utilize a medical expert, but deny Plaintiff the appointment of an independent Medical Expert to aid the trier of fact.

Granted, it is in the Court's discretion to hold a hearing under Fed. R. Civ. P., rule 65 before granting or refusing a TRO/PI, it was nevertheless warranted in this instance to reconcile highly disputed material facts. (See *McDonalds Corp. v. Robertson*, 147 F.3d 1301, 1311-13 (11th Cir. 1998) ("Rule 65 does not [always] require an evidentiary hearing; "undisputed material facts require no hearing, but "bitterly disputed facts do...."). Rule 702 provides, in pertinent part,, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert... may testify thereto...." (See *Helling v. McKinney*, 509 U.S. 25, 113 S.Ct. 2475 (1993)( Suggesting appointment of expert witness on the health risks of environmental tobacco smoke). Our Sister Circuit advised that complex medical diagnosis makes expert witnesses necessary.( See *Ledford v. Sullivan*, 105 F.3d 354, 358-59 (7th Cir. 1997). And the Third Circuit has stated that that when defendants utilize expert to prove their case, the denial to a plaintiff is manifest injustice. (See *Parham v. Johnson*, 126 F.3d 454, 460 (3rd Cir 1997).

Rush simultaneous files his motion to appoint an independent medical expert and also moves the Court for a Rule 65 hearing on the disputed facts.

WHEREFORE, Rush presented a Rule to Show Cause why the Defendants should not be compelled to provide Rush the immediate emergency medical care he has been diagnosed as requiring. Defendants' only answer to this Court largely consisted of skewed and misrepresented facts; significant omission of material key facts, fatally flawed and incongruous legal conclusions, and misapprehended claims and misapplied legal standards to support their opposition. Rush has sufficiently carried his burden on all four prongs, and the Court is warranted in granting Rush's request due to the extraordinary circumstances.

*David Rush*                                                                                           10/10/07
David Rush, 173418                                                                           Date
1181 Paddock Rd.
Smyrna, DE 19977

I/M: DAVID RUSH
SBI# 173418   UNIT W
DELAWARE CORRECTIONAL CENTER
1181 PADDOCK ROAD
SMYRNA, DELAWARE 19977



U.S. District court
844 King St.
Lockbox 18
Wilmington, DE 19801-3570