IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

DAVID W. RUSH, )
    Plaintiff, )
    v. ) C.A. 07-514-SLR
CORRECTIONAL MEDICAL SERVICES, Inc, et al, )
    Defendants.

### PLAINTIFF'S MOTION FOR RELIEF FROM JUDGMENT

Plaintiff, Rush, pro se, comes now, pursuant to Fed. R. Civ. P., rule 60 (b) and any applicable Delaware Local Rule, and requests that the Court grant his Motion for Relief From Judgment regarding the Court's October 16, 2007, Memorandum Order (Order) (D.I. _____) denying Rush's reasonable request for medical care via TRO/PI (TRO/PI) (D.I. 7). (See Order D.I. _____). Rush is pro se and he seeks pleading leniency under *Haines v. Kerner*, 404 U.S. 519 (1972). Rush offers the following:

#### Nature and Stage of TRO/PI

On or about 8-22-07 Rush filed his complaint against defendant CMS, et al (D.I. 2), and he filed his TRO/PI on 9-12-07( D.I. 7-8). Therein, Rush made a request for immediate, emergency medical care for several serious medical conditions ("TRO/PI"). On 9-12-07 this Court Ordered CMS and the Attorney for the State of Delaware ("DDOC"), to respond to Rush's TRO/PI, and the Court Ordered CMS to provide the Court Rush's Medical records for review. CMS and DDOC responded on 9-19-07 ("CMS's Res") (D.I. 18-20) . CMS did not provide Rush's medical records either in whole or in pertinent part. Alternatively, CMS provided only a piece meal of Rush's medical records and they only covered a small time frame, some eleven months regarding his Hep C condition, and which ostensibly supported its narrow view of the on going problem. Rush objects and requests the Court to reiterate its 9-12-07 Order to CMS to provide all the pertinent medical records. CMS's opposition was without merit and Rush filed a Reply on or about 10/13/07 (dated 10/10/07)("Rush's Reply") (D.I. _____). Also, because CMS failed to begin Rush's Hep treatments as stated to this Court and because CMS has refused to provide any care whatsoever for Rush's painful Lipomas, which is also in conflict with CMS's statements of providing on going care and monitoring of same, Plaintiff filed an Addendum to Rush's Reply on or about 10-18-07 (Rush's Adden'") (D.I. _____). On 10-16-07, this Court issued an Order denying Rush's requests for medical care and stated the following:

> Discussion: Defendants CMS and the Delaware Department of Correction ('DOC") respond that Plaintiff's motion should be denied. More specifically, the DOC argues that plaintiff's medical records appear to indicate that the *medical staff is monitoring and testing plaintiff's condition. CMS argues that plaintiff's motion is moot* with respect to his treatment for Hepatitis C. It argues that plaintiff's request for elective *surgery to treat lipoma should be denied inasmuch as the condition is not life-threatening* and does not constitute a serious medical condition. Additionally, *CMS notes that plaintiff has been seen by consulting dermatologists* and *CMS physicians who have monitored and treated*

1

> *his condition.* [ ] The medical records submitted indicate that *plaintiff is receiving ongoing care and treatment and is being followed for his medical conditions.* (D.I. 18-20) Plaintiff has been evaluated for Hepatitis C treatment and, assuming he remains stable, was scheduled to begin treatment on September 29, 2007. (D.I. 19, aff. Dr. Lawrence McDonald). [ ] Plaintiff contends, but provides *no evidence to support his position, that he has "late-stage" lipoma which is a serious medical condition.* Dr. John Conlon ("Dr Conlon") avers that plaintiff's skim lipoma is benign and not life-threatening. (D.I.19 aff. Dr. John Conlon). He further avers that Lipoma do not present an immediate threat to plaintiff's health. Id. Also, the *removal of lipoma is a cosmetic and elective surgical procedure. Id.* ...The records indicate that plaintiff has received, and continues to receive, care for his medical condition. ...*There is no indication that, at the present time, plaintiff is in danger of suffering irreparable harm.*...Therefore, the motion for temporary restraining order/preliminary injunction (D.I. 7) is denied. (See Order at items 3-6) (emphasis added).

Rush respectfully submits that the Court's conclusions are in error; not supported by the relevant factual record, but are alternatively based on a misapprehension of the facts as manipulated by defendant CMS. It appears that the Court's decision failed to consider Rush's Reply –and his exhibits- in any meaningful and fair manner. Rush submits that each and every one of CMS's averments are belied by the relevant medical records; they are in irreconcilable conflict and incongruous with same and reconsideration and/or relief from judgment is warranted due to manifest misapprehensions of fact and/or misapplications of the controlling legal standard. Moreover, failure to grant Rush's TRO/PI will undoubtedly cause Rush to incur permanent injuries and to needlessly endure pain and suffering to a degree prohibited under the Eighth Amendment of the Constitution. Rush offers the following:

MISAPREHENSIONS OF LAW AND FACT:

The Court misapprehended both relevant facts and misapplied the relevant legal standard relating to the following conclusions:

    a. That the Hep C issue is moot because CMS is providing treatment, assuming Rush remains stable;
    b. That CMS is monitoring and treating Rush's Hep C condition;
    c. That Rush does not face permanent injuries relating to his Hep C condition;
    d. That Rush is receiving ongoing monitoring and treatment of his Lipomas;
    e. That the standard requires Rush's Lipomas to be life-threatening before he receives medical care; and
    f. That CMS's claim (e.g. Rush's Lipomas are a cosmetic and elective surgical procedure) is valid;
    g. That Rush's Lipomas do not pose an immediate threat to Rush's health.

(Incorporated herein are Rush's Response and Addendum and their exhibits).

    I.    CMS's claim that Rush is receiving treatment for his Hep C and thus is moot is false. and CMS's ostensible need to monitor and/or CMS's ostensible attempts to stabilize Rush's condition before beginning the Hep C treatments were equally false and belied by the records:

For example, not only has CMS not begun the promised "Interferon injections" ..."as of 10-[18]-07, but doctor McDonald directed Rush to begin the Ribavirin first in conflict with the manufacture's posted prohibitions." (see Rush's Adden). It appears that CMS is actually attempting to cause Rush to suffer an adverse reaction and thus create a bad faith justification to discontinue Rush's Hep C treatments. Indeed, Rush's medical records clearly establish that CMS actually employed a campaign of deception to deny providing Rush the Hep C care he requires to save his life and arrest the permanent injuries to his liver (e.g. liver choruses).

> CMS manufactured erroneous liver function counts and falsely stated Rush's liver function was improving, when Rush's labs demonstrated the exact opposite. (See Rush's Reply at p. 6) defendant S. Altman of CMS wrote Rush a response to the 10-06-06 Notice/Demand letter and Altman falsely claimed the 5/3, 5/15, and 9/15-06 labs demonstrated Rush's "liver function tests were not increasing but decreasing." (I.e. Thus Rush did not require the long sought after HCV treatments). (See TRO/PI Ex-section II at E-1). Altman's claim was patently false.... (See Rush's Reply at p. 6-7).

Also, CMS claims that Rush's platelets were too low and/or that his hypothyroidism precluded beginning the Hep C treatments at an earlier time were equally false.

> ➢ On or about 11-18-06, Niaz conducted a Clinic and announced Rush's platelets were too low to begin the liver biopsy or the HCV treatments (i.e. contraindicative), (See TRO/PI Ex, Section II at C 1-2 at items 5-18), [Niaz's claim was patently false. On 1-22-07, an Outside Hep C/Liver Specialist, Doctor Scott Hall, noted that the low platelets needed to be monitored during the Interferon treatments, but that" *there is no contraindication… to consideration of the hepatitis C therapy going forward… I do not feel that Rush needs any further testing or follow up.*" (See CMS's Res. At EX-b) (emphasis added) Therein, Rush's hypothyroidism was also considered and thus found not to preclude the HCV treatments. Also, Rush's rapidly falling platelets mandated immediate, aggressive HCV treatments, not more delay or denials. Indeed, like Altman's false claim, Niaz's also was the exact opposite of what Rush's documented objective medical factors mandated.]

> ➢ On 11-21-06, Rush challenged CMS's pretexts via letter to Altman. (See TRO/PI Ex, Section II at D-5), and on 12-01-06, Altman maintained the "Low platelets are a contraindication to the combination Interferon/Ribavirin treatment ...." (Id at II , D-6);

> ➢ December 2006, Vandusen conducted a HCV Clinic and continued CMS's bad faith pretext. (See TRO/PI Ex. Section II at C-2 items 14-26);

3

[Recall that Rush's labs disclosed low platelet counts as early as March 2003 and thereafter, between mid-2005 and May 2006, these same "low platelets" began a rapid negative progression, yet CMS did nothing to address the matter. However, as soon as defendants first pretext fails and Rush demands the HCV treatments, miraculously defendants became concerned with the low platelets. Moreover, instead of commencing immediate, aggressive HCV treatments, ironically defendants' response is more of the same: denial/delay of care.

➢ On 12-14-06, Rush received the belated liver biopsy that Niaz had ordered on 3-25-06, and this occurred absent any ostensibly needed platelet care;

➢ December 2006 (circa) defendant McDonald began Rush on thyroid replacement hormones for his hypothyroidism;

[Defendants wasted no time employing Rush's hypothyroidism as yet another pretext to deny/delay HCV care. Of course, this too proved patently false, because there is no relationship or contraindication between Synthroid (thyroid hormones) or hypothyroidism and the HCV treatments. Moreover, specialist Hall unequivocally confirmed the same on 1-22-07 and Vandusen concurred on 05-25-07. (See CMS's Res. At Ex-B & TRO/PI Ex Section II at A-3, items 2-11).

➢ On 1-22-07, outside specialist Scott Hall, M.D. ("Hall") unequivocally and conclusively refuted each and every one of defendants pretexts, and Hall explicitly stated that there was nothing to prevent Rush "from going forward" and "testing or follow up" was not needed. (See CMS's Res. At Ex-B).

[Thus, Hall's repost/recommendation for Rush to begin HCV treatment conclusively refuted: (a) Niaz and McDonald's claims that Rush's platelets were too low to conduct the liver biopsy/HCV treatments; and (b) McDonald's claim that Rush's hypothyroidism precluded the HCV treatments. Also, we know that Rush's concurrent labs proved Altman's claims false relating to Rush's ostensible improving liver numbers. Consequently, two disturbing and clear patterns emerge: 1. Defendants employed multiple claims that were not supported by legitimate medical factors; and 2. Each and every one was demonstrated as erroneous (i.e. not a legitimate medical factor). Perhaps defendants will now claim medical prudence or simple negligence (i.e. that until 1-22-07, they simply were not aware of the legitimate medical factors), but defendants subsequent act/omissions to act are more damning then the preceding. Any prudence/negligence claim is belied by the record. For example,

a. CMS began its contract in mid-July 2005;

b. As early as September 2005 Rush was diagnosed with HCV;

4

c.  Labs between March 2003 and May 2006 conclusively demonstrated a rapid negative progression in Rush's counts; and

d.  Rush was already over forty, difficult genotype, and had already demonstrated signs of early liver cirrhosis by late 2006.

September 2005 till Hall's January 2007 report/recommendation is a span of 15 months, in which defendants had a viable opening to begin Rush's HCV treatments, but defendants merely "monitored" Rush's high risk/chronic condition --a rapidly deteriorating condition- yet failed to take appropriate action to provide immediate, aggressive HCV treatments. CMS's act/omissions to act were not the result of legitimate medical factors or of any informed professional medical judgment. It is no surprise CMS/defendants fail to respond to these particular claims in Rush's TRO/PI, but alternatively provides a small snap-shot from January 2007 to August 2007. These facts are damning and they conclusively refute defendants' assertion that they were working on stabilizing Rush's condition before beginning the HCV treatments. Simply put defendants' acts/omissions to act were in conflict with the legitimate and known medical facts. Thus, the "some treatment" defense is distinguished. (See *Durmer v. O'Carroll*, 991 F.2d 64 (3d Cir. 1993)( ...the fact that plaintiffs were provided with treatment is not, by itself, enough to preclude an Eighth Amendment claim): *Greeno v. Daley*, 414 F.3d 645, 58-59 (7th Cir. 2005)(... defendants argue since he received on-going medical care, his claim is nothing more than a disagreement with a prescribed course of treatment...[but] a prisoner is not required to show that he was literally ignored...Likewise the **some treatment argument misses the possibility that the treatment Greeno did receive was "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate" his condition....**); *(Monmouth County Corr' Inst' Inmates of Allegheny County Jail v. Pierce*, 612 F. 2d 754, 762 (3d Cir. 1979)( restrictions unrelated to individual treatment needs states cause of action); cert. denied 486 U.S. 1066 (1989); *Tillery v, Owens*, 719 F.2d 418 (3d Cir. 1990) (As one court put it, "We will defer to the informed judgment of ... officials as to an appropriate form of medial treatment. But if an informed judgment has not been made, claim has been stated."); *Hamilton v. Endel*, 981 F.2d 1063 (9th Cir 1992) (Officials ... may not intentionally rely on medical opinion that is without adequate basis). Not only were defendants' medical opinions precluding HCV care without adequate basis, but they were actually false and evidence of bad motives can be inferred as subjective deliberate indifference. (See *Hughes v.*

5

*Joliet Corr' Center*, 931 F.2d 425, 428 (7th Cir. 1991); and *Mullen v. Smith*, 738 F.2d 317, 318-19 (8th Cir. 1984). (see Rush's Reply at p.p. 7-9).

Moreover, CMS specifically failed to follow the specialist's recommendations of doctor Scott Hall of January 2007, which was that Rush need not be further tested and that there was no contraindication present that would preclude Rush's Interferon treatments from going forward. Subsequently, some five months later –and no treatment- Rush experienced a near fatal esophagus hemorrhage that could have been avoided had CMS not created further bad faith delays in providing the needed and specialist's recommended care. The records show for example the following:

> Our Circuit held that a serious medical need is one diagnosed by a doctor as mandating treatment. (See *Monmouth County, supra*, at 347). Rush was diagnosed with HCV by a doctor in 2003, 2005, and 2006. Because Rush exhibited multiple high risk factors, his HCV condition mandated immediate, aggressive treatments. (e.g. Rush's rapidly negative progression of lab numbers). Defendants were well aware of these facts by virtue of Rush's persistence and Rush's medical records, but defendants failed to act in accord with the legitimate medical factors and continued to fail to act in accord with the specialist's explicit recommendations. Rush stated a sufficient claim and supported same with objective evidence. (See Young v. Harris, 509 F. Supp 1111, 1113-14 (S.D. NY 1981) (Allegations state a claim on theory that defendants' failed to provide Young whit *prescribed treatment* or that they have unreasonably delayed his access to such treatment); *Johnson v. Lockhart*, 941 F.2d 705, 706-7 (8th Cir. 1991) (10 month delay in surgery that doctor recommended be done within days is a failure to act on medical recommendation and is actionable); and *Hamilton v. Endel, supra* at 1066-67 (Holding that Officials' disregarding a surgeon's recommendation on non-medical grounds could state claim). It is undisputable that as of 1-22-07, defendants had no legitimate medical factor to continue to deny/delay Rush his needed HCVLDC treatments, and alternatively did have multiple legitimate medical factors that mandated immediate, aggressive HCV care. Defendants failed to provide the mandated HCV care and thus exposed Rush to an unnecessary life-threatening emergency and permanent injuries in June 2007.]

➢ On 3-27-07, Rush is finally provided the Interf. Ed. and actually signed the accompanying "Informed Consent" form (See DDOC's Resp. at Ex-D);

6

> On 4-18-07, defendant Chuks had to reorder the "unnecessary labs" which were noted by defendants as required before any HCV care; however, was in complete conflict with Hall's specialized opinion;

> On 5-25-07, Rush met with defendant Vandusen who entered the following: *"Scheduled ASAP with Dr. McDonald to resolve issue of starting Hep C meds."* (See CMS's Res. At Ex-C);

[Note that Rush was experiencing an acute outbreak of jaundice between 05-14-07 and early June 2007, which was likely a precursor and or warning of Rush's upcoming esophagus rupture. Vandusen failed to address Rush's obvious serious symptom and no entry appears in Rush's medical records on 5-25-07 of the acute jaundice. Vandusen did request an "Ammonal level/PT/ INR" but it is unclear why) (See CMS's Resp. at Ex-C)].

> On 6-24-07 (circa) Rush experienced a needless and/or preventable massive hemorrhage to his esophagus as a direst result of his failing liver and quickly deteriorating condition. Indeed, post op definitively revealed this fact. (See CMS's Resp. at Ex.-E);

[Thus, Rush was exposed to a near fatal emergency episode some five months after Hall's 1-22-07 recommendation to begin HCV treatments, but HCV treatments typically last six months, and had defendants not ignored and acted in conflict with Hall's recommendation, it is likely Rush's rapid progressive deterioration would have been arrested and likely that Rush's esophagus would not have ruptured causing massive hemorrhaging. CMS's claim to have worked to "stabilize" Rush's condition on Feb. 13, March 24, April 18, May 25, and August 2007, is absolutely false and in irreconcilable conflict with the undisputable facts. Rush's esophagus did not rupture until late June 2007 and Hall explicitly stated No contraindication or nothing present to preclude Rush's HCV treatment from beginning –on 1-22-07. Rush's condition was already stabelized and CMS's claims are incongruous and disingenuous.] (See Rush's Reply at p.p. 10-11).

Consequently, CMS's claim to be monitoring and treating Rush's Hep C condition is nothing more than a bad faith pretext. The records are definitive on this conclusion. Rush enjoys a likelihood of success on the merits. Moreover, Rush faces irreparable injuries –if not premature death- if the Court does not reconsider its denial, because the undisputable records indicate that Rush has already suffered stage three liver choruses/disease and his condition is quickly deteriorating and may preclude a lost chance of recovery.

7

II. It was an abuse of discretion and/or manifest injustice for the Court to rely on defendant's medical expert but fail to consider Rush's motion for an independent expert to aid the trier of fact with specialized medical issues of material fact via a Rule 65 hearing:

Rush simultaneously filed a motion for the appointment of an independent medical expert with his Reply. (D.I. _____) (Rush incorporates Motion for independent expert herein).

Indeed, in view of the highly contested issue and lack of credible unbiased expert medical opinion, it was error for the Court to deny any hearing and/or the appointment of an independent expert opinion to determine this intensive and complicated medical question. Granted, it is in the Court's discretion to hold a hearing under Fed. R. Civ. P., rule 65 before granting or refusing a TRO/PI, it was nevertheless warranted in this instance to reconcile highly disputed material facts. (See *McDonalds Corp. v. Robertson*, 147 F.3d 1301, 1311-13 (11th Cir. 1998) ("Rule 65 does not [always] require an evidentiary hearing; "undisputed material facts require no hearing, but "bitterly disputed facts do...."). Rule 702 provides, in pertinent part,, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert... may testify thereto...." (See *Helling v. McKinney*, 509 U.S. 25, 113 S.Ct. 2475 (1993)( Suggesting appointment of expert witness on the health risks of environmental tobacco smoke). Our Sister Circuit advised that complex medical diagnosis makes expert witnesses necessary.( See *Ledford v. Sullivan*, 105 F.3d 354, 358-59 (7th Cir. 1997). And the Third Circuit has stated that that when defendants utilize expert to prove their case, the denial to a plaintiff is manifest injustice. (See *Parham v. Johnson*, 126 F.3d 454, 460 (3rd Cir 1997). Consequently, defendant CMS utilized doctor's affidavits as expert testimony on a highly contested issue; an issue in which defendant CMS appears to have grossly misstated material facts in order to support preposterous medical claims. To deny plaintiff's uncontested motion for an independent expert is manifest injustice. Rule 706 provides for that independent expert medical opinion, and the Court should have given great weight to considering the appointment to shed light upon this disputed medical fact issue. Indeed, our Sister Circuit also opined on the matter in *Spann v. Roper*, 453 F.3d 1007, 1008-09 (8th Cir. 2006) (found "it was incongruous of the district court to have denied Spann's motion for expert witness and than grant summary judgment, in part, based on Spann's failure to provide verifying medical evidence that the delay had detrimental effects.) Granted, this Court did not grant a summary judgment against Rush, but it did nevertheless make a final determination as to his request for a TRO/PI under significantly similar circumstances and reconsideration and/or rehearing is warranted to right a manifest injustice.

Lastly, the records clearly demonstrate that CMS had no intention to treat Rush's Hep C, but had actually written them off. For example, Rush noted the following:

> On 8-22-07, Vandusen noted: "Stop NSAIDS" "Schedule repeat ammonia level" and "Have Deb R. schedule follow up ccc. (See CMS's Resp. at Ex-C);

> On 8-23-07, Vandusen noted in the Plan: Medication changes section of the Clinic report: "Stop Protocol", Stop NSAIDS" F/U 2 months ccc 10-19-07."
> (i.e. Next scheduled Clinic on 10-19-07) (Id).

[Consequently, McDonald specifically entered into Rush's records on 8-18-07 "Not a candidate...cirrhosis," and intentionally refused to reschedule Rush for any further HCV Clinics. Subsequently, Vandusen sees Rush for his thyroid Clinic and he also enters "Stop Protocol." Clearly, as of August 2007, defendant had explicitly written off providing any HCV treatment to Rush once and for all. Defendants were content to simply "monitor" his dire condition with some morbid fascination until Rush died a painful and agonizing death. No other Clinic was schedule, and the only one that was, was with Vandusen for another matter on 10-19-07. The records are conclusive on this matter. Thus, defendants claims to be working to stabilizing Rush's condition throughout Aug 2007 was also false, and their claim to this Court to have scheduled Rush for begin HCV treatments on 9-29-07 is equally false. No such record existed prior to the Court's intervention on Rush's behalf and in response to his TRO/PI. Indeed, Altman even documented McDonald's final August 2007 denial. (See Ex- C). The records refute and belie defendants' claims and they have no credibility whatsoever. (See Rush's Reply at p.p. 12-13)

Consequently, CMS's claims to be monitoring and treating Rush's Hep C are clearly belied by the record and the Court has misapprehended the relevant facts.

III. CMS's claim that Rush is receiving ongoing treatment for his lipomas is false; CMS's unilateral declaration that said Lipomas are cosmetic/elective is false; CMS's claim that said Lipomas do not present a threat to Rush is false; and Rush has established that his Lipomas are a serious medical condition –nor does the standard require that said condition be life-threatening:

---

First, Rush's medical records clearly demonstrate the following: It was the dermotologist that recommended that Rush's Lipomas warranted a rescheduling for excision. This is the substance of Rush's claim of experiencing painful late-stage Lipomas. Thus, Rush had supporting medical evidence. Moreover, it was defendant CMS who subsequently declared to the specialist (i.e. dermatologist) that CMS would not reschedule Rush for the recommended excision and it was CMS who unilaterally declared –in conflict with the specialist's recommendation- that said excision of Lipomas were cosmetic/elective. CMS did not support its unilateral declaration with any relevant medical rationale whatsoever. CMS merely countermined the specialist's recommendation for excision and has subsequently refused to provide any treatment whatsoever for Rush's painful Lipomas. Rush demonstrated all the above with sufficiency. See below:

9

For example Rush claimed significant impairment of his "normal daily functions" which shall mean as it specifically related to Rush's acute-late stage Lipomas: "( Significant impairment of Rush's normal daily functions shall mean the following: (a) A substantial impairment of grip, mobility, and range of motion in both of his arms; (b) A substantial impairment of his ability to lift or carry nominal weights exceeding ten pounds; and (c) A substantial impairment in his ability to bath, sleep, work, and/or promote good health via meaningful exercise.

(See TRO/PI at item 4 and foot note 1). Rush supported same w/objective documentation of collateral injuries
(Head injury an employment incident) that resulted in loss time of work. (TRO/PI, Ex. Section I at G item 1-4) and multiple notices of same (Id at H item 1-10). Again Defendant's conveniently omit these documented facts from their claim: that Rush's Lipomas are not a serious medical condition. But under these facts, the appropriate standard finds that a medical condition is serious if it "significantly affects an individual's daily activities. " (See *Tillery v. Owens*, 719 F Supp. 1256, 1286 ( W.O. Pa 1989) Affirmed, 907 F2d 418 ( 3rd Cir. 1990), 930 F2d 1150, 54-55 ( 6th Cir. 1991) ( "Conditions that cause pain, discomfort, or threat to good health states a claim.), and *Jones v. Evans* 544 F. Supp. 769,775 at note 4 ( N.D.Ga. (1992) (and serious cumulative effects from repeated denial of care with regard to even minor needs may state a claim). Indeed, Rush claimed that his significant impairment resulted in his injured right shoulder- a residual and tangible injury. (TRO/PI at item 4 (b) and exhibits). Regardless, Rush claimed significant impairment in his ability to sleep, work, promote good health vise meaningful exercise, and grip, carry, lift objects in excess of ten pounds, and that the range of motion in his arms is severely limited -- so much so- that Dr. Durst mistook his residual, right shoulder injury for a torn rotator cuff. At Durst's examination Rush was unable to lift his arm beyond horizontal. In *Jackson,* a medical condition that threatens one's ability to walk, even it ultimately reversible, is unquestionably a serious matter. (See *Jackson v. Fauver,* 334 F. Supp. 2nd 697 _____ ( D.N.J. 2004). Here Rush can walk but his ability to lift, carry, manipulate his arms and/or shower and bath himself absent excruciating pain and suffering is threatened and thus a serious medical condition.
The Court does not have to accept Rush's subjective or objective proof of his significant pain and suffering and impairment of normal daily functions as

10

establishing the first prong (i.e. serious medical condition) because Rush's claims have been objectively verified repeatedly.

For example, Rush's late stage acute Lipomas were diagnosed by doctors/surgeons as requiring excision on the following.

a)    2/10/06 Lipomas excision, Messinger ("General Surgery" (Excision per Lee Ann").

b)    4/17/06 Surgery consult request, Messinger, (Please Reprocess).

c)    4/28/06 by Bolansy (outside surgery Surgeon recommendation). For general surgery."... reschedule for excision... 2 upper arm + 1 forearm Lipomas". ( this was also signed off by Durst on 5/1/06, ( See TRO/PI, EX Section I at K p.p. 1-4).

d)    3/16/05 Dr. Alie for "further evaluation or excision" and this Consult was coded *"Urgent" (1-2 week)* (See TRO/PI ex, Section I at I. p.p. 1-6). Consequently, Rush's Lipomas were recommended for excision five times ( e.g. 3/16/05, 2/10/06, 4/17/06, 4/28/06, 5/1/06), but never provided. Moreover, the 4/28/06 recommendation to "reschedule for excision" was from an outside surgeon/specialist, Defendant's ignored the specialist's diagnosis and recommendation for excision despite the legitimate medical factors and in conflict with same. Such act/omissions to act support the second prong of Defendant's subjective denial & needed care. (See *Johnson v. Supra* at 706-07 (10 month delay in surgery that doctor recommended be done within days state claim), and our Circuit added that a patient who experienced pain while awaiting a delayed operation stated claim. (See *West, Supra* at 161-62). Here a specialist recommended surgery to remove Rush's painful Lipomas on 4/28/06. It is now 10/06/07 and seventeen months have elapsed, yet Rush still suffers needless pain. Rush's pain and impairment has been noted by the above physicians and layman alike (see TRO/PI at ex-Section I, at F-2). It is not surprising Defendant's failed to address the claims Rush actually made and supported with his medical records and other relevant documentation, but alternatively created a phantom claim to refute. Defendant's engage in a classic red herring tactic and their averments are factually and legally frivolous.

Moreover, it is incongruous for Defendants' to now claim that Rush's acute late stage Lipomas are not a "serious medical condition.", because CMS and the DDOC have both admitted to the contrary. For example, Rush filed an Emergency Medical Grievance ("EMG") # 21535 in which Rush made all of the above claims and also added that CMS had employed a custom/policy to deny

11

the needed care absent legit medical factors. DDOC agreed and "*Upheld*" Rush's EMG requesting excision (See TRO/PI ex. I at H p.p. 3-10). Also, Rush sent a complaint/notice to CMS on 2/20/06 -- complaining of pain etc- and CMS found Rush's complaint/claim "*to be with merit*". (Id at J-1). Despite Defendant's conceding the merit of Rush's claims and despite the surgeon's recommendation, Defendants' actually documented "their" unilateral finding --in conflict with the specialist- that the surgery was "elective" and Defendants' consequently *informed the outside specialist that his diagnosis was therefore incorrect..* (I.D at H-5). This is clearly contrary to the legit Medical factors and it clearly supports Defendants' culpable conduct. Rush enjoys a likelihood of success on the merits.

Additionally, Defendants' claim to "have monitored and treated his condition (CMS'S Response at item 5). If is true that Defendant's monitored Rush's needless suffering and impairment over an inordinately long time period (e.g. September 05 to the present) (some 25 months), but Defendants' clearly did not provide the needed or recommended treatment. Alternatively Defendants' continued a course of treatment ( e.g. prescribed massive doses of Motrin) that they know were ineffective, painful, and/or entailed substantial risk of serious harm to Rush. (See *White, supra* at 109). For example, the same doctors – Defendants- who were intimately aware of Rush's acute HCV/LDC condition, nevertheless prescribed a class of pain-killers that is prohibited and/or aggravated said condition. ) Rush incorporates pertinent claims above, herein). McDonald even admitted as much!

Also, the fact that Defendants' continuously prescribed Rush pain Meds, demonstrates that Defendants' knew Rush was suffering and that his condition required constant meds to manage the pain. Our Circuit in *Spruill v. Gillas*, 372, F3d 218, 235-236 (3rd Cir. 2004) (held that inmates "back condition itself that allegedly required significant and continuous medication, causing excruciating pain and a tangible threat of falling or collapsing incidents, stated a cause of action) Moreover Spruill's alleged pain/back condition was purely subjective, but here Rush enjoys objective independent evidence of his suffering and impairment and related accidents.

Consequently Defendant's claim of cosmetic/elective surgery is without merit and is in conflict with Rush's legit objective medical factors. So is their claim of incurring incredible expense because Lipoma excision merely involves a local anesthetic and outpatient minor surgery. Indeed had Defendant's provided

the recommended excision in a timely manner, Rush would not now have to experience permanent nerve or tissue damage as a result of the delayed excision.

Indeed an inmate named Flynn had a "golf-ball sized" fatty tissue lump (i.e. Lipomas) removed June 2006- one year after diagnosis on June 2005- and the district court found Flynn stated a cause of action, because it had caused irreparable nerve and tissue damage ( i.e. scar tissue from the delayed procedure). (See *Flynn v. Doyle*, C.A. No. 06c-537-RTR (May 1, 2006) (U.S.D.C ED. WI). Reliance on some treatment is fatally flawed.

Lastly, Defendant's offer Conlon's Aff't, however, he does not state the requisite under F.R.E. 602 of having personal knowledge of Rush's particular Lipoma condition, thus his opinions violate F.R.E. 602 and is immaterial as it relates to Rush's acute condition. Alternatively, if the Court gives Conlon's Aff't. consideration, then it is under a general medical opinion and because this matter is highly disputed, Rush would face manifest injustice. If Defendants were permitted to utilize a medical expert, but deny Plaintiff the appointment of an independent Medical Expert to aid the trier of fact.

Granted, it is in the Court's discretion to hold a hearing under Fed. R. Civ. P., rule 65 before granting or refusing a TRO/PI, it was nevertheless warranted in this instance to reconcile highly disputed material facts. (See *McDonalds Corp. v. Robertson*, 147 F.3d 1301, 1311-13 (11th Cir. 1998) ("Rule 65 does not [always] require an evidentiary hearing; "undisputed material facts require no hearing, but "bitterly disputed facts do...."). Rule 702 provides, in pertinent part,, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert... may testify thereto...." (See *Helling v. McKinney*, 509 U.S. 25, 113 S.Ct. 2475 (1993)( Suggesting appointment of expert witness on the health risks of environmental tobacco smoke). Our Sister Circuit advised that complex medical diagnosis makes expert witnesses necessary.( See *Ledford v. Sullivan*, 105 F.3d 354, 358-59 (7th Cir. 1997). And the Third Circuit has stated that that when defendants utilize expert to prove their case, the denial to a plaintiff is manifest injustice. (See *Parham v. Johnson*, 126 F.3d 454, 460 (3rd Cir 1997).(See Rush's Reply at p.p. 14-17).

Also, see Rush's Addendum at the following items:

7. Rush met doctor _____, (European descent), on 10-12-07, and he immediately stated they do not normally do anything for Lipomas unless they are pinching the nerves or causing damage to the blood vessels.

8. Rush showed the doctor his left arm, in which his Lipomas were indeed pinching multiple nerves in his arms and causing deep bruising and damage to the blood vessels.

9. The doctor told Rush to take off his shirt, and he subsequently noted multiple large Lipomas and damage to Rush's left arm.

10. Rush began to demonstrate how he was unable to perform normal daily tasks: such as washing his back or cleaning motions, but the doctor just talked over Rush and asked him what he was in jail for.

11. Rush questioned the doctor as to what that had to do with Rush's medical condition?

12. The doctor then asked Rush how much time he had left to do on his sentence?

13. Rush again stated that he did not know what or why his conviction or sentence had to do with him receiving medical care for his painful condition.

14. Rush was offended and his present sense impression of the doctor's unprofessional inquires was that the doctor was passing judgment upon Rush and somehow this factored into whether Rush was going to receive care.

15. The doctor then stated that he wanted to know whether Rush had used (illicit) drugs in the past two years, and Rush was startled by the doctor's evasiveness and Rush questioned him "What is this all about."

16. "Well, the Lipomas could be caused by doing certain drugs, and I see that you have Hepatitis C, and you can't begin Hep C treatments if you have done any drugs in the past two years," replied the doctor.

17. Rush exploded, "My Lipomas are not caused by any drug use; it's clearly documented that they are hereditary in my records and I haven't done drugs in over twenty years. My Hep C treatments have not begun yet and I did not come here today to see you about my Hep C."

18. Rush continued, "Now I'm in pain here and what are you going to do about it.

19. "Well, the Hep C issue must be considered," the doctor replied, "because we can no longer prescribe you Motrin for your problem."

20. Rush asked what alternatives were available and the doctor merely hunched his shoulders and shook his head.

21. "I can't help you; I think we are done here," said the doctor.

22. Rush received no treatment, no meds, and no viable medical plan for his diagnosed and obviously painful Lipomas. ...[ end of Addendum].

It is unclear what relevant, independent, and/or accurate medical information the Court based its denial of Rush's reasonable request to have his painful Lipomas excised, but it appears that an independent expert should have been consulted, and the decision warranted careful consideration within the confines of a rule 65 hearing. Rush incorporates his arguments above for same herein as appropriate.

WHEREFORE, Rush prays that this Court reconsider its denial of his TRO/PI and appoint an independent medical expert for the purpose of conducting a thorough and informed rule 65 hearing.

*David Rush* (signature)                                                        10-19-07

David Rush, SBI 173418, 1181 Paddock Rd. Smyrna, DE 19977                       Date

## CERTIFICATE OF SERVICE

I, David Rush, do swear that I have caused to be delivered the following filings:

1. PLAINTIFF'S MOTION FOR RELIEF FROM JUDGMENT ;

2. _____

On the following defendants by placing same in a U.S. Mail Receptacle at the DCC Prison on 23rd day of October 2007.

(CMS Counsel)

James E. Drnec, Esq.
(Counsel for CMS, et al)
711 King St.
Wilmington, DE 19801

(STATE COUNSEL)

BALICK & BALICK
(Counsel for State)
711 King Street
Wilmington, DE 19801

*David Rush*
David Rush, 173418
W-1, D-16
1181 Paddock Rd.
Smyrna, DE 19977

I/M: DAVID RUSH
SBI# 173418  UNIT W
DELAWARE CORRECTIONAL CENTER
1181 PADDOCK ROAD
SMYRNA, DELAWARE 19977



U.S. District court
844 King St.
Lockbox 18
Wilmington, DE 19801-3570

U.S.M.S.
X-RAY