IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DAVID RUSH, | ) |
|     Plaintiff, | ) |
| v. | )   C.A. 07-514-SLR |
| CORRECTIONAL MEDICAL SERVICES, Inc, et al, | ) |
|     Defendants. | |

<u>RUSH'S OBJECTION TO "DEFENDANT'S RESPONSE TO COURT'S ORDER"</u>

Plaintiff, Rush, pro se, comes now, pursuant to any applicable F. R.Civ. P. and/or Delaware Local Rule, and objects to CMS's response to the Court's 11-16-07 Order (D.I. 39). Rush is pro se and he seeks pleading leniency under *Haines v. Kerner*, 404 U.S. 519 (1972). Rush offers the following:

<u>Nature and Stage of TRO/PI Hep C Treatments</u>

Rush filed his TRO/PI on 9-12-07( D.I. 7-8). Therein, Rush made a request for immediate, emergency medical care for his quickly deteriorating Hepatitis/liver cirrhosis condition. On 9-12-07 this Court Ordered CMS and the Attorney for the State of Delaware ("DDOC"), to respond to Rush's TRO/PI. CMS and DDOC responded on 9-19-07 ("CMS's Res") (D.I. 18-20).

Therein, CMS stated to this Court that it was working to stabilize his condition and had scheduled to begin Rush's Hep C treatments on 09-29-07. Rush's medical records; however, *belie CMS's claim because as of August 2007 CMS had discontinued Rush's Hep C care and no other Chronic care Clinics were scheduled to occur in September or October for the Hep C condition*. (See D.I. 32 at item I). The records conclusively establish CMS's false statements to the Court.

Moreover, CMS did not begin Rush's Hep C treatments on 09-29-07 as promised (D.I. 19). Alternatively, CMS attempted to cause an adverse reaction by directing Rush to violate the pharmaceutical manufacturer's posted warnings regarding the Interferon/Ribavirin protocol (i.e. begin the Ribavirin first without the Interferon injections). The Court accepted CMS's statements, however, and denied Rush's request for emergency care. (D.I. 25).

Rush filed for reconsideration (D.I. 32), and noted CMS's false statements and failure to begin the Hep C treatments. Subsequently, the Court ordered CMS to reply on 11-16-07 (D.I. 39). CMS filed a response to the Court's Order (CMS's response). CMS's response is nearly 100 percent false and CMS commits perjury and forgery in its response. Rush objects to CMS malfeasance and request immediate, emergency treatment for his Hep C/liver cirrhosis before his condition passes the point of viable recovery. The likelihood of Rush's deliberate indifference complaint morphing into a wrongful death suit is substantial and Rush's condition cannot afford further delay or bad faith. Rush offers the following:

    I.    The Court's Order stated in pertinent part:

FILED
DEC - 5 2007
U.S. DISTRICT COURT
DISTRICT OF DELAWARE
BD Scanned

> ... In responding to plaintiff's motion for injunctive relief, CMS made representations to the Court that, assuming plaintiff remained stable, he would begin Hepatitis C treatment on September 29, 2007. Plaintiff's current motion raise[s] a concern inasmuch as he states that he is not receiving the "promised Interferon injections" for his Hepatitis C condition but, rather, was directed to first begin Ribavirin. (D.I. 32) Plaintiff indicates that Ribavirin is contraindicative for his condition. [Ribavirin alone is contraindicative according to Roche pharmaceutical] *CMS did not address this issue* in its opposition to the motion for reconsideration. Accordingly, CMS, shall within four days from the date of this order, *advise the court if Rush is receiving the appropriate medical treatment for his Hepatitis C as it previously represented to the Court.* (D.I. 39). (emphasis added).

On 11-20-07, CMS filed its response to the Court's order. Therein, CMS commits perjury and fraud to this Court. Also, CMS misleads the Court and fails to address Rush's concern about the Roche's posted warning against taking Ribavirin alone.

    1. CMS never began the Interferon injections, not did CMS ever offer Rush to begin them at any time before the date of the instant objection. CMS's claim is patently false.

    2. The records CMS provided conclusively established Rush's claim about CMS directing him to begin the Ribavirin alone in direct conflict with Roche's posted Ribavirin protocol warnings; however, CMS failed to explain any reasoning for violating the drug manufacturer's posted warning. Rush provided the Court with the warnings in his reconsideration. Moreover, McDonald conceded this fact when Rush confronted him. (See Ex-A Roche's Drug information for Ribavirin and Ex-B Rush's Aff't at item 2-10).

    3. CMS presented false statements and fraudulent medical records in order to mislead the Court and disguise CMS's malfeasance.

    For example, CMS stated that McDonald saw Rush on 09-29-07. (See Ex-A of CMS's response). **This is patently false**. The record CMS offers as an exhibit is fraudulent. First, Rush was never scheduled to attend any Clinic for his Hep C or any other function at the hospital on September 29, 2007. (See Ex-C Offender Activity Schedule for W-1 Building) Rush is housed at W building and his name would have appeared on this list to notify both security and Rush to the scheduled hospital appointment. Neither was Rush called into the hospital for any appointment, and in fact, Rush was at an Honor Visit with his parents on 09-29-07 from 10:45 until 2:45 PM. (See Ex-D Notarized Affidavit from Edward R. Rush). If the Court is unconvinced of CMS's false entries, then the matter can easily be settled by ordering DOC to provide the Inmate Destination Sheets for the following: (a) W-bldg, (b) Hospital, and (c) Search Room for 9-29-07. Rush's condition does not allow unnecessary delay, however, and Rush respectfully requests the Court to act with this in mind.

    Incredibly, CMS even forged Rush's vital signs in the 9-29-07 forgeries in order to give the appearance of legitimacy; however, who's vitals they are, is anyone's guess because Rush was never at any 9-29-07 hospital clinic. Also, note that the entries are signed by McDonald, but they are simultaneously written in the third person voice. If McDonald was actually at the hospital on 9-29-07 and if he actually forged the entries himself, then why

2

would he make entries in the third person voice as if he were talking about himself? CMS is sloppy with its malfeasance. This behavior cannot be permitted to continue.

CMS claims to have ordered the Ribavirin and Interferon on 09-29-07 (Ex-B of CMS's response), however, this entry was evidently generated sometime afterwards. It is likely these false records were generated after the Court ordered CMS to respond, but it is unclear at this point. The Court could determine the actual date of order by requesting hard copy order forms from the pharmaceutical supplier or manufacturer. This may not be essential to the issue though. Note, however, an interesting entry appears in the 9-29-07 forgery: "*when approved start Ribavirin....*" (Id at Ex-B). If CMS had scheduled Rush to begin the Hep C treatments on 09-29-07, then why is their an entry that states "when approved...." ? This appears incongruous.

CMS claimed that more tests were ordered (e.g. chest x-ray and EKG), for the purpose of ensuring against *complications*. (Id). This is absurd. First, the chest x-ray and EKG is part of the early protocol and they were already conducted. Moreover, specialist Scott Hall in January 2007, specifically stated that their only concern to be monitored closely regarded Rush's low platelets. Also, CMS has conducted acts that have greatly aggravated Rush's condition and they appear designed to do just that. (e.g. prescribed massive doses of Motrin –a known contraindicative medication- prescribed iron tablets –a known contraindicative supplement- and directed Rush to take the Ribavirin alone, in conflict to drug manufacturer's posted warnings –also contraindicative). Indeed, is it any surprise that CMS stated: "*Assuming plaintiff tolerated the Ribavirin*, he was scheduled to begin receiving the Interferon ... November 2, 2007." (CMS's response). Rush was not expected to tolerate the Ribavirin, because CMS had given erroneous directions to Rush and had expected to capitalize on the adverse reaction. CMS's acts and statements are not copasetic. In reality CMS is merely stalling for time in order to capitalize on Rush's rapidly worsen condition so that CMS may create a justification to discontinue the Hep C protocol. Rush specifically stated this caveat and supported same with evidence, and now it appears that CMS may have succeeded in its bad faith. The pattern is clear and unmistakable.

CMS claims that Rush was scheduled to begin the Ribavirin on 10-29-07. This is the only truthful statement that CMS made in its response. But we know that Roche pharmaceutical posted a warning specifically prohibiting the administration of Ribavirin alone. CMS has not responded to this. In any event, the fact that CMS did provide the Ribavirin does not support its claim to have begun Hep C treatments on 09-29-07, because absent the Interferon injections, no Hep C treatment has actually begun. This is fact. Moreover, Rush confronted McDonald on 11-10-07 about Roche's posted warning, and McDonald conceded the concern but he still directed Rush to take the Ribavirin as if McDonald had not just conceded the issue. (See Ex-B at items 2-21).

Rush did meet with McDonald on 11-10-07, but at no time prior or during this visit was Rush offered Interferon injections. Moreover, CMS claims that McDonald discussed the "protocols and risk factors" with Rush on 11-10-07, but Rush "declined to engage in the protocol..." **This is patently false**. First, the issue of whether Rush wished to continue with the protocol has already been settled. Rush demanded of McDonald to begin the Interferon injections, but McDonald became evasive and changed the subject. (EX-B Rush's Aff't). Second, McDonald never asked Rush again whether he would agree to take the Interferon injections or Hep C treatments.

3

Rush has already signed a "Consent" to treat form. Why would McDonald repeat this settled issue. It is absurd to even make such a statement. Moreover, had Rush "declined" the Hep C treatment, then DOC hospital regulations mandate that the patient sign a "Refusal" form. No form exists. Had Rush refused to sign the "Refusal" form, then security would have been required to (a) Witness Rush's refusal to sign the form (in which case a witnessed form would still exist), and (b) File Disciplinary Charges against Rush. Indeed, Rush would not been permitted to leave the hospital without signing the "Refusal" form. This is a strictly enforced regulation. CMS did not provide any such Refusal form or witnessed unsigned Refusal form, because they do not exist. CMS again commits fraud. CMS's ill fated attempts are sloppy and shocking.

CMS also claims that Rush refused his Interferon injection on 11-02-07. **This is patently false.** No Interferon injections were offered to Rush on the second. Rush did not refuse and had he done so, again there would be a refusal form or disciplinary write up none exist however because CMS's self-serving albeit disingenuous feeble attempts to commit fraud are transparent. It is unlikely that DOC will face liability to support CMS's fraudulent activity, but Rush invites the Court to follow up on the matter. Rush has nothing to hide. In addition, CMS offers an absurd justification to Rush's alleged 11-02-07 refusal: "refuse the Interferon on November 2, stating that he did not believe it was appropriate to administer the drugs separately." (CMS's response at item 2). This is absurd, because Rush already possessed the Ribavirin. He could have received the Interferon injection and then returned to his room and took the Ribavirin. Rush did not say any such ridiculous thing, nor would he have. Evidently, CMS is attempting to paint a picture of Rush as being manipulative or indecisive regarding the Hep C treatment or this litigation, but CMS paints a picture with a dry stick and the facts belie CMS's fraud. Lastly, Rush gave blood for labs on 11-02-07 and nothing more. No Interferon injections were mentioned or offered in any capacity whatsoever. (See Ex-E Employee Attendance report for Rush on 11/02/07.

Lastly, CMS's pattern of deception is unmistakable:
For example, Rush's medical records clearly establish that CMS actually employed a campaign of deception to deny providing Rush the Hep C care he requires to save his life and arrest the permanent injuries to his liver (e.g. liver cirrosis.)

> CMS manufactured erroneous liver function counts and falsely stated Rush's liver function was improving, when Rush's labs demonstrated the exact opposite. (See Rush's Reply at p. 6). Defendant S. Altman of CMS wrote Rush a response to the 10-06-06 Notice/Demand letter and Altman falsely claimed the 5/3, 5/15, and 9/15-06 labs demonstrated Rush's "liver function tests were not increasing but decreasing." (I.e. Thus Rush did not require the long sought after HCV treatments). (See TRO/PI Ex-section II at E-1). **Altman's claim was patently false....** (See Rush's Reply at p. 6-7).

Also, CMS claims that Rush's platelets were too low and/or that his hypothyroidism precluded beginning the Hep C treatments at an earlier time were equally false.

4

> ➢ On or about 11-18-06, Niaz conducted a Clinic and announced Rush's platelets were too low to begin the liver biopsy or the HCV treatments (i.e. contraindicative), (See TRO/PI Ex, Section II at C 1-2 at items 5-18), [Niaz's claim was patently false. On 1-22-07, an Outside Hep C/Liver Specialist, Doctor Scott Hall, noted that the low platelets needed to be monitored during the Interferon treatments, but that" *there is no contraindication… to consideration of the hepatitis C therapy going forward… I do not feel that Rush needs any further testing or follow up."* (See CMS's Res. At EX-b) (emphasis added) Therein, Rush's hypothyroidism was also considered and thus found not to preclude the HCV treatments. Also, Rush's rapidly falling platelets mandated immediate, aggressive HCV treatments, not more delay or denials. Indeed, like Altman's false claim, Niaz's also was the exact opposite of what Rush's documented objective medical factors mandated.]

> ➢ On 11-21-06, Rush challenged CMS's pretexts via letter to Altman. (See TRO/PI Ex, Section II at D-5), and on 12-01-06, Altman maintained the "Low platelets are a contraindication to the combination Interferon/Ribavirin treatment …." (Id at II, D-6);

> ➢ December 2006, Vandusen conducted a HCV Clinic and continued CMS's bad faith pretext. (See TRO/PI Ex. Section II at C-2 items 14-26); [Recall that Rush's labs disclosed low platelet counts as early as March 2003 and thereafter, between mid-2005 and May 2006, these same "low platelets" began a rapid negative progression, yet CMS did nothing to address the matter. However, as soon as defendants first pretext fails and Rush demands the HCV treatments, miraculously defendants became concerned with the low platelets. Moreover, instead of commencing immediate, aggressive HCV treatments, ironically defendants' response is more of the same: denial/delay of care.

> ➢ December 2006 (circa) defendant McDonald began Rush on thyroid replacement hormones for his hypothyroidism; [Defendants wasted no time employing Rush's hypothyroidism as yet another pretext to deny/delay HCV care. Of course, this too proved patently false, because there is no relationship or contraindication between Synthroid (thyroid hormones) or hypothyroidism and the HCV treatments. Moreover, specialist Hall unequivocally confirmed the same on 1-22-07 and Vandusen concurred on 05-25-07. (See CMS's Res. At Ex-B & TRO/PI Ex Section II at A-3, items 2-11).

5

> ➤   *On 1-22-07, outside specialist Scott Hall, M.D. ("Hall") unequivocally and conclusively refuted each and every one of defendants pretexts, and Hall explicitly stated that there was nothing to prevent Rush "from going forward" and "testing or follow up" was not needed.* (See CMS's Res. At Ex-B).

Thus, Hall's report/recommendation for Rush to begin HCV treatment conclusively refuted: (a) Niaz and McDonald's claims that Rush's platelets were too low to conduct the liver biopsy/HCV treatments; and (b) McDonald's claim that Rush's hypothyroidism precluded the HCV treatments. Also, we know that Rush's concurrent labs proved Altman's claims relating to Rush's ostensible improving liver numbers. Consequently, two disturbing and clear patterns emerge: 1. Defendants employed multiple claims that were not supported by legitimate medical factors; and 2. Each and every one was demonstrated as erroneous (i.e. not a legitimate medical factor). Perhaps defendants will now claim medical prudence or simple negligence (i.e. that until 1-22-07, they simply were not aware of the legitimate medical factors), but defendants subsequent act/omissions to act are more damning then the preceding. September 2005 till Hall's January 2007 report/recommendation is a span of 15 months, in which defendants had a viable opening to begin Rush's HCV treatments, but defendants merely "monitored" Rush's high risk/chronic condition –a rapidly deteriorating condition- yet failed to take appropriate action to provide immediate, aggressive HCV treatments.

> ➤   On 6-24-07 (circa) Rush experienced a needless and/or preventable massive hemorrhage to his esophagus as a direst result of his failing liver and quickly deteriorating condition. Indeed, post op definitively revealed this fact. (See CMS's Resp. at Ex.-E);

Thus, Rush was exposed to a near fatal emergency episode some five months after Hall's 1-22-07 recommendation to begin HCV treatments, but HCV treatments typically last six months, and had defendants not ignored and acted in conflict with Hall's recommendation, it is likely Rush's rapid progressive deterioration would have been arrested and likely that Rush's esophagus would not have ruptured causing massive hemorrhaging. *CMS's claim to have worked to "stabilize" Rush's condition on Feb. 13, March 24, April 18, May 25, and August 2007, is absolutely false and in irreconcilable conflict with the undisputable facts.* Rush's esophagus did not rupture until late June 2007 and Hall explicitly stated No contraindication or nothing present to preclude Rush's HCV treatment from beginning –on 1-22-07. Rush's condition was already stabelized and CMS's claims are incongruous and disingenuous. (See Rush's Reply at p.p. 10-11).

In conclusion, Rush's medical records conclusively demonstrate the above. CMS did not work to stabilize Rush's condition in order to begin Hep C treatment, CMS aggravated it. CMS did not begin any legitimate Hep C treatments, but alternatively entered falsified medical entries that are destroyed upon examination. This behavior is shocking. Rush is not nor has he refused any Interferon injections. Rush is not nor has he played games with his life, and Rush does not appreciate CMS doing so. Rush's condition is fast deteriorating and Rush renews his request to this Court to "Order" Rush's Hep C treatments and Rush points out the clear need for an independents Hep C specialist to monitor the situation. CMS has demonstrated its propensity to commit fraud. Any further delay places Rush at an unacceptable risk of permanent harm and or death.

*David Rush*                                                             11-28-07

David Rush, 173418                                                       Date
1181 Paddock Rd.
Smyrna, DE 19977

## Certificate of Service

I, DAVID R. RUSH, hereby certify that I have served a true And correct cop(ies) of the attached: RUSH'S OBJECTION TO DEFENDANT'S RESPONSE TO COURT'S ORDER upon the following parties/person (s):

TO: _____

James E. Drnec, Esq.
(Counsel for CMS, et al)
711 King St.
Wilmington, DE 19801

TO: _____

TO: _____

TO: _____

BY PLACING SAME IN A SEALED ENVELOPE, and depositing same in the United States Mail at the Delaware Correctional Center, Smyrna, DE 19977.

On this 2nd day of December, 2007

David Rush    11-28-07

# EXHIBIT A

- Women who are pregnant.
- Men whose female partners are pregnant.
- Patients with hemoglobinopathies (e.g., thalassemia major or sickle-cell anemia).

COPEGUS and PEGASYS combination therapy is contraindicated in patients with:

- Autoimmune hepatitis.
- Hepatic decompensation (Child-Pugh score greater than 6; class B and C) in cirrhotic CHC monoinfected patients before or during treatment.
- Hepatic decompensation with Child-Pugh score greater than or equal to 6 in cirrhotic CHC patients coinfected with HIV before or during treatment.

## WARNINGS

**COPEGUS must not be used alone because ribavirin monotherapy is not effective for the treatment of chronic hepatitis C virus infection. The safety and efficacy of COPEGUS have only been established when used together with PEGASYS (pegylated interferon alfa-2a, recombinant).**

COPEGUS and PEGASYS should be discontinued in patients who develop evidence of hepatic decompensation during treatment.

**There are significant adverse events caused by COPEGUS/PEGASYS therapy, including severe depression and suicidal ideation, hemolytic anemia, suppression of bone marrow function, autoimmune and infectious disorders, pulmonary dysfunction, pancreatitis, and diabetes. The PEGASYS Package Insert and MEDICATION GUIDE should be reviewed in their entirety prior to initiation of combination treatment for additional safety information.**

### General

Treatment with COPEGUS and PEGASYS should be administered under the guidance of a qualified physician and may lead to moderate to severe adverse experiences requiring dose reduction, temporary dose cessation or discontinuation of therapy.

### Pregnancy

**Ribavirin may cause birth defects and/or death of the exposed fetus. Extreme care must be taken to avoid pregnancy in female patients and in female partners of male patients. Ribavirin has demonstrated significant teratogenic and/or embryocidal effects in all animal species in which adequate studies have been conducted. These effects occurred at doses as low as one twentieth of the recommended human dose of ribavirin. COPEGUS THERAPY SHOULD NOT BE STARTED UNLESS A REPORT OF A NEGATIVE PREGNANCY TEST HAS BEEN OBTAINED IMMEDIATELY PRIOR TO PLANNED INITIATION OF THERAPY. Patients should be instructed to use at least two forms of effective contraception during treatment and for 6 months after treatment has been stopped. Pregnancy testing**

8

# EXHIBIT B

## AFFIDAVIT OF DAVID RUSH

1. I, David Rush, am the Affiant listed above and do depose and state the following in support of Rush v. CMS, et al, 07-514-SLR:

2. On 11-10-07 Affiant met with Dr. McDonald, the viral infectious disease doctor, regarding Affiant's Hep C disease.

4. The Interferon injections were supposed to begin in September 29, 2007, but CMS never began them as promised.

5. Sometime after 11/07/07, Infectious disease nurse, Crystal, informed McDonald of Affiant's concerns about violating Roche's posted warnings against taking the Ribavirin alone because it was specifically contraindicative.

6. Dr. McDonald immediately attacked Affiant and admonished Affiant for not taking the Ribavirin before beginning the Interferon injections.

7. Affiant replied that the manufacture, Roche pharmaceuticals, specifically warned against beginning the Ribavirin before the Interferon injections (i.e. that it was contraindicative), and Affiant had informed McDonald on 10-27-07 of said warning.

8. On 10-27-07 McDonald agreed with the manufacture's warning, but nevertheless erroneously instructed Affiant to begin the Ribavirin.

9. When Affiant reminded McDonald of this fact, McDonald became evasive and changed the subject and began talking about testing Affiant's liver to determine the amount of damage.

10. Affiant refused to allow McDonald to evade the unresolved issue and asked why his Interferon treatment, which were allegedly ordered to begin on 10-01-07 (second ordered date), had not begun.

11. McDonald stated that when he was informed by Crystal (11-07-07) that Affiant had not begun the Ribavirin that he had cancelled the Interferon injections.

12. This is absolutely false because Rush was informed that the Interferon injections were ordered and would begin on 10-01-07; however, Affiant did not see Crystal until 11-07-07 and McDonald could not have been informed by Crystal before 11-07-07.

13. Affiant challenged McDonald's fabrication with the above and also asked: "Ok then, if that is true, why didn't the Interferon treatments begin the first, second, third, or fourth week of October?

1

14. Again McDonald became evasive and physically nervous: he began bouncing his pencil upon the side of the desk and his eyes were shifting from side to side.

15. McDonald abruptly began talking of a liver transplant and Affiant's low platelets as a concern.

16. Affiant exploded: "My platelets have been low for three years and they are getting lower every day you deny me care –you know this and I demand for the last and final time that you begin the Interferon treatments that were promised me!"

17. McDonald switched directions again and instructed Rush to return the unused Ribavirin and that he would be scheduled for a liver sonogram to determine the amount of liver damage to see if the risk was worth it.

18. Affiant informed McDonald that the liver specialist, Scott Hall, had already made his specialized recommendation back in January 2007, which called for the Interferon to begin, and that no further tests were required.

19. McDonald ignored Affiant and sent him away.

20. On October 30, 2007, the Delaware District Court denied Affiant's request for an injunction to force CMS to begin his Interferon treatments (and for monitoring of same), because CMS stated to the Court that the issue was moot because CMS had Affiant scheduled to begin Hep C care on 09-29-07 "assuming his condition remains stable."

21. Since CMS's statements to the Court, CMS has attempted to create a crisis –that would destabilize Affiant's condition- and thus justify ending treatment early by instructing Affiant to begin the Ribavirin alone without the Interferon injections, but when Affiant foiled CMS's attempted assault upon Affiant, CMS stalled beginning the Interferon injections and now scrambles to create another pretext to deny the promised Interferon treatments.

22. The above is true and correct and is a product of Affiant's personal experience.

SIGNED and SWORN before me this ___15th___ day of November 2007.

_David Rush_
David Rush

_Timothy J. Mats_
Notary Public

Commission expires: June 14, 2008

2

# EXHIBIT C

Report Count 7

# Offender Activity Schedule

Date of Report: 11/27/2007

Institution: DCC    Housing Location Bldg W1    Activity Type Medical

Date Range: 09/29/2007 TO 09/29/2007

| SBI# | Name | Start Date | Time | End Date | Time | Empl. Date | Activity Type | No Refusal | Housing Location | Destination |
|---|---|---|---|---|---|---|---|---|---|---|
| | Patrick Ernest R | 09/29/2007 | 08:00 | 09/29/2007 | | | Medical () | [ ] | Bldg W1/Tier F | Others |
| | Price John D | 09/29/2007 | 08:00 | 09/29/2007 | | | Medical () | [ ] | Bldg W1/Tier A | Others |
| | Crowe James T | 09/29/2007 | 09:30 | 09/29/2007 | | | Medical (Med Renewal) | [ ] | Bldg W1/Tier A | Others |
| | Miller Franklin T | 09/29/2007 | 09:30 | 09/29/2007 | | | Medical (Med Eval) | [ ] | Bldg W1/Tier I | Others |
| | Williams Robert F 3 | 09/29/2007 | 10:00 | 09/29/2007 | | | Medical () | [ ] | Bldg W1/Tier I | Others |
| | Hackett Aldrich A | 09/29/2007 | 10:13 | 09/29/2007 | 15:13 | | Medical (Ppd Read) | [ ] | Bldg W1/Tier E | Others |
| | Daniels Richard L J | | | | | | | | Bldg W1/Tier I | Others |

Page Count: 7

Page 1 of 1

# EXHIBIT D

Nov. 23, 2007

To Whom It May Concern:

On Sept. 29th, 2007, my wife and I had a honor visit with our son, David Rush. A honor visit lets us bring food in for a picnic and visit with him. We arrived at the Delaware Correctional Center about 10:00 a.m. that day, and left about 3:00 p.m. in the afternoon. Durimg this period of time, I know my son did not receive any medical treatment.

Sincerely,

Edward R. Rush
6086 Westbourgh Drive,
Naples, Fl.      34112

DIANA LYNN STRICKLER
Notary Public - State of Florida
My Commission Expires Apr 29, 2011
Commission # DD 650947
Bonded Through National Notary Assn.

EXHIBIT E

# Employee Attendance

| Card # | Worker Name | Date | Reason | Comments |
|---|---|---|---|---|
| 52 | Downing, George | 10/24/07 | Medical | Dr. Appt. |
| 54 | Simmons, Phonso | 11/06/07 | Visit | |
| 55 | Bruno, Michael | 10/05/07 | Visit | |
| | | 10/12/07 | Visit | |
| | | 10/30/07 | Unexcused | flu waiting for sick call |
| | | 11/02/07 | Medical | Dr.Appt. |
| 56 | Heath, Thomas | 10/04/07 | Medical | Dr.Appt. |
| | | 10/22/07 | Visit | |
| | | 10/24/07 | Visit | |
| | | 11/01/07 | Medical | Dr.Appt. |
| | | 11/02/07 | Medical | Dr.Appt. |
| 57 | Rush, David | 10/05/07 | Medical | Dr.Appt. |
| | | 10/12/07 | Medical | Dr.Appt. "Lipoma" consult. |
| | | 10/16/07 | Medical | |
| | | 10/19/07 | Medical | X-Ray & Thyroid CC. |
| | | 10/25/07 | Medical | Bloodwork |
| | | 10/31/07 | Medical | TB Test |
| | ※ | 11/02/07 | Medical | Bloodwork |
| | | 11/09/07 | Medical | T B Check |
| | | 11/16/07 | Other | Pulled Back loading truck |
| 58 | Davis, Stacy | 10/12/07 | Visit | |
| | | 10/24/07 | Other | pending investigation |
| | | 10/25/07 | Other | pending investigation |
| | | 10/26/07 | Other | pending investigation |
| | | 10/29/07 | Other | pending investigation |
| | | 10/30/07 | Other | pending investigation |
| | | 10/31/07 | Other | pending investigation |
| | | 11/01/07 | Other | pending investigation |
| | | 11/02/07 | Other | pending investigation |
| | | 11/05/07 | Other | pending investigation |
| | | 11/06/07 | Other | pending investigation |
| | | 11/07/07 | Other | pending investigation |
| | | 11/08/07 | Other | pending investigation |
| | | 11/09/07 | Other | excused per JB |
| 59 | Claudio, Carmelo | 10/04/07 | Other | school |
| | | 10/10/07 | Medical | Dr. Appt.. |
| | | 10/30/07 | Medical | Dr. Appt.. |
| | | 10/31/07 | Medical | Dr. Appt.. |
| | | 11/05/07 | Medical | Dr. Appt.. |
| | | 11/21/07 | Medical | Dr. Appt.. |
| 60 | Stevens, Darrell | 11/15/07 | Medical | phyisical |

I/M: DAVID RUSH
SBI# 173418   UNIT W
DELAWARE CORRECTIONAL CENTER
1181 PADDOCK ROAD
SMYRNA, DELAWARE  19977





U.S. District court
844 King St.
Lockbox 18
Wilmington, DE 19801-3570