IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DAVID W. RUSH, | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. 07-514-SLR |
| CORRECTIONAL MEDICAL SERVICES, Inc, et al, | ) | |
| Defendants. | | |

PLAINTIFF SEEKS LEAVE TO AMEND HIS COMPLAINT TO CORRECT DEFICIENCIES

Rush, a pro se plaintiff, seeks leave to amend his complaint pursuant to the appropriate FRCP, Rule 15 (a), and/or Local Rules. Rush *does not add any new claims or new defendants* to the above action through the instant Amendment, but merely corrects deficiencies in his existing claims. No events that have occurred since the original filing date of the Complaint (i.e. 08/22/07) have been added or amended herein. Consequently, said amendment should relate back as permitted by FRCP and case authorities. Rush is pro se and he seeks pleading leniency under *Haines v. Kerner*, 404 U.S. 519 (1972). Rush offers the following:

## Nature and Stage of TRO/PI

Background: Rush is an inmate at the James T. Vaughn Correctional Center (formerly Delaware Correctional Center). He proceeds pro se and was granted leave to proceed in forma pauperis.

1.      Rush claims a violation of his constitutional rights, including the First, Fifth, Eighth, and Fourteenth Amendments. (D.I. 2) (**8-22-07**). He alleges the defendants are deliberately indifferent to his serious medical needs, retaliated against him for exercising constitutionally protected activities and violated the ban on cruel and unusual punishment.  The Complaint consists of three medical issues. Count I alleges Rush suffers the acute Lipomas growths; Count II regards a residual tangible injury to Rush's right shoulder, and Count III regards Rush's chronic Hepatitis C/Liver Disease (cirrhosis).

2.      Rush filed for an emergency TRO/PI on 9-12-07 (D.I. 7-10), which requested immediate medical care for his chronic Hep C and liver cirrhosis (HCV/CDL), acute painful Lipoma growths, and an atrophied/significantly impaired right shoulder.

3.      On 9-19-07 CMS responded (D.I. 19-20), in opposition to Rush's request for medical treatment.

5.      On 10-16-07 (D.I. 25) the lower Court denied Rush's TRO/PI request.

6.       On 10-31-07 the Court issued a sua sponte Order (D.I. 34), which dismissed various claims and defendants based on statute of limitations and based on a 12 (b) (6) for a failure to state a claim which warrants relief.

1

FILED

AUG 2 6 2008

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

7.    The lower Court dismissed sua sponte "FCM[I] in counts I and III, Dr. Alie in count I, and Dr. Niaz in count III…. (See D.I. 2, [items] 27, 28, 31-51, 311-337, 339)," based on a statute of limitations issue (i.e. claims made prior to August 17, 2005) (D.I. 34, p. 4-5, items 5 and 6).

8.    In compliance with the Court's statute of limitations ruling, Rush has Struck defendants FCMI, Alie, and Niaz from the Amended Complaint.

9.    The lower Court dismissed sua sponte Dr. [John] Doe, Durst, and McDonald in count I; Durst in count II, and Dr. Niaz in count III and the claims against them based on a failure to state a claim upon which relief may be granted. (D.I. 34, p. 9 at item 14).

10.    On 11-30-07, Rush filed his Notice of Appeal  (D.I. 44) of the lower Court's disposal of Rush's motion for reconsideration and TRO/PI. (D.I. 25 &  39)and Rush took appeal of the Court's dismissal for statute of limitations issue and the dismissal of claims and defendants for a failure to state a claim upon which may warrant relief, however, the Circuit Court summarily dismissed on 07/28/08, the latter 12 (b) sua sponte dismissal portion of the appeal because it was not a Final Judgment.

11.    It was not until after Rush filed his appeal that CMS in March 2008 finally provided Rush the life saving Interferon therapy for Rush's chronic Stage 4 Hepatitis C/Liver Disease despite the fact that Rush's HCV caused him to unnecessarily experience a near fatal internal hemorrhage and cirrhosis of the liver (i.e. a permanent injury).

12.    On 12-05-07 Rush filed an objection and conclusively demonstrated that CMS filed a fraudulent response (D.I. 47).

13.    To date defendants have not filed any Answer, Defense Motion, or reply to the above listed Complaint, thus the Court is warranted in giving Rush leave to amend his Complaint and due to the intervening Appeal, this is the very first opportunity for Rush to file an Amended Complaint

## AMENDED SECTIONS

1.    In compliance with the Court's statute of limitations ruling, Rush has Struck defendants FCMI, Alie, John Doe, MD, and Niaz from the Amended Complaint and the cover page of same. Also, Rush corrected Doctor McDonald's name to reflect the following: Lawrence McDonald.

2.    Rush struck defendants FCMI, Alie, John Doe, MD, and Niaz from the *Parties* section of the Amended Complaint by a Strike Through line therein at pages 2-3.

3.    Rush Struck Count III in its entirety (i.e. Original pages 45-63, items at paragraphs 289 through 423) and rewrote them to correct statute of limitations deficiencies and to state a claim upon which relief can be

2

granted. (See Amended Complaint at pages 45 through **59**, items at paragraphs 289 through 360.) (See below for amended pages) and (See attached Amended Complaint in its entirety).

---

285. Additionally, when Durst's misplaced theory of a torn rotator cuff proved incorrect [(i.e. ruled out)], that returned Rush to his *original underlying complaint of acutely painful lipomas*, but Durst nor Eller would consider any other potential causes. They only ruled out the torn rotator cuff and were content to down play and disregard observable symptoms, and misstate facts in order to avoid addressing any needed treatment whatsoever for Rush's acutely painful and significantly impaired right shoulder.

286. Rush's EMG requested "warranted follow-up treatment/surgery", only because CMS staff engaged in a campaign of deception to mislead Rush and otherwise not disclose what the appropriate standard of treatment would actually be.

287. Surely some type of medical treatment would improve or correct Rush's acutely painful and debilitating condition, but CMS is busy engaged in creating pretexts and red herrings in order to avoid providing needed treatment. These acts are not simple medical negligence, but conscious decisions to deny needed medical care- not based on valid medical factors and are devoid of professional medical judgment –and consequently they do intentional cause Rush to needlessly suffer acute pain; significant impairment of his mobility and range of motion and normal daily functions; and it is significant and likely to cause permanent injuries and or a likely risk or future permanent injuries.

288. Rush exhausted his administrative remedies for this claim.

### COUNT III: Denial of Reasonably Adequate Medial Care for Rush's Hepatitis C

289. Defendants CMS, Altman, and McDonald  intentionally or with gross reckless disregard to Rush's known and/or obvious serious medical condition, denied, inordinately delayed, and/or knowingly provided less efficacious, inadequate, or contraindicative medical care for Rush's diagnosed and chronic Hepatitis C/Liver Disease ("HCV") and its residual tangible injuries/symptoms. Defendants' acts or

omissions were contrary to legitimate medical factors and despite knowledge of the need for adequate

medical treatments (i.e. Interferon/Ribavirin therapy), Defendants did cause Rush to experience the

following: (1) undue, significant pain and suffering, (2) undue permanent injuries (i.e. Liver cirrhosis,

etc), (3) a significant and likely risk to his future health and life, (4) a significantly diminished capacity

to make a full recover, and (5) Undue diminished life expectancy. ("undue pain and suffering and

permanent injuries")

290. Defendants' acts and omissions were intentionally employed via CMS's custom/policy to deny

and/or delay Rush's needed medical treatments, and were perpetrated in bad faith and/or with the intent

or knowledge that said acts –below- would cause Rush to experience undue pain and suffering and

permanent injuries.

291. CMS knew or should have known that said custom/policy of denial and/or inordinate delay would

likely cause Rush's HCV to progress and either cause Rush an unreasonable risk to his future health

and/or unnecessarily increase his permanent injuries, undue pain and suffering and permanent injuries,

and/or disqualify Rush from receiving any viable medical treatment whatsoever (i.e. lost chance of

recovery)

292. Defendant employed said custom/policy *in bad faith* and devoid any legitimate medical factors or

exercise of professional medical judgment.

293. Rush's Hep C disease was objectively known by defendants as a serious medical condition that

required immediate and aggressive medical treatments for the following:

    a. Because of the presence of HCV virus persisted for over six months and had advanced to

    "Chronic" stage,

    b. Because of the presence of Hepatitis C virus in Rush's blood stream,

    c.  Because of the persistently high and rapidly rising liver enzyme levels,

    d. Because of the very high and rapidly rising Viral Load count,

e. Because of the Rush's low and progressively worsening platelets, which is know or should have known to pose a substantial and unreasonable risk of internal hemorrhaging and related serious incidents,

f. Because Rush was repeatedly diagnosed with HCV and it was rapidly worsening and Rush was a high risk patient,

g. Because Rush demonstrated residual classic aggravated symptoms (e.g. jaundice and high ammonia levels in the blood stream),

h. Because Rush was enrolled as a Chronic-Disease Patient,

i. Because Rush was a high risk patient who was fast approaching a lost chance of any recovery (i.e. disqualification of treatments and or acute liver cirrhosis), and

j. Because these objective symptoms mandate –under the Center for Disease Control- immediate and aggressive medical treatments (i.e. Interferon/Ribavirin therapy).

294. For example, objective factors that the CDC employs to recommend antiviral therapy (i.e. Interferon/Ribavirin) are as follows:

a. Persistently elevated Alt liver enzymes levels,

b. Detectable HCV RNA for longer than six months, and

c. A liver biopsy that indicates either Portal or bridging fibrosis (i.e. stage one of four), or at least moderate degrees of inflammation.

295. Additionally, the identifying factors for a high risk patient are as follows:

a. Patient over forty years of age,

b. Patients with the most difficult genotype,

c. Patients who had relatively stable liver enzymes or platelets counts, but which began to increase their rates of negative progression, and

d. Patients who experience persistent and/or rapidly increasing viral load counts.

296. AS of August 2005, Rush had already met or greatly exceeded the CDC's standard for

recommending antiviral therapy and these legitimate medical factors were aggravated because Rush was

a high risk patient who was fast approaching a lost chance of recovery. For instance see the following:

    a. As early as March 2003, Rush exhibited the classic and elemental markers indicative of HCV

    Rush was 43 then (low platelets of 131 and high liver enzymes: AST 53 & Alt 91);

    b. On March 2005, defendant FCM had recorded in Rush's medical records

    Rush's diagnosis for HCV, but withheld that information from Rush;

    c.    On 9-08-05, Labs re-confirmed Rush's HCV diagnosis and also illustrated

    the high risk factors of rapidly progressive counts (e.g. liver enzymes ALT #1 at

    91, ALT #2 at 145) (D.I. 27-28, Ex-B, 2006 Labs). [[Negative progression of

    Rush's labs and his age of 45 are objective medical factors that required

    immediate, aggressive HCV care then]; and

    d.  Rush's viral load was above one million and rapidly progressing.

297. Defendants have a duty to provide a community/adequate standard of medical care

whether in a correctional setting or not.

298. This standard was outlined by the CDC and/or by the Liver Specialist, Doctor Hall.

299. CMS, McDonald, Altman, Plante, and Eller, however, refused to render any

adequate standard of care, but alternatively denied it and/or rendered aggravating acts to

destabilize Rush's rapidly worsening condition.

300. The standard dictated by Rush's advanced and rapidly worsening condition should

have been for Defendants to immediately begin the antiviral therapy and any needed

ancillary medical care to arrest the HCV progression and treat the disease, so that (1) It

would limit unnecessary pain and suffering and permanent injuries, (2) would limit

Rush's high risk of experiencing unnecessary residual tangible injuries, (3) would limit

Rush's high risk of experiencing unnecessary serious or emergency collateral injuries

(i.e. esophagus rupture or internal hemorrhaging, (4) would limit Rush's high risk of experiencing an unnecessary lost chance of recovery, and (5) would limit Rush's high risk of experiencing unnecessary liver cancer or type two diabetes.

301. The medical care provided by Defendants, however, was not only grossly inadequate and did not meet any acceptable standard of care, it is believed and therefore averred that Defendants actually sought to destabilize Rush's rapidly worsening condition and thus disqualify Rush from any chance of recovery, or did intentional cause Rush serious harm, and/or with gross reckless disregard did expose Rush to serious pain and suffering and permanent injuries.

302. Indeed, all of Rush's pertinent liver function numbers began a rapid negative progression, and instead of beginning immediate, aggressive HCV therapy, Defendants committed the following aggravating factors and/or bad faith deception in an effort to deny and/or create an inordinate delay and thus disqualify Rush from receiving any viable HCV therapy:

    a. Altman falsely stated that Rush's liver function numbers were improving and thus they did not indicate he needed treatments;

    b. McDonald repeatedly prescribed medications that were known or should have been known to be extremely contraindicative and thus cause Rush's condition to destabilize, however, at a time when CMS was concurrently claiming to be stabilizing Rush's condition (i.e. prescribed iron supplements and NSAIDS and/or allowed the continued use of NSAIDS while Rush exhibited aggravated symptoms of his HCV, and prescribe Ribavirin to be taken by itself contrary to the drug manufacture's posted warnings against such use);

    c. McDonald unilaterally disqualified Rush from and HCV protocol while concurrently claiming to have begun HCV therapy;

d. Eller and Plante repeatedly promised to provide Rush the long belated Interferon

Drug Therapy Education/Information required before the therapy could begin, but

failed to do so and CMS employed a sham Interferon Nurse allegedly qualified to

provide said Interferon Ed, but none existed at the time;

e. CMS manufactured false medical records to support a claim the Rush had refused

or denied the Interferon therapy, but this was definitively proven false; and

f. CMS falsely claimed to have scheduled Rush for the Interferon therapy, but had

actually disqualified Rush from receiving the therapy and did not alter this position

until well after Rush filed his complaint.

303. Defendants' acts and omissions combined to expose Rush to a substantial and

unreasonable risk to his future health, increased Rush's permanent injuries (i.e. cirrhosis),

nearly caused Rush a lost chance of recovery, and exposed him to a near fatal esophagus

hemorrhage.

304. On 1-30-06, Rush had filed a formal medical grievance against defendants CMS,

and claimed CMS was creating an inordinate delay in providing Rush the needed HCV

care; (See D.I. 7-10, Ex Section II at D-1). Rush had begun to demand HCV therapy

shortly after CMS took over as the health care vendor in July 2005.

305.    Rush had repeatedly requested the HCV protocol from the previous infectious disease doctor,

Doctor Niaz, but Niaz refused to provide it.

306. Subsequently, CMS began its contract as Delaware's prison medical vendor in mid-July 2005, so

CMS was well aware of Rush's diagnosis and risk factors then.

307.    On 3-01-06 thru 3-14-06, labs reconfirmed  Rush's HCV diagnosis. (See D.I. 7-10, Ex Section

II at Item B 1-3).

308.     Rush's labs again disclosed his rapid negative progression: Liver enzymes AST at 67, ALT at

145 & positive HCV diagnosis. (See D.I. 7-10, Ex, Section II at B 1 -2), but Defendants failed to

initiate the HCV protocol, before Rush was exposed to permanent injury and a life threatening hemorrhage.

309.    Rush's HCV had been categorized as "Chronic" back on 03-18-06, but Rush had to secure his medical records on 05-13-06 to find out this information, because CMS withheld his HCV diagnosis.

310.    On 03-31-06 labs disclosed positive high count for AFP Tumor marker at 9.5 (See D.I. 7-10, Ex, Section II at B-8) and Niaz finally ordered the requisite liver biopsy, though it was not performed until 12-15-06.

311.    Rush's viral load was upwards of 4 million on 5-12-06, but the significance of this very high viral load was also withheld by CMS.

312.    Consequently, Rush had already exceeded the objective criteria recommended by the CDC to begin antiviral therapy, but CMS continued to employ the same dogged denials and also employed various bad faith pretexts to create an inordinate delay.

313.    For instance, CMS –contrary to the minimal standard of medical care for HCV- refused to disclose to Rush the significance of his diagnosis, liver damage level, Rush's high risk category, Rush's rapidly decreasing chance of successful HCV treatments, or the Intreferon/Ribaviron risks and benefits for over the intervening year and this added CMS's campaign to create an inordinate delay and/or a pretext to deny Rush needed HCV therapy.

314.    On 5-30-06, Rush filed a formal medical grievance (i.e. #46223) in which Rush charged that CMS refused to provide Rush the HCV drug information ("Interf. Ed"), in bad faith to create an inordinate delay in beginning the actual HCV treatments.

315.    Rush was promised the requested Interf Ed by Debby Rodweller on 08-30-06, by Gail Eller on 09-27-06, and at the Formal Grievance Hearing (e.g. #466223), on 10-04-06, but CMS refused to provided it until 03-27-07.

316.    CMS employed said refusal to create an inordinate delay in providing Rush the needed HCV therapy; however, it is believed and therefore averred that CMS did not actually have any qualified

9

nurse for this function despite repeatedly representing that it did and that it would schedule Rush to see her for the purpose of receiving the Interferon Ed, so its repeat representations were offered in bad faith.

317.    Indeed, according to Rush's medical records, Rush allegedly received the required Interf. Ed on 09-09-06, so as far as CMS was concerned it was denying Rush the HCV therapy until he received Interferon Ed, which he had already received. Thus, CMS's delay was made in bad faith.

318.    Rush sought to eliminate CMS's pretext and acquired the Interferon Ed information unilaterally from the drug manufacturing company, but CMS merely employed an alternative pretext.

319.    For instance, on 10-06-06, Rush filed a Formal Notice to CMS that he (a) no longer needed CMS to provide the Interf. Ed. because he had acquired it directly from Roche pharma and (b) Rush requested immediate commencement of the HCV treatments. (See D.I. 7-10, Ex, Section II at D-4).

320.    On 10-20-07 Defendant Altman responded to Rush's demand for the Interferon treatments, but Altman falsely claimed that Rush's Liver Function numbers were improving, thus Rush did not require the demanded care. (D.I. 7-10, Ex E-1). (i.e. Bad faith deception).

321.    It is believed and therefore averred that Altman offered misstatements of fact in order to deceive Rush, justify CMS's denial of the needed medical treatments, and realize CMS's custom/policy of said denial.

322. On or about 11-18-06, one month after Altman's false claims of "improving" numbers, Niaz conducted a Clinic and concurrently announced Rush's platelets were too low to begin the liver biopsy or the HCV treatments (i.e. contraindicative), (See D.I. 7-10 Ex, Section II at C 1-2 at items 5-18).

323. Thus, one CMS employee states Rush's numbers are too good to begin HCV therapy and another states that they are too bad to begin HCV therapy, but both cannot be correct. The common denominator; however, is that both representations were employed to deny Rush HCV therapy that CMS knew or should have known he desperately needed.

324. Moreover, Niaz's claim was refuted on 1-22-07 by an Outside Hep C/Liver Specialist, Doctor Scott Hall. Hall noted that the low platelets needed to be monitored during the Interferon treatments, but

that" *there is no contraindication… to consideration of the hepatitis C therapy going forward… I do not feel that Rush needs any further testing or follow up*." (See CMS's Res. At EX-b) (emphasis added).

325. Therein, Rush's hypothyroidism was also considered by the liver specialist and he determined that it would not preclude the HCV treatments. Moreover, that Rush's rapidly falling platelets mandated immediate, aggressive HCV treatments, but CMS/McDonald ignored the liver specialist's report/recommendation and employed more of the same dogged denial and delays.

326. On 11-21-06, Rush challenged CMS's pretexts via letter to Altman. (See D.I. 7-10, Ex, Section II at D-5), and on 12-01-06, Altman abandoned his 10-20-07 "improving" liver function numbers and adopted the **new** "Low platelets" are too bad to begin care. (Id at II , D-6).

327. Rush's labs disclosed low platelet counts, however, as early as March 2003 and thereafter, between mid-2005 and May 2006, these same "low platelets" began a rapid negative progression in late 05 and early 2006, but CMS did nothing to address the matter then nor until its various pretexts began to fail scrutiny.

328. For instance, as soon as defendants' first delaying tactic failed and Rush demanded the HCV treatments, miraculously defendants became concerned with the low platelets. (I.e. 03-27-03 labs, 2005 labs, March 2006 Labs, and May 2006 Labs).

329. Moreover, instead of commencing immediate, aggressive HCV treatments, ironically defendants' response is more of the same: denial/delay of care and a campaign to destabilize Rush's condition.

330. Indeed, CMS was specifically made aware of Rush's progressively worsening platelet levels since Rush brought the issue to their attention in January 2006, but CMS refused to provide any medical care to stabilize the problem and exposed Rush to a near fatal esophagus hemorrhage.

331. Defendants committed the following aggravating factors and/or bad faith deception in an effort to deny and/or create an inordinate delay and thus disqualify Rush from receiving any viable HCV therapy:

   a. Altman falsely stated that Rush's liver function numbers were improving and thus they did not indicate he needed treatments;

11

b. McDonald repeatedly prescribed medications that were known or should have been known to be extremely contraindicative and thus cause Rush's condition to destabilize, however, at a time when CMS was concurrently claiming to be stabilizing Rush's condition (i.e. prescribed iron supplements and NSAIDS and/or allowed the continued use of NSAIDS while Rush exhibited aggravated symptoms of his HCV, and prescribe Ribavirin to be taken by itself contrary to the drug manufacture's posted warnings against such use);

c. McDonald unilaterally disqualified Rush from and HCV protocol while concurrently claiming to have begun HCV therapy;

d. Eller and Plante repeatedly promised to provide Rush the long belated Interferon Drug Therapy Education/Information required before the therapy could begin, but failed to do so and CMS employed a sham Interferon Nurse allegedly qualified to provide said Interferon Ed, but none existed at the time;

e. CMS manufactured false medical records to support a claim the Rush had refused or denied the Interferon therapy, but this was definitively proven false; and

f. CMS falsely claimed to have scheduled Rush for the Interferon therapy, but had actually disqualified Rush from receiving the therapy and did not alter this position until well after Rush filed his complaint.

332. On 12-14-06, Rush received the belated liver biopsy that Niaz had ordered on 3-25-06.

333. Defendants' failed for over a year to treat Rush's hypothyroidism, but when he demanded the HCV therapy McDonald used this matter as yet another pretext to deny/delay HCV care.

334. McDonald's pretext was refuted by Hall, however, –liver specialist- on 1-22-07 and Doctor Vandusen also concurred on 05-25-07. (See CMS's Res. At Ex-B & D.I. 7-10, Ex Section II at A-3, items 2-11).

335. On 1-22-07, outside specialist Scott Hall, M.D. ("Hall") unequivocally and conclusively refuted each and every one of defendants pretexts, and Hall explicitly stated that there was nothing to prevent Rush "from going forward" and "testing or follow up" was not needed. (See CMS's Res. At Ex-B).

336. But McDonald still refused to begin Rush's needed HCV therapy and still denied said treatments to Rush despite the obvious need and despite a liver Specialist's recommendation to begin it.

337. On 3-27-07, CMS finally provided the Interf. Ed to Rush and he signed the accompanying "Informed Consent" form, which verifies when the Interferon Ed was not conducted until 03-27-08 and demonstrates that Niaz's medical entry was false (See DOC's Resp. at Ex-D).

338. On 5-25-07, Rush met with defendant Vandusen who entered the following: "*Scheduled ASAP with Dr. McDonald to resolve issue of starting Hep C meds*," because McDonald had not begun the needed therapy and it was obvious to Vandusen that Rush's condition was fast deteriorating and in need of immediate, aggressive medical care to arrest the disease. (See CMS's Res. At Ex-C).

339. Doctor Vandusen left the employment of CMS thereafter.

340. Rush was experiencing an acute outbreak of jaundice between 05-14-07 and early June 2007, which was likely a precursor and or a warning of Rush's upcoming esophagus rupture, but these classic symptoms of an aggravated nature were ignored.

341. Moreover, McDonald allowed Rush to be prescribed contraindicative Iron supplements and NSAIDS and knew or should have known that these contraindicative drugs would seriously aggravate Rush's rapidly worsening condition (i.e. unnecessarily expose Rush to undue pain and suffering and permanent injuries, and/or destabilized his condition).

342. Yet CMS failed to address Rush's obvious serious symptom and no entry appears in Rush's medical records on 5-25-07 of the acute jaundice.

343. On 6-24-07 (circa) Rush experienced a needless and/or preventable massive hemorrhage to his esophagus as a direst result of his failing liver and quickly deteriorating condition. Post op definitively revealed this fact. (See CMS's Resp. at Ex.-E);

13

[Thus, Rush was exposed to a near fatal emergency episode some

five months after Hall's 1-22-07 recommendation to begin HCV

treatments.  CMS's claim to have worked to "stabilize" Rush's

condition on Feb. 13, March 24, April 18, May 25, and August 2007,

is dubious. Rush's esophagus did not rupture until late June 2007 and

Hall explicitly stated No contraindication or nothing present to preclude

Rush's HCV treatment from beginning –on 1-22-07. ]

344.    This near fatal internal hemorrhage was a direct result of Defendants' acts and omissions (i.e.

aggravating and contraindicate prescriptions and failure to begin the HCV therapy and arrest the

progression). It was avoidable, but McDonald alternatively employed his master's (i.e. CMS's)

custom/policy to deny Rush the needed medical care and thus put Rush's life in jeopardy.

345.    On 8-18-07, Rush's first HCV Clinic since his June near fatal esophagus rupture, McDonald

confirmed the post op's findings: esophagus was likely caused by Rush's HCV/LDC condition.

McDonald then noted alarming facts that should have alerted any physician who was actually

conducting meaningful "monitoring" : (a) That Rush's blood showed elevated protein levels and that

this was a classic symptom and/or precursor to the esophagus incident, and (b) That the massive doses of

Motrin -these very same doctors who were so good at "monitoring" Rush's condition- had actually

aggravated Rush's condition because it is a prohibited class of drugs for Rush's advanced HCV/LDC

condition.

346.    Despite a near fatal internal hemorrhage and despite the known effects of NSAIDS to destabilize

chronic/precarious HCV conditions, McDonald failed to discontinue Rush's prescriptions for said

contraindicative NSAIDS meds and thus continued to intentionally inflict harm upon Rush and

intentionally attempted to destabilize Rush's now precarious condition.

347.    On 8-18-07 McDonald unilaterally declared that Rush was no longer a candidate for any HCV treatments due to the level of liver cirrhosis's. McDonald entered the following in Rush's medical records: "Not a candidate…cirrhosis…VPLTCT."

348.    Also, McDonald refused to reschedule Rush for any further Hep C Chronic Care Clinics as noted by the intentional omission to reschedule. (D.I. 19-20, Ex-C); however, subsequently claimed that he had actually scheduled to begin the HCV therapy for Rush.

349.    Rush definitively proved that CMS's/McDonald's claim to have scheduled Rush to begin HCV therapy (i.e. medical entry) was false; and thus McDonald's bad faith attempt to continue his deception regarding the denial of Rush's needed HCV therapy demonstrates McDonald's culpability and knowledge of his deliberate indifference.

350.    CMS employed McDonald's false entries to the same effect and it is believe and therefore averred that CMS either directed the manufacture of said false medical entries and/or knew or should have known of the false medical entries.

351.    Thus as of 08-18-07 CMS had declared its outright denial of Hep C care to Rush, because Rush's liver was too far gone, but Rush had previously requested the Hep C care from CMS since 1-30-06.

352.    On 8-22-07, Vandusen intervened to thwart McDonald's clearly harmful acts and noted: "Stop NSAIDS" "Schedule repeat ammonia level" and "Have Deb R. schedule follow up ccc. (See CMS's Resp. at Ex-C).

353.    Consequently since 08/22/08 CMS has denied any and all medical treatment for Rush's diagnosed, acutely painful Lipomas and atrophied right shoulder, and they both unnecessarily impair – significantly- Rush's normal daily activities and range of motion and cause him undue pain and suffering.

15

354.  Despite knowledge and previous treatment for the Lipomas and right shoulder (i.e. pain medications), CMS simple denies all forms of medical care and still denies Rush the recommended excision of the Lipomas absent and contrary to legitimate medical factors.

355.  On 8-23-07, Vandusen noted in the Plan: Medication changes section of the Clinic report: "Stop Protocol", Stop NSAIDS" F/U 2 months 10-19-07."

356.  McDonald never even bothered to discontinue the counter indicative NSAIDS on 08-18-07 despite confirmation that Motrin aggravated Rush's condition and destabilized it, and despite Rush's near fatal internal hemorrhage.

357.  It is believed and therefore averred that CMS's profits are inescapably tied to minimizing costs – prescription drug costs- and that CMS denied HCV therapy to Rush that it knew or should have known he required in order to create a windfall profit (i.e. custom/policy of cost avoidance).

358.  In short, CMS/Defendants knew or should have known as early as August 2005 that Rush's condition demanded immediate, aggressive HCV therapy, but alternatively Defendants employed a campaign of deception and bad faith to deny HCV therapy to Rush, which did cause Rush to experience an avoidable near fatal internal hemorrhage, significant increased permanent injuries (i.e. liver cirrhosis), and diminished life expectancy contrary to legitimate medical factors and with deliberate intent to harm Rush and/or gross reckless disregard to a known significant threat to Rush's health and life.

359.  Defendants acted or omitted to act with deliberated indifference and/or with gross reckless disregard to a known and objective serious threat to Rush's life in any of the following ways:

a. By disregarding legitimate medical and high risk factors that demanded immediate and aggressive medical therapy;

b. By disregarding the persistently high –and rapidly rising liver- enzyme numbers and/or the rapidly progression of Rush's particular HCV;

16

c. By intentionally creating an inordinate delay, *with bad faith* and contrary to known legitimate medical factors, in providing the needed medical therapy and intentionally and or with gross reckless disregard exposed Rush to significant pain and suffering or a serious and unreasonable risk to Rush's future health and life (i.e. Near fatal esophagus rupture/internal hemoraging);

d. By intentionally employing a camping of deception, misinformation, and bad faith to realize said custom/policy to deny medical therapy to Rush –therapy required to save Rush's life- and/or create an inordinate delay and permit Rush's disease to progress and disqualify him from any chance of viable treatments;

e. By failing to employ adequate policies/procedures to meet the emergency medical needs of Rush's known serious medical condition; and

f. By intentionally employing multiple illegitimate pretexts to justify Defendants denial and/or inordinate delays in providing needed medical care to Rush; and

g. By failing to correct a known systemic failure to meet the emergency and/or known medical needs of Rush despite the knowledge that a failure to do so would likely violate Rush's constitutional rights.

360. Items (a) thru (g) at paragraph 289-360 were employed by Defendants intentionally and without any legitimate medical reasons and/or with gross reckless disregard to a known objective serious medical need and with bad faith and a failure to exercise professional medical judgment.

---

4. Lastly, Rush amended the Statement of Claims to correct the *new numbering* and reflect the struck defendants. (See Statement of Claims at pages ___ 6ℓ ___ to ___ 65 ___ items 361 thru 362.

WHEREFORE, Rush prays the Court grant Rush's request to Amend his complaint, which relates back and order service of process etc. as warranted.

Respectfully,

*David Rush*

David Rush, 1181 Paddock Rd., W-1, D-16, Smyrna, DE 19977

8/20/2008

Date



I/M: DAVID RUSH
SBI# 173418    UNIT W

DELAWARE CORRECTIONAL CENTER
1181 PADDOCK ROAD
SMYRNA, DELAWARE 19977

U.S. District court
844 King St.
Lockbox 18
Wilmington, DE 19801-3570

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DAVID W. RUSH, | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. 07-514-SLR |
| CORRECTIONAL MEDICAL SERVICES, Inc, | ) | |
| SCOT ALTMAN, | ) | |
| CHRISTINE MALANEY, | ) | |
| DONNA PLANTE, | ) | |
| GAIL ELLER, | ) | |
| FREDERICK DURST, MD, | ) | |
| LAWRENCE McDONALD, MD, and | ) | |
| DEBBIE RODWELLER, | ) | |
| Defendants. | ) | |

### AMENDED COMPLAINT

This is a civil rights action brought by David Rush, a pro se plaintiff and state prisoner of Delaware, pursuant to 42 U.S.C., section 1983 and 1997, requesting declaratory judgment, injunctive relief, and damages. Rush claims herein that defendants committed several distinct acts of deliberate indifference to Rush's known serious medical needs in violation of his constitutional rights: Specifically the Eighth and Fourteenth Amendments' ban on cruel and unusual punishment; and the Fifth and Fourteenth Amendments' right to free speech and due process clauses by their deliberate acts of retaliation against Rush after he exercised his protected right to seek redress from the government.

F I L E D

AUG 2 6 2008

1

## JURISDICTION

1.  The Court has jurisdiction over Rush's claims of violations of his federal constitutional rights under 42 U.S.C. subsections 133(a), 1334, and supplemental jurisdiction over any subordinate state law tort claims under 28 U.S.C. section 1367 and any other applicable sections.

## PARTIES

2.  Plaintiff, David R. Rush, is a state prisoner incarcerated at the Delaware Correctional Center (DCC) during the events described herein.

3.  Defendant, Correctional Medical Services, Inc., )CMS) is a privately held corporation contracted as an agent of the State to provide all aspects of medical, dental, and mental health care to the prison population. This includes[1] the following:  timely medical referrals/examinations and emergency care, appropriate diagnostic testing, inpatient/outpatient procedures, prescriptions and the management of infectious or chronic diseases. CMS is sued in its individual and official capacities.

4.  Defendant, Donna Plante, was CMS's director of nursing at D.C.C. facility during the part of the events described herein. Plante executed CMS policy/custom and supervised subordinates in accord; she responds to inmate medical needs, complaints and represented CMS at formal medical grievance hearings. Plante is sued in her individual and official capacities.

5.  ~~Defendant, John Doe, MD, is believed to be a medical doctor for CMS who worked at DCC facility during part of the events described herein.  CMS employed him to provide adequate medical care including exams, diagnosis, referrals for inpatient/outpatient procedures/specialists when needed, emergency care, and prescribing needed medications.  John Doe's exact identity is currently unknown; however, he is sued in his individual and official capacities.~~

---

[1]  The terms include, includes, or including shall mean "including but not limited to" herein.

2

6. Defendant, Christine Maloney, was CMS's Health Services Administrator, who was responsible for administrating CMS policy/custom at the DCC facility during part of the events described herein. She had a direct supervisory position over Director of Nursing, Plante, and her responsibilities included responding to inmate medical needs/complaints and grievances. Maloney is sued in her individual and official capacities.

7. Defendant, Gail Eller, is believed to be CMS's current Director of Nursing at the DCC facility during the remaining part of the events described herein. Eller executes CMS custom/policy, supervises subordinates in accord, and her responsibilities include responding to inmate medical needs, complaints, and representing CMS at formal medical grievance hearings. Eller is sued in her individual and official capacities.

8. Defendant Fredrick Durst, MD, is believed to be a medical doctor for CMS who worked at DCC facility during part of the events described herein. CMS employed him to provide adequate medical care including exams, diagnosis, referrals for inpatient/outpatient procedures/specialists when needed, emergency care, and prescribing needed medications. Frederick Durst, MD is sued in his individual and official capacities.

9. Defendant Scot Altman is believed to be CMS's Delaware Office Ombudsman during the events described herein. His responsibilities included responding to and investigating inmate medical claims, complaints, grievances, and correcting same. Altman also affected CMS custom/policy. Altman is sued in his individual and official capacities.

10. Defendant Muhammed Niaz is believed to have been employed by both First Correctional Medical, Inc. (FCM) and by CMS as a medical doctor/infectious disease doctor for part of the events described herein at the DCC facility. FCM and or CMS employed him to

3

~~realize their respective custom/policies and his responsibilities included diagnosis, testing and~~
~~treatment of infectious diseases, adequate medical care, examinations; referrals for~~
~~inpatient/outpatient procedures and or specialists when needed, emergency care, and prescribing~~
~~needed medications. Niaz is sued in his individual and official capacities.~~

~~11. Defendant First Correctional Medical, Inc. (FCM) is a private corporation based out of~~
~~Tucson, Arizona, that is the principal and or parent owner of the subsidiary corporation known as~~
~~First Correctional Medical, Del. LLC (FCM,LLC). FCM wholly owns/controls FCM, LLC,~~
~~which acted more or less as a regional office in Delaware. FCM was contracted as an agent of~~
~~the State from 2002 (Circa) thru mid July 2005 to provide all aspects of medical, dental, and~~
~~mental health care to the prison population. This includes² the following: timely medical~~
~~referrals/examinations and emergency care, appropriate diagnostic testing, inpatient/outpatient~~
~~procedures, prescriptions and the management of infectious or chronic diseases. FCM is sued in~~
~~its individual and official capacities.~~

~~12. Defendant, Sitta Alie, MD, is believed to have been employed by FCM as a medical~~
~~doctor at the DCC facility for part of the events described herein. FCM employed her to realize~~
~~its custom/policies and her responsibilities included diagnosis, testing and treatment of infectious~~
~~diseases, adequate medical care, examinations; referrals for inpatient/outpatient procedures and~~
~~or specialists when needed, emergency care, and prescribing needed medications. Alie is sued in~~
~~his individual and official capacities.~~

13. Defendant _____ McDonald, MD, is believed to be a medical doctor for
CMS to realize their respective custom/policies and his responsibilities included diagnosis,
testing and treatment of infectious diseases, adequate medical care, examinations; referrals for

---

² The terms include, includes, or including shall mean "including but not limited to" herein.

inpatient/outpatient procedures and or specialists when needed, emergency care, and prescribing needed medications. McDonald is sued in his individual and official capacities.

14. Defendant, Debbie Rodweller, is believed to be employed as a nurse with CMS and is assigned to the DCC hospital during the events described herein. Rodweller among her general nursing duties also is responsible to screen, investigate, and conduct informal Level I grievance medical hearings as a representative of CMS. Rodweller employs

CMS's customs/policies regarding the handling of medical grievances. Rodweller is sued in her individual and official capacities.

15. All defendants have acted and/or continue to act under color of State Law at all times relevant to this complaint.

## FACTS

## COUNT 1: DENIAL OF REASONABLY ADEQUATE MEDICAL CARE [3]

16. Defendants CMS, Altman, Maloney, Plante, John Doe, MD, Eller, Durst, FCM, and Alie are objectively aware of Rush's serious medical condition (e.g. several late-state and acutely painful lipoma growths (lipomas hereafter); however, said defendants have intentionally denied Rush adequate/needed treatment (medical care); have deliberately disregarded Rush's known serious medical condition with gross negligence; and or committed acts that equate to deliberate indifference to Rush's known serious medical needs.[4]

17. Rush's lipomas are an objective serious medical condition known to these defendants (at 16) under any of the following theories:

a) Due to the easily observable and obvious classic symptoms of late-state acutely painful lipomas;

---

[3] Though Rush structures the instant complaint as separate counts, he does not waive any claims—federal or state tort—that are supported by the fact situation.

[4] Medical condition and medical needs may be used interchangeably herein.

5

b) Due to Rush's medical record that shows prior acknowledgment of same and the timely removal of lipomas;

c) Due to multiple patient notices—including medical care requests and medical grievances—in which Rush outlined his acute pain and deteriorating health (e.g. constant pain and acute sudden sharp stabbing pains caused locally via bumping or pressing lipoma growth or simply, through normal activities; and, deep bruising, recurring rupturing of blood vessels, pinched muscles and nerves, and significant nerve and tissue damage) (i.e. permanent injury);

d) Due to multiple patient notices—including medical care requests and medical grievances—in which Rush outlined the resulting significant impairment of his normal daily functions (e.g. including a complete inability to promote health via meaningful exercise, which has resulted in significant weight gain (i.e. obesity), damaged Cardiovascular system, deteriorating physical plant (i.e. muscle, etc.); impairment of arm mobility and hand grip, which hinders Rush's ability to shower properly and adversely effects his work performance; and significant impairment of Rush's ability to realize meaningful sleep—all of which conspire to create mental and emotional stress, anxiety and frustration, and a significant threat to future health;

e) Due to multiple doctors acknowledging Rush's serious medical need and ordering surgical removal of his lipomas—two referrals were even coded "urgent";

f) Due to the Department of Correction (DOC) agreeing with Rush's medical grievance (MG) claims and "Upholding" [sic] Rush's reasonable requests for medical care;

g) Due to CMS also acknowledging the merit of Rush's claim via Ombudsman Altman; and

h) Due to the fact that any layman could view the hideously large and deeply bruised golf ball sized lipoma on Rush's left forearm—with its inflamed and ruptured blood vessels—and infer the need for immediate medical attention.

18.   Defendants CMS, Altman, Maloney, Plante, John Doe, MD, Eller, Durst, MD, FCM, and Alie officially committed acts or omissions in a deliberate and intentional manner (i.e. subjectively) to deny Rush needed medical care and or created an inordinate delay in providing needed medical care in a manner that equates to deliberate indifference to Rush's serious medical condition.   Their acts and omissions to act were not rooted in legitimate medical factors or the product of informed medical judgment, but were the product of a continuing course of action of gross negligence and or a custom/policy of the corporate entities FCM and CMS.

19.   Defendants (above at 16-18) subjectively acted or omitted to act under any of the following:

a) By disregarding the obvious and classic symptoms of late-stage painful lipomas and denying Rush needed care;

b) By disregarding Rush's multiple notices, reasonable requests and medical grievances, which pleaded for needed care;

c) By disregarding several doctor's orders—two of which were coded "urgent"—to surgically remove Rush's lipomas;

d) By disregarding the known inherent, and observable advancing nature of lipoma growths over a prolonged period;

e) By employing a custom/policy to deny or delay needed care—absent legitimate

7

medical factors—and or continuing a course of treatment that is known to be less efficacious, painful, or a likely threat to health despite objective knowledge of Rush's serious medical condition;

f) By employing a continuous pattern of medical care being delayed for non-medical reasons and or gross negligence;

g) By employing a continuous pattern of medical care that obviously evinces a systematic breakdown in medical services, which is tantamount to precluding professional medical judgments and or precluding "urgently" needed care;

h) By employing devices designed to frustrate the patient—make seeking care so uncomfortable—that the patient ultimately abandons his quest for it (i.e. psychological warfare) (e.g. scheduling repeat mock or ghost visits in over-crowded, uncomfortable conditions for prolonged periods, which also result in tangible losses: lost wages and good time credits; and, treating patient with contempt, scorn, hostility, and as a nuisance—not as a patient;

i) By employing intentional impediments and or actually precluding Rush from timely and meaningful access to the administrative grievance process and by retaliating against Rush because he exercised his rights; and

j) By employing ever morphing medical criteria and or by erecting arbitrary and burdensome procedures—repeat referrals—that resulted in inordinate delays or denials of needed care.

20.  The following facts establish the objective/subjective components (items 16-19 incorporated herein) and they evince the personal involvement of the defendants.

21.  Rush suffers from several late stage and acutely painful lipomas.

8

22.  Lipomas are initially a benign form of cancerous growth in which fatty-like cancer growths form both inbedded in or on muscle/nerve groups and below the skin.  They appear to be hereditary.

23.  At early stages of growth (e.g. up to the size of a green pea or small marble) the lipomas are more an unsightly nuisance, unless of course they are positioned to aggravate nerve clusters/muscle groups or blood vessels.

24.  When liponas aggravate nerve clusters/muscle groups, one routinely experiences constant pain, tingling and burning sensations throughout the affected area or limb and or nerve damage.  Also, muscle numbness, soreness, sharp stabbing pains, and impaired mobility, strength, and grip; and deep, dark spontaneous bruising and ruptured blood vessels and tissue damage is common.  They never heal, but progressively grow worse.

25.  Rush experiences all the effects listed at 22; he has multiple late-stage lipomas which are positioned to acutely aggravate nerve clusters/muscle groups and rupture blood vessels.

26.  For example, Rush has late-stage lipomas in the following areas:

   a) Upper chest-left side-about the rib cage that acutely aggravates and impairs Rush's ability to lift his left arm above horizontal, lift over ten pounds, and sends sudden sharp pain throughout chest area when deep breathing or brushed against;

   b) Left forearm[5] directly aggravating both nerve clusters and multiple muscle groups—which acutely aggravates and impairs rush's ability to use his left arm in any meaningful manner. (e.g. substantially impairs ability to grip, hold, carry weights of ten pounds, and substantially impairs his range of motion to the point he is unable to properly bath, wash his hair, or promote meaningful exercise);

   c)  Both left and right tricept regions, which aggravates those pivotal muscle regions

---

[5] Rush is a life-long "lefty" and his right is more like a foreign limb than any real use to him.

9

and substantially impairs rush's range of motion, etc.

27.  In March 2005, Rush began making reasonable requests for medical care to have the lipomas removed because he was experiencing the following:

a)  Easily observable and classic symptoms of late-stage, acutely painful lipomas;

b)  Acute pain, sudden sharp stabbing pain, tingling and or burning sensations; deep dark discolored and painful bruising, ruptured blood vessels, nerve and tissue damage, and substantial impairment of rush's normal daily functions.[6]

c)  Substantial impairment and inability to enjoy life;

d)  Several lipoma related accident episodes that were dangerous and created a tangible and serious risk to current and future health or a like permanent injury and also adversely affected Rush's work performance;

e)  Substantial weight gain—some twenty-five pounds over the period—(i.e. obesity) and substantial deterioration of mind, body, and health, which creates a substantial and likely threat to health (e.g. exposes Rush to end organ damage, type two diabetes, stroke or coronary events, and aggravates his chronic disease: Hepititas C; and

f)  Increases ridicule, shock, and or repulsion from correction staff, civilians, and peers alike when they viewed the hideous lipomas—especially the large often deeply bruised growth on his left forearm with its ruptured blood vessels.  These common and frequent reactions aggravate and damage Rush's self-esteem, cause him acute mental and emotional distress, anxiety, and depression.

---

[6] Rush's impairment of normal daily functions shall mean substantial impairment of mobility, range of motion, ability to bath, sleep, work, carry, lift, and or promote good health via meaningful exercise.

10

28. Even as early as March 2005, any layman could easily observe the advanced stages of Rush's lipomas—their obvious pain and impairment of his normal daily functions, and of Rush's deteriorating health, and consequently may infer the need for urgent medical care.

29. Rush's lipomas will never heal on their own; will only grow progressively worse over time and create more tangible and residual damage, and the denial to treat them constitutes a continuing violation.

30. Moreover, Rush was examined by medical personnel and they, too, acknowledge the need for urgent medical care (i.e. excision of lipomas), but failed repeatedly to provide the care they themselves acknowledged and ordered as needed.

31. For example, Rush submitted a sick call request[7] (SCR) sometime in April 2005 (circa) and was examined on March 16, 2005 by FCM medical staff who examined the lipomas in both arms—one measuring 4-5 cm and the left measuring 5-6 cm. Also, Rush informed staff of his acute pain, impairment of normal daily functions and other experiences listed above at 24 (a-c) and 25 (a-c and f).

32. Staff acknowledged the urgent nature of Rush's lipomas then by coding a consultation request as "urgent (1-2 weeks), however, Rush was not made aware of the "urgent" code until late 2006.

33. Rush was alternatively told that he would have to receive further consultation and "clearance" (i.e. authorization) from Dr. Alie for their removal.

34. Rush noted the acute pain again and noted that while incarcerated in the 1980's, he had had several late-stage lipomas removed then; that it was a simple outpatient procedure that only required a local anesthetic and a few minutes; that his medical record contained this informati9on; and Rush noted the progressive nature of his newest late-state growths.

---

[7] Sick call request and sick call slip are used interchangeably herein.

35. Rush, therefore, requested a timely scheduling with Alie and pain meds during the interim.

36. Staff—who is believed to be a nurse(_ ___ ___ ___) disregarded Rush's pleas and stated the following: "There are some two-thousand inmates here and you are not the only one who needs help so be patient., and if I were you I would not give up because they don't like to send people out for procedures—it costs them too much."

37. Rush took this statement as a reference to FCM's custom/policy to deny needed medical care due to a non-medical criteria of cost—avoidance, particularly for outpatient off-site procedures.

38. Some eight weeks later around May 2005 Circa (discovery will bear out the exact date), Rush was scheduled to be examined presumably by Dr. Alie, though she refused to provide her name.

39. The doctor was very short and curt towards Rush, and she interrupted him and cut him off several times while he explained his suffering from the lipomas.

40. She barely glanced at the one on his left arm—the most painful—and refused to examine the one on his rib cage or tricep regions stating that she did not need to see them.

41. She abruptly stated: "Look I'm going to be candid with you—it's my medical opinion that these growths are not serious enough o warrant removal at this time."

42. Rush was flabbergasted by the incredible finding and challenged it as unfounded in view of her repeat interruptions, refusal to let him explain his ailments, and refusal to conduct any meaningful examination,

43.  Rush reiterated his acute pain and impairment of normal daily functions, and noted that the last time they were removed they were about the same size or slightly smaller than his current limpomas.

44.  Outwardly irritated, the doctor sharply inquired: "Well, what is it exactly that you want done?"

45.  Rush responded that he merely wanted the standard medical care that this type of late-stage growth would normally receive; to have them removed before they grew worse like they were before.

46.  Finally, the doctor stated she could not promise anything, but that she would file a medical referral, which would be subject to a review process, and that he would be rescheduled once the process was complete.  Meanwhile he would have to be patient.

47.  Several months passed with no follow up or pain meds provided.

48.  Sometime in late July 2005, Rush found out that the Department of Corrections (DDC) had exercised emergency authority due to FCM's extraordinary failures and breaches of contract and consequently voided FCM's contract with Delaware DDC.

49.  Rush was led to believe by FCM that his reasonable request for "urgent" and needed medical care was being processed and that he was on a waiting list.

50.  Alternatively, FCM employed a ruse as a delaying tactic and or created arbitrary obstacles to deny Rush needed treatment in bad faith and as a custom/policy of cost-avoidance on providing outpatient off-site medical procedures, however, absent any legitimate medical factors and absent valid professional medical judgment.

51.  FCM's bad faith ruse was consciously employed to dupe Rush and it did cause him to unnecessarily suffer significant pain, discomfort, impairment of normal daily functions, and mental and emotional distress, and humiliation; and a likely tangible threat to future health.

52.  Mid-July 2005, CMS accepted the emergency no-bid contract with Delaware D.O.C. as the health care provider for the prison population.  It was reported that CMS assumed all the responsibilities, liabilities, and or continuing claims from the prior health care provider, FCM, in the News Journal.

53.  CMS consciously employed a substantially similar custom/policy of denying obviously needed and or doctor's ordered medical care regarding Rush's lipomas, however, CMS managed to aggravate the gross deliberate and indifference in the process.

54.  First, Rush experience two accidents that were directly caused by his late-stage lipomas:  On 9-1-05, Rush was jolted awake by a sharp-stabbing pain to his left arm and he fell from his bunk and sustained an abrasion to his forehead.  While asleep, Rush evidently rolled over onto the left arm aggravating the painful lipoma and causing the sharp-stabbing pain.

55.  Rush experienced work loss on 9-2-05 as a result.

56.  On 9-26-05, Rush bumped his left arm (i.e. lipoma) while carrying a piece of furniture at his work site of thirteen years.

57.  Rush was paralyzed with pain shooting up his left arm into the shoulder region and he dropped the customer's furniture causing damage to it.

58.  Rush was directed by staff to seek medical care.

59.  Rush experienced work loss on 9-27-05 as a direct result of the 9-26-05 incident.

60.  Rush filed another SCR on 9-30-05 and noted that he was "suffering from several painful lipomas ion both upper arms and upper chest on the left side.  Specifically, a large lipoma

14

is exerting pressure on the nerves, etc. of my left forearm, right upper arm…They are adversely

effecting my daily functions.

61. On 10-3-05, Rush's SCR was received and a reply stated, "10/3/05 on computer to

be seen…."

62. Over two months passed with no follow up.

63. On 12-112-05, Rush wrote Plante and requested immediate attention for the

lipomas. Rush again explained his unnecessary suffering acute pain and impairment of normal

daily functions, inability to sleep or promote health via meaningful exercise, and my valid

concern over my deteriorating health and likely risk of future health or permanent injury.

64. Moreover, Rush's medical records contained FCM's "urgent" code for the very

same lipomas.

65. CMS's director of nursing, Plante, never deigned to reply, but alternatively Plante

disregarded Rush's reasonable requests for needed medical care.

66. On 12-16-05—some seventy-seven days after Rush filed a SCR—Rush filed a

formal "Emergency medical Grievance" (EMG) #21535 due to CMS's ongoing denial of needed

medical care for his lipomas and also claimed deliberate indifference.

67. Rush's EMG #21535 noted his 9-30-05 SCR and that their refusal to follow up was

a deliberate and inordinate delay that needlessly caused Rush to suffer acute pain, however,

absent any legitimate medical factor.

68. CMS refused to reply to Rush's EMG; CMS violated Inmate Grievance Procedures

4.4 (IGP) by constructively denying the clear emergency nature of the EMG and by refusing to

even hear the EMG within 180 days as mandated by IGP; and in fact, CMS attempted to

preclude Rush meaningful access to the grievance process and ultimately to the courts in

retaliation for his grievance activity.

69.  IGP clearly mandates the following:

> Purpose: . . .Every inmate <u>will</u> be provided a <u>timely</u>, effective means
> of having issue brought to the attention of those who can offer admin-
> istrative remedies <u>before court petitions can be filed</u>…
>             (Emphasis added)

70.  IGP clearly identifies EMG as:

> IV.  Definitions:
> …B.  Emergency Grievance:  An issue that concerns matters which
> under regular time limits would subject the inmate to substantial
> risk of personal, physical, or psychological harm.
> …J.   Medical Grievance Committee (MGC): …minimum of three
> medical services contractual staff from the following list: Health
> Service Administrator, Director of Nursing….

71.  IGP mandates "The, IGP <u>shall</u> afford the grievant a meaningful remedy…within a

reasonable, <u>specified time period</u>…" (Emphasis added)

72.  Furthermore, IGP defines the "reasonable, specified time period" as a "maximum

period between initial grievance receipt and final appeal response <u>shall not exceed 180 calendar</u>

<u>days</u>…(Emphasis added)

73.  Thus, the requisite "Level I (Informal Resolution) and "Level II (RGC…)

hearings must be conducted prior to 180 calendar days lapsing in order to comply with the

"reasonable, specified time period" mandate of the IGP.  Failure to comply with mandates

deprive a grievant of "timely" and "effective" means of seeking administrative redress and

results in a defacto prohibition from seeking redress in the courts (i.e. "…before court petitions

can be filed.")

16

74. Moreover, the IGP mandates specific guidelines for EMGs:

> Emergency Grievance:
> …shall be addressed immediately by the Warden/Warden's Designee.
> …And the [w/wsd] shall respond within one calendar day…If the
> [w/wsd] should determine that the grievance does not meet emergency
> criteria, the grievance shall be…process[ed] through the normal IGP
> process steps. (Emphasis added)

75. All medical grievances are provided to the "medical services contractual staff: for

Level I and Level II RGC hearings. Thus CMS is the Warden's Designee in regard to any EMG

and is bound to screen for medical emergencies within one calendar day.

76. Indeed, it was reported by Commissioner Taylor that CMS's contract called for the

contracted health care provider to be responsible for all medical issues and grievances.

77. Rush's EMG clearly articulated grounds that establish an emergency medical

condition as defined by the IGP, however, CMS refused to provide any treatment within the 24

hour mandated period and constructively determined that Rush suffered no medical emergency.

78. Indeed, CMS refused to provide Rush any meaningful or timely access to the IGP

and failed to conduct any requisite hearing in excess of the maximum 180 days mandated by the

IGP.

79. On February 22, 2006, Rush filed an inquiry with the Inmate Grievance

Chairperson(IGC) as to the status of his EMG #21535 and provided copies to Maloney, Plante,

and to the CMS Delaware Regional Offices (CMS).

80. No response was forthcoming.

81. On 4-30-06, Rush filed a second complaint with the IGC regarding EMG #21535

with copies to Plante, and CMS as well as the Bureau Chief, P. Howard.

82. No response was forthcoming.

17

83.  On 5-15-06, Rush filed a "Direct Appeal" to the Warden in accord with IGP due to CMS's "Adverse Action" against Rush/grievant.

84.  At that time, 150 days had elapsed since Rush filed his EMG but CMS refused to conduct any of the requisite hearings in violation of IGP.

85.  Moreover, while CMS was denying Rush access to the IGP, it had provided Level I hearings to three grievants on 5-9-06, but all three of these grievants had filed their MG(s) on or about March/April 2006 (Circa).  They were filed well after Rush's EMG, but they were provided access to the IGP y CMS; however, CMS refused Rush access to the IGP. (Inmate grievants on 5-9-06 were Baxter, Williamson, and Rivera).

86.  CMS malicious and capricious denial of the IGP to Rush—despite his emergency nature and despite his two complaint letters—is clearly a conscious adverse act, which constitutes prohibited "Reprisal," and did deny Rush access to the IGP and did deny Rush the ability to petition the courts for relief.

87.  Moreover, CMS completely disregarded the IGPs regarding medical emergencies and did not even attempt to establish adeauate procedures to screen for medical emergencies— via EMG(s)—and or establish adequate procedures to treat such medical emergencies once alerted.

88.  The Warden failed to comply with IGP regarding "Direct Appeals," and Rus consequently filed a "Medical Grievance/Reprisal Appeal" according to IGP with the Bureau Chief P. Howard on 5-28-06.

89.  Rush also filed a formal Reprisal Grievance (RG) RG #46403 in direct response to the retaliation (e.g. denial of grievance process), and Rush filed another MG #43843 regarding

CMS's continuing deliberate indifference in deliberately denying rush needed medical care for his lipomas.

90.  Eventually the DOC(s) had to intervene taking extraordinary steps—and "reopen" EMG #21535 and #46403, however, determined that #43843 was a "duplicate" of 21535. This occurred 7-28-06 a full seven months after filing EMG #21535.

91.  Meanwhile, during the time CMS deliberately denied Rush any meaningful medical care and denied Rush access to the IGP and courts, CMS alternatively removed a benign growth from the neck of inmate Ernest Patrick (SBI #072925) sometime in September 2005.

92.  Patrick had filed a SCR sometime in August 2005 and CMS wasted no time providing Patrick medical care that was substantially similar to what Rush requested, but denied to Rush.

93.  On October 30, 2006, the DOC, Bureau Chief, P. Howard, found in favor of Rush's claims of EMG 21535 and "Upheld" [sic] Rush's appeal request. Administrative procedures have been exhausted, though, Rush was denied access within the meaning of IGP, retaliated upon, left to suffer physical, mental, and emotionally as a direct result of CMS's medical and grievance denials, and Rush was needlessly forced to exercise extraordinary efforts to even receive any access to the IGP.

94.  Unfortunately, CMS continued to refuse Rush his needed medical treatment despite his EMG, despite the two complaint letters to CMS, despite letters to Plante and Maloney, and despite the DOC's findings regarding said appeal #25135.

95.  CMS , Maloney, and Plante have thus been provided adequate notice of Rush's objectively serious medical condition; his claims of deliberate indifference and retaliation, and still they took no meaningful effort to provide Rush his needed treatment.

19

96. Instead of providing rush needed—yet simple outpatient—treatment, CMS employed delaying tactics, constructed arbitrary obstacles to delay/deny care, and refused to otherwise take affirmative corrective action to rectify a clear systemic breakdown in providing medical services; however, absent legitimate medical factors.

97. The need for corrective action is obvious, and it is obviously clear that existing CMS policies resulted in violation of Rush's constitutional rights against cruel and unusual punishment and against retaliation for him seeking protected redress via IGP and the courts.

98. On 1-5-06—a full ninety-seven days after Rush's 9-30-05 SCR and twenty days after his EMG filing—Rush was scheduled in with John Doe, MD (_____), regarding Rush's lipomas.

99. Rush explained in detail his acute suffering (Item 25 (a-e) incorporated herein), however, the doctor treated Rush with contempt and indifference.

100. For example, the doctor constantly interrupted Rush and talked over Rush making inappropriate and dismissive comments, and he actually attempted to silence Rush from explaining his acute ailment and its effects.

101. Moreover, the doctor disregarded the obvious and classic symptoms of late-stage aggravated lipoma growths, and instead attempted to construct an implausible pretext in order to explain away Rush's pain and mobility problems. Indeed, the doctor said upon Rush's description of his sleep position as the cause of Rush's "Nerve Clusters" being aggravated.

102. The doctor completed dismissed the prior diagnosis, the "urgent" referral for excision, and the standard treatment in addition to the easily observable physical symptoms and Rush's articulate and detailed complaints.

103. The doctor's misdiagnosis was so far removed from any exercise of professional medical judgment that Rush's exam can only be characterized as an intentional mock exam designed to deny treatment.

104. The doctor's real efforts were to realize CMS's custom/policy to deny care and or create an inordinate delay—causing Rush to unnecessarily suffer—of cost-avoidance by intentionally misdiagnosing or grossly under diagnosing Rush's easily observable serious medical condition.

105. Rush was adamant about receiving the standard care and he pressed the preposterous findings of the doctor.

106. The doctor abruptly ended the session with: "I'm just going to schedule you in for a follow up consultation." This can be identified as the hand off tactic which is actually a needless delaying tactic (i.e. arbitrary construction of needless obstacles to care), however, absent any legitimate medical factors.

107. Rush continued that he was suffering needlessly already for an extended period and Rush pleaded for pain meds, but the cold and callous reply of the doctor was: "Don't they sell Tylenol at the commissary?"

108. The doctor refused to prescribe any appropriate pain meds contrary to the obvious need.

109. On 2-10-06 Rush was rescheduled for the hand-off exam with doctor Durst. (130 days since filing SCR).

110. Rush again explained in detail his acute suffering (item 25(a-e) incorporated herein), and Rush explained John Doe's, MD (_____) erroneous diagnosis, which rush believes was designed to frustrate his efforts to realize meaningful medical care.

111. Durst flatly stated: "That's bologna!" "I'm going to order surgery for the removal of your lipomas, because that's all that can be done to correct the problem."

112. Durst completed the surgery request in the presence of Rush and stated: "I'm not a surgeon, so I can't remove them now—it's really a simple procedure, though—but I can't say when they will get around to it. If it doesn't get done, and I was you, I certainly would pursue the matter. Stick to your guns, if you know what I mean."

113. Rush was experiencing déjà vu all over again, because Durst's caveat: "Stick to your guns, if you know what I mean," inferred a substantially similar message as that of the nurse on 3-16-05.

114. It was clear to Rush that Durst too was commenting on CMS's custom/policy to deny needed care for non-medical reasons (i.e. cost-avoidance), and that Durst believed it likely that Rush would indeed be denied the surgery.

115. Durst's general surgery-excision of multiple "pain" lipomas, which adversely affected Rush's "working, sleeping" was coded "Off site" and "Routine" on the consultation request. Durst did not provide pain meds.

116. CMS, however, rejected the doctor's order for general surgery with an erroneous "Request additional information (If not received within 14 days, on automatic "not met" is assigned, and a new request must be submitted)"

117. A question was written in the comment section: "Any signs of infection or inflammation? Have biopsy been done?"

118. CMS rejection/request for more information was received on 2-14-06 and replied to on 2-15-06 with the doctor replying: "No signs of infection…No biopsy done. Feel none are needed."

119. CMS's automatic cancellation mechanism after 14 days kicks in regardless of the required info having been provided within twenty-four hours, which is in complete contrast to any follow up to provide needed treatment that has been denied or grossly delayed.

120. Consequently, CMS employs arbitrary obstacles to automatically deny needed treatment, but fails to employ meaningful policy to address needed medical care.

121. On 2-20-06, Rush filed notice with CMS of his "Unnecessary suffering due to advanced stage of lipomas."

122. Rush's notice was unnecessary because doctor Durst had already ordered excision of the lipomas as the needed medical care on 2-10-06, and CMS should employ adequate policies to ensure that the medical orders of treating physicians are carried out in a reasonable manner.

123. CMS refused to realize the treating physician's order.

124. On 3-9-06 CMS responded—via Ombudsman Altman—to Rush's 2-20-06 notice/complaint and subsequently acknowledged, in one breath, that Rush's complaint had "merit."

125. In contrast to the complaint having merit (e.g. unnecessary suffering due to denial of needed care), Altman incredibly stated that because Rush was "seen for this condition on 5 January 2006, 30 January 2006, and 10 February 2006…this would indicate to me [Altman] that we have been managing this condition."

126. Being "seen" or scheduled for redundant mock exams, however, never receiving any actual medical care or pain meds whatsoever is clearly not "managing this condition" in any meaningful manner.

127. Moreover, Altman's finding of merit completely contradicts Altman's subsequent erroneous determination of managing the condition—as does rush's medical records.

128. Altman's reply was callous and insulting and it is evidence of CMS's culture of deliberate indifference to serious medical needs.

129. On 3-14-06, Rush was again scheduled for an unneeded, redundant exam before Durst.

130. Rush again articulated in detail his acute, progressive suffering (item 25 (a-c) incorporated herein) and reviewed the prior exam/consultation and surgery referral history to Durst.

131. Rush pleaded for follow up on the needed and already ordered surgery and Rush pleaded for some minimum relief (i.e. pain reliever).

132. Durst finally ordered pain meds for Rush, which is the first such order in nearly six months since Rush filed his 9-30-05 SCR and despite three prior mock exams.

133. Rush was unable to raise his left arm past horizontal without acute pain and Durst theorized it may be due to a torn rotator cuff. Durst also ordered a MRI of Rush's left shoulder to rule out a torn rotator cuff.

135. Again Rush also filed notices/complaints to CMS regarding his EMG 21535 (lipomas) on 2-22-06 and 4-30-06.

136. Meanwhile, CMS also engaged in scheduling Rush for ghost medical visits in an effort to cause him injury (e.g. loss of earnings and good time credits) and frustrate Rush on 2-9-06 and 3-23-06.

137. This tactic would be continuously employed by CMS despite Rush grieving the matter repeatedly.

138. Indeed, CMS has a history of over-scheduling patients—despite absolutely no realistic chance of actually being attended to by medical personnel—because the excessive

amount of scheduled patients exceed the operating hours and existing staffing levels by several times.

139. This tactic is referred to as "Bull-pen therapy" by the inmate population, and it is understood that despite a clear and repeat pattern of grossly over scheduling patients, CMS continues to do so—packing twenty-thirty-or more inmates—into a space with only ten nominal seats, and then routinely reschedules a majority of patient or employs the mock exams to deny any treatment whatsoever.

140. Then a patient—Rush—must endure the acutely aggravating and frustrating "Bull-pen therapy" session again and again with no end in site and little or no hope of actually receiving care.

141. This tactic is very effective for CMS, because a large portion will seek to end the "Bull-pen therapy" by "signing-off" on a refusal of medical care form.

142. The repeat ghost medical visits also help CMS realize its goal of causing financial injury and unbearable conditions in order to frustrate the inmate population and thus secure their "Refusal" forms.

143. Indeed, it is ironic how quickly CMS medical personnel materialize with the "Refusal" forms when a patient can no longer bear the "Bull-pen therapy." It's as if they lie in wait to secure an inmate's signature.

144. On the contrary, if an inmate decides to fight this psychological war of attrition with CMS, he will likely and routinely wait, and wait, and wait, and then be confronted with a "sorry we will have to reschedule you" or he will likely receive a ghost scheduling or mock exam—like Rush's prior three exams and two prior ghost visits.

145. CMS's continuing pattern of "Bull-pen therapy" is too blatant, too consistent, and too convenient to be dismissed as anything other than the conscious employment of bad faith tactics to create inordinate delays or denials of medical care without legitimate medical factors.

146. On or about 4-28-06, Rush was finally sent off-site presumably to have his lipomas removed, though, it appeared to rush that it was some type of CMS procedure of which required a second refer/order from a specialist.

147. Rush explained in detail his suffering again to this doctor (_____), (item 25(a-e) incorporated herein) and also noted that the growth on his left arm had progressed from a large marble size to a larger peach pit size, and that it was causing Rush acute, stabbing pain, deep bruising and ruptured blood vessels.

148. It was obvious to the doctor the serious nature of rush's late-stage and aggravated lipomas were, and the likely and substantial risk of permanent nerve and tissue damage.

149. The doctor explained that he could not remove the lipomas due to logistic problems at the facility but assured Rush that he would be rescheduled in the very near future for their removal.

150. The doctor completed CMS's requisite surgery referral and noted it as "Elective" surgery, but due to the obvious advanced stage and seriousness of rush's specific condition he coded it "Urgent." We already know an urgent code requires follow up in two to three weeks.

151. CMS refused to provide the doctor's ordered treatment again despite the order and despite the urgent code.

152. Moreover, on 4-17-06 another on-site consultation request for surgery had also been resubmitted to CMS and it contained the original request and reply to CMS's info. Request.

153. On 5-4-06, CMS scheduled Rush for his third ghost medical visit regarding his lipomas.

154. On 5-5-06, Rush was sent out for his shoulder MRI.

155. Rush filed his second MG #44468 and specifically claimed: that the MRI ruled out Durst's theory of a torn rotator cuff, therefore, the impaired mobility and range of motion was caused by Rush's original complaint of painful lipomas—and evidently it has caused significant deterioration of Rush's shoulder because the MRI showed muscle atrophy; that CMS was intentionally creating inordinate delays—via misdiagnosis, cancelled appointments, and deliberate refusal to provide Rush access to the grievance procedure.

156. MG #44468 also claimed Gail Eller fabricated the MRI results in order to diminish the serious nature of Rush's medical condition.

157. Also, Eller refused to return to the underlying ailment of painful lipomas, despite the MRI ruling out Durst's theory of a torn rotator cuff.

158. The pretext was ruled out, but still CMS refused to provide the needed and doctor's ordered medical care for rush's acutely painful and deteriorating condition.

159. On 6-14-06, Durst gave Rush the MRI readings.

160. On 6-16-06, CMS again scheduled Rush for a ghost medical visit regarding his lipomas and causing him unnecessary injury in the form of lost wages and good time credits.

161. Also, 6-16-06 marked the lapse of 180 calendar days since Rush filed his EMG #21535, but CMS refused to provide Rush with any of the two requisite medical grievance hearings to this date in clear violation of IGP mandates.

162. CMS consciously violated IGP and refused to provide access to the IGP, however, did provide other inmates hearings who had filed much later medical grievances (items 76-83 incorporated herein).

163. CMS also disregarded Rush's two letters of inquiry regarding the same MG (e.g. 2-22-06 and 4-30-06).

164. CMS is clearly aware of the one and only result of denying Rush access to the IGP, and that is to preclude him from seeking redress in the courts, because the IGP clearly states the administrative process must be complete before one may file petitions with the courts.

165. This behavior shocks the conscience and it is painfully obvious that CMS's conscious acts cannot be dismissed as inadvertence, but are substantially likely to violate Rush's constitutional rights.

166. On 6-23-06 Rush filed a grievance against CMS (MG #__ ___ ___) requesting reimbursement for his loss of earnings, which was needlessly caused by CMS's employment of "Bull-pen therapy" (e.g. ghost medical schedulings).

167. On 7-21-06—Nearly seven months after filing EMG #21535—Rush was finally provided the first requisite Informal grievance hearing.

168. The informal investigation seized on the referring doctor's term of "elective," however, deliberately omitted his "urgent" code, which referred not to the general elective nature of insignificant lymphoma growths, but did refer to Rush's particular late-stage lipomas.

169. By seizing the general term and omitting the specific "urgent" code, CMS staff misrepresented the grievance investigation/report.

170. On 9-27-06—nearly nine months after filing EMG #21535—Rush was provided the second requisite Formal Grievance hearing before Eller.

171. Eller rigged disinformation, misstatements of fact, and wholly dismissive approach to Rush's progressive and acute lipomas and CMS clear denial of care. She seized the so-called "elective" characterization and suggested that Rush's ailments were a figment of his imagination. Eller also offered her interpretation of his MRI as being nothing more than an "arthritic shoulder," which was absolutely contrary to what the MRI indicated.

172. Moreover, Eller is believed to be the new director of nursing and it appears that she is unqualified to even interpret an MRI reading.

173. Also, Rush pointed out that evidently the theorized torn rotator cuff was ruled out so that clearly brings us back to the original lipomas as the cause of Rush's impaired range of motion, mobility, and pain.

174. Eller became visibly irritated at Rush's use of clear logic to destroy her attempts to manufacture preposterous and medically unfounded reasons to support CMS's custom/policy of denying needed medical care absent legitimate medical factors.

175. Eller disregarded Rush's medical record, both doctor's orders for lymphoma removal. Rush's consistent and articulate complaints of needlessly suffering, and disregarded the obvious need for medical care when rush rolled up his shirt sleeve to show the panel his deeply bruised lymphoma with visibly ruptured blood vessels.

176. Also, despite a doctor providing information to CMS already that no biopsies were needed, and despite that information being relayed to Eller, she nevertheless listed Rush to be "scheduled for biopsy" as opposed to scheduling Rush for the already three times ordered surgical removal of his lipomas.

177. Eller is clearly employing CMS's custom/policy of denying or delaying needed treatment by constructing arbitrary obstacles to the needed treatment, however, absent any legitimate medical factors because her biopsy order was contrary to the informed medical opinion of a doctor and contrary to the "urgent" code for surgery done back in April 2006.

179. Eller consciously disregarded Rush's objectively known serious medical condition.

180. Rush filed a formal appeal and DOC upheld Rush's claims and requests, but CMS still refused to provide the needed, doctor's ordered, and DOC recommended medical care.

181. On 12-12-06, Rush filed another complaint to CMS and again noted the following:

   a) Impairment of normal daily functions;

   b) Impairment of sleeping, showering, and lifting, grabbing, or holding moderate weight;

   c) Impairment of ability to promote good health via meaningful exercise;

   d) Significant deterioration of body;

   e) Significant unnecessary pain and suffering;

   d) Inadequacy of Motrin pain relievers, which Rush must take ever increasing and dangerous doses; and Rush illustrated his

   f) Significant mental and emotional distress by outlining that he was unable to sleep without the aid of sleep agents—that when he did sleep he had disturbing dreams—that he felt powerless and overwhelmed—that he felt broken.

182. CMS responded to Rush's 12-12-06 plea with its true to form deliberate indifference on 12-28-06.

30

183. For example, Altman incredibly states he reviewed rush's medical records and that Rush had "not submitted a sick call request in over nine months...medical staff would not be aware of the need for care if you have not notified them."

184. Altman even provided a copy of his "with merit" 3-9-06 reply with the 12-28-06 reply, but the 12-28-06 reply is completely contrary to Rush's claim of being denied treatment and of Altman's determination that said claims had merit.

185. Rush was shocked by Altman's about face and clearly erroneous reply.

186. As of 12-12-06 Rush had provided CMS with the following forms of notice/requests for needed medical care:

a) Four written notices (April 05, Sept. 05, Dec. 05, and Dec. 06;

b) Three formal grievances (EMG #21535, RG #46403, and MG #43843);

c) Six physical live notice at redundant consultation/mock exams (March 05, May 05, Jan 06, Feb 06, March 06, and April 06);

d) Attended several grievance hearings, filed several direct appeals and filed formal appeals; and

e) Rush's medical file already contained multiple doctor's orders for the needed medical care.

187. These facts are contrary to Altman's incredibly impossible claim that "medical staff would not be aware of the need for care."

188. Again, Rush is directed by CMS to perform redundant and unnecessary jumping through hoops as CMS constructs barriers to receiving needed care for Rush's objectively known serious medical condition.

189. Rush challenged CMS's shocking behavior and use of psychological warfare on 1-17-07 in a letter to the Bureau Chief as non-compliance with EMG #21535.

199. Rush filed a copy with CMS Delaware Office.

191. CMS never acknowledged Rush's 1-17-07 complaint.

192. Meanwhile on 12-21-06, Rush was scheduled to see doctor McDonald for his chronic disease (e.g. Hepatitis C), and Rush recited his lipoma suffering and cancelled surgery history, etc.

193. McDonald replied to Rush's plea to follow up on the lipoma surgery: "Well, I'm surprised that they even sent you out for that because there are cost containment issues. It's usually an unnecessary operation unless they press against a nerve or rupture a blood vessel."

194. Rush immediately pulled up his left shirt sleeve to show McDonald his current visibly ruptured blood vessels and deep blue/black bruising and tissue damage. Rush also affirmed that the now golf ball sized lipoma was constantly aggravating the muscle group and nerve clusters—that it caused Rush acute pain and significantly impaired the use of Rush's left arm.

195. McDonald dismissed rush's obvious inflamed and painful lipoma growth and refused to even conduct an examination of his lipomas—despite Rush meeting McDonald's medical standard of ruptured blood vessels and up against the nerves.

196. McDonald rolled his eyes and stated "What, do you want me to squeeze them or something?"

197. Rush was shocked and humiliated at McDonald's contemptuous and callos reply.

32

198.  Evidently, McDonald chose a medical standard that he thought Rush could not meet, but when Rush did meet the so-called objective medical factors, McDonald nevertheless refused to follow up on the surgery or provide any care whatsoever.

199.  McDonald continued and even referenced CMS's custom/policy of cost-avoidance, which is not based on legitimate medical factors, but is clearly contrary to existing medical factors.

200.  CMS has continued to needlessly expose Rush to acute pain and suffering; muscle, nerve, and tissue damage; significant disfigurement; mental and emotional distress; significant impairment of Rush's normal daily functions; and a likely and significant residual threat to Rush's future health and well being.

201.  Indeed, Rush has been precluded from realizing any meaningful exercise and it has caused him muscle atrophy, significant weight gain—in which rush is now officially "obese" and exposed to diabetes and or end organ damage; and significant physical deterioration.

202.  Rush's lipomas are progressive, will never heal, and result in more and more damage as time goes on.

203.  CMS and other named defendants are clearly aware of Rush's objective serious medical needs and the resulting distress, but have engaged in a custom/pattern of deliberate indifference by denying rush his needed—yet simple outpatient—medical care for some seventeen months.

204.  On 4-9-07, Rush filed still another SCR outlining his acute pain, bruising, and ruptured blood vessels.

205. The serious nature is so clear and obvious any layman can infer the need for immediate medical attention.

206. The need to take affirmative correction action is also obvious and failure to employ policies to correct rush's denials is also an obvious violation of his constitutional rights.

207. Meanwhile, Rush needlessly suffers and is commonly subjected to shock, ridicule, humiliation, and revulsion directly related to his disfigurement from his advance state—gross—lipomas.

208. For example, on 12-14-06, Rush was sent to Kent General Hospital for an unrelated procedure and Officer Young pointed to Rush's left arm—limpoma—and stated with obvious revulsion: "Man, what's that thing!"

209. Young continued: "You should really get that thing removed while you are here!"

210. Thereafter, the nurse returned and with shock mistook the same lipoma for a possible adverse reaction to a needle she had previously given Rush.

211. Not a week passes that someone has not ridiculed, pitied, or shown Rush revulsion due to his lipoma condition. He has been called "Elephant Man," "Lumpy", and "Alien" to name a few.

212. Rush suffers a direct loss of reputation and standing as a result of his prolonged condition not being treated.

213. Also, while CMS was busy denying rush needed care, it had alternatively provided inmate Joseph Wittrock unilateral and unsolicited care substantially similar to Rush's requests.

214. Wittrock never placed a SCR, but was scheduled in for an annual physical.

215. Doctor Vandusen noted a benign growth (e.g. senial-caratosis) on Wittrock's temple about the size of a raisin.

216. Wittrock did not indicate any pain associated with his growth, but Vandusen saw to it that Wittrock would have it removed off-site and out-patient.

217. Without any delay or follow up, Wittrock was sent out on 1-15-07 and had the growth removed.

218. Rush still suffers needlessly, because CMS refuses to care for his acutely painful growths.

219. The sheer number of specific instances—continuing course of action—by CMS to deny, delay, and frustrate Rush's needed medical care over the past seventeen months, in which CMS and all named defendants know is painful and ineffective is tantamount to deliberate indifference to Rush's known serious medical needs.

220. Defendant's ongoing denial of needed medical care does expose Rush— unnecessarily—to likely and significant risk to his future health due to the greatly increased risk of accidents/incidents, such as by falling or losing control and dropping objects upon himself when a painful lipoma is aggravated.

## COUNT II: Denial of Reasonably Adequate Medical Care

221. Defendants CMS, Durst, and Eller have either intentionally denied, delayed, and/or knowingly provided a less efficacious and inadequate medical care with intentional deliberate indifference to Rush's known serious medical condition. Said defendants employed a pervasive and continuous pattern of deliberate acts to deny Rush minimal standard/effective medical care for his acutely painful right shoulder that needlessly caused Rush to suffer acute

35

pain, substantial impairment of mobility and range of motion, and substantial impairment of his

normal daily functions.  The end result of these impairments is a tangible threat of permanent

injury and a substantial likely risk of residual injury and threat to Rush's future health.

222.  Rush's right shoulder injury is objectively known as a serious medical condition

that requires immediate/emergency medical care by defendants at 219 for the following reasons:

> a) By virtue of the fact that rush articulated and demonstrated symptoms
>    of acute pain, substantial impairment of mobility, strength, range of
>    motion to Durst, and these observable objective factors substantiate
>    an objective serious medical condition;
> b) By virtue of the fact Rush suffered substantial impairment of his normal
>    daily functions that included the inability to raise his arm to horizontal, to
>    shower or to wash his hair; promote good health via meaningful exercise,
>    and it greatly aggravated his obesity and painful lipoma conditions;
> c) By virtue of the fact items (a) and (b) conspired to create a tangible threat to
>    Rush's current health and a likely residual threat to Rush's future health,
>    including a substantial, increased risk of developing Type 2 diabetes,
>    Cardiovascular disease, stroke or a coronary incident, and by severely
>    aggravated Rush's chronic disease of Hepatitis C and creating likely per-
>    manent end-organ damage;
> d) By virtue of the fact that an objective medical/physical exam substantiated the
>    effects and results at items (a) thru (c), and on MRI diagnostic test clearly
>    exposed a degenerative sub cortical cyst in Rush's humeral head (ie. Shoulder
>    area) and a rotator cuff impingement, which are both aggravated by a down
>    sloping of the acromium muscle (i.e. muscle atrophy);
> e) Because the condition persisted unabated—actually worsened and
>    degenerated—and the prescribed pain meds (e.g. Motrin) proved wholly
>    ineffective; and
> f) Because any layman who casually observed Rush's obvious acute pain and
>    impaired mobility, strength, and range of motion could easily infer the
>    immediate need for medical care.

223.  Defendants at 221 individually and officially acted with deliberate indifference and

or gross negligent disregard of Rush's objective serious medical condition in the following

manner:

> a) By down playing the severity of the known and obvious serious medical
>    condition (contrary to medical factors);
> b) By denying the minimal  standard medical care for non-medical reasons;

    c) By denying any legitimate medical care to correct or improve
       the condition for non-medical reasons;

    d) By continuing a course of treatment that is a known substandard
       or less efficacasious treatment;

    e) By creating frivolous pretexts and or deliberate under diagnosis
       that is contrary to the objective medical symptoms in order to
       mislead Rush; and

    f) By making false statements of creating a viable treatment plan,
       however, actually offering a mock treatment plan, which is devoid
       of any actual professional medical judgment.

224. The following facts establish the above items at 221-223, and these facts establish

the subjective personal involvement of defendants and or the corporate custom policy of CMS to

deny/delay needed medical care; however, based on non-medical factors.

225. On 3-14-06 Rush was examined by Durst regarding his acutely painful lipomos.

226. Durst took special note of Rush's significant pain and impairment of his strength,

mobility, and range of motion with his right arm.

227. For example, Rush was unable to lift his right arm—out straight—past horizontal

(i.e. parallel with the floor) without experiencing paralyzing pain.

228. Durst noted "severe pain" and "multiple" possible signs of a torn "rotor cuff"

based on his comprehensive medical exam.

229. Durst ordered an MRI diagnostic test to determine the exact causes of Rush's

acute pain and mobility impairment, and to determine the extent of injury.

230. Durst also ordered 800mg of over-the-counter pain meds: Motrin to begin

immediately.

231. Durst, however, never indicated what the possible causes may be, what the

ramifications may be, or what the causes may be, what the ramifications may be, or what the

minimal standard treatment may entail.

232.    Rush, however, had been needlessly suffering acutely painful lipoma growths in both arms for an extended period of time and believed his shoulder pain and impaired mobility was naturally related to this serious medical condition—if not significantly contributed to the condition and or aggravated it due to his deteriorating physical condition.

233.    For example, Rush has been impeded from his ability to promote good health via meaningful exercise due to the acutely painful lipomas and as a direct result, Rush has gained some twenty-five to thirty pounds—is now categorized as dangerously obese—has experienced muscle atrophy and has experienced significant degradation of his overall physical body,

234.    Indeed, Rush's significant impairment of normal daily functions have exposed Rush to such injuries, to a likely and significant risk of permanent injury and needless suffering, and to a residual risk of future injuries.

235.    Though, CMS staff were objectively aware of Rush's acute pain and suffering, etc., Rush was not provided the motrin for several weeks after Durst had ordered it.

236.    On 5-5-06, Rush received the MRI test.

237.    On 5-10-06, CMS engaged in its bull-pen therapy and scheduled Rush in for a ghost medical visit to receive the MRI results, but no MRI results were ever received by the DCC hospital. This caused Rush to lose income and good time credits unnecessarily.

238.    The Motrin pain meds proved wholly ineffective at managing Rush's acute shoulder and or lipoma related pain.

239.    On 5-30-06, Rush filed a formal EMG (e.g. EMG #44468) and grieved the following:

> a) That "CMS has demonstrated a pattern of both denying the needed and minimally adequate treatment, and or by creating an inordinate delay in rendering needed care";

38

      b)  Continuous deliberate indifference to Rush's serious medical
           needs;
      c)  Scheduling ghost doctor's visits and claiming the ghost visit
           was treatment when nothing was actually provided;
      d)  That the motrin was inadequate—and had lapsed; and it requested:
      e)  Adequate pain reliever and whatever follow up medical care was
           required, etc.

240.    CMS not only deliberately failed to comply or even attempt to employ policies to
comply with Emergency Medical Grievances, it fails to employ any tangible/viable policies or
procedures to meet the serious needs of patients.

241.    Rush was already objectively diagnosed with "severe pain", significant mobility
and range of motion impairment—which was so acute it was indicative of a possible torn rotator
cuff by Durst on 3-14-06.  This is a known objective fact.

242.    Rush clearly indicated that the motrin was ineffective and that it had lapsed
anyway via his EMG on 5-30-06.

243.    The objective standard for an "emergency" according to the IGP is an "issue that
concerns matters which under regular time limits would subject the inmate to substantial risk of
personal, physical, or psychological harm…."

244.    Under the IGP, Rush's acutely painful condition was already found by Durst to
constitute a substantial risk of personal, physical, or psychological harm.  Thus, the EMG should
have been screened within 24 hours in accord with the well established IGP so that Rush could
be treated directly.

245.    CMS, however, has yet to process or screen any medical grievance that happens
to invoke "emergency" criteria/claims in clear violation of the IGP and with gross reckless
disregard to Rush's painful serious medical condition.

246.    This is a well known grossly deficient custom/policy (act or omission to act) that is not rooted in valid medical factors, but actually is contrary to and disregards legitimate medical factors with gross malfeasance.

247.    For example, Rush's EMG #44468 was not even screened or processed before medical personnel until 6-6-06 (seven days later), and even then medical personnel refused to apply the objective "emergency" medical criteria—pursuant to IGP that would mandate "immediate" treatment, and simply disregarded Rush's suffering. (Items 67-68, 72 and 73 incorporated herein).

248.    CMS staff Debbie Rodweller completed the initial screening/investigation of EMG #44468, thus Rodweller employed CMS's custom/policy to perfunctorily disregard Rush's EMG; his acutely painful condition, which clearly met the emergency medical criteria and did cause Rush to continue to needlessly suffer.

249.    Rodweller merely documented that the MRI had been done, that rush was on "the list" to be evaluated, and forwarded Rush's EMG to the next level.

250.    No immediate care was provided, no adequate pain medication was provided, no more motrin was even provided, and no minimal adequate care was even considered by Rodweller despite Rodweller reviewing Rush's medical records that clearly supported the medical claims he made in the EMG.

251.    Rodweller's acts and omissions to act were not rooted in valid medical factors, were actually contrary to legitimate medical factors and easily observable symptoms.

252.    Rodweller's acts and omissions to act were wholly devoid of any legitimate professional medical judgment, but alternatively they were the product of CMS's custom/policy to deny/delay needed medical care for non-medical factors, including cost-avoidance.

253.    CMS's custom/policy regarding the gross negligent mishandling of potential emergency medical grievances—that does not even attempt to determine if a valid medical emergency exists—is so obviously likely to violate the constitutional rights of a suffering patient like Rush, that it demands immediate corrective action, but CMS refuses to take any affirmative/corrective action whatsoever.

254.    Indeed, CMS continued to employ its pattern of disregarding Emergency Medical Grievances—specifically Rush's EMGs and objective serious medical needs—back on 12-16-05 (e.g. EMG 21535) and now again on 5-30-06 regarding EMG 44468, and in neither case were they processed/screened according to IGP (ie.e. Rush's complaints, symptoms, and documented medical conditions were not applied to the objective emergency medical criteria).

255.    On 6-14-06, Rush met with Durst to receive the MRI findings.

256.    To Durst's surprise, Rush did not suffer a torn rotator cuff, but his acute pain, suffering, and significant impairment of mobility and range of motion were caused by other physical ailments.

257.    Durst stated that Rush suffered a "droopy shoulder muscle" (i.e. displaced shoulder muscle), and then engaged in a campaign of deception and stonewalling in an effort to downplay the seriousness of Rush's acutely painful, etc. condition.

258.    Durst refused to answer what this condition meant (i.e. what were the ramifications), what were the likely causes, and refused to disclose what was the standard medical treatment for this type of condition.

259.    Moreover, Rush explained again that the Motrin was wholly inadequate at managing the pain, and that the condition was becoming progressively worse—that the pain was

41

so excruciating that it would actually cause Rush to sob and just lie in bed unable to even walk to the chow hall for his meals among impairing other normal daily functions.

260.    Durst shrugged his shoulders at Rush's pleas and stated: "Well, I'm sorry but they won't permit us to prescribe anything stronger." I'll order more motrin."

261.    Durst himself noted Rush's "severe" pain at the earlier 3-14-06 medical exam. Indeed, Rush's pain and impaired mobility was so severe that the doctor mistook it for a torn rotator cuff.

262.    Durst also is aware of the fact that the motrin is inadequate, that Rush's condition is progressive, and that Rush is suffering excruciating and debilitating pain and significant mobility impairment, but Durst disregarded all this known and objective medical criteria and (a) continued a course of treatment (motrin) that he knew was ineffective and cause rush to needlessly suffer, based on non-medical factors (i.e. "they won't permit us to prescribe anything stronger.")

263.    Clearly the perfunctory denial of adequate minimal treatment was not based on legitimate medical criteria, but alternatively based on a defacto custom/policy to deny more costly medications.

264.    Moreover, Rush never received any tangible treatment plan, whether surgery, physical therapy, strength training, or whatever the standard medical care is for Rush's acute condition whatsoever.

265.    Rush was simply sent away by a disinterested Durst, who failed to call upon any semblance of professional medical judgment to the obvious detriment of Rush's health and well being.

42

266.    Also, it appears that Durst engaged in a campaign of deception, because Rush acquired his medical records and ultimately uncovered several inconsistencies with what Durst disclosed and did.

267.    For example, the MRI uncovered a down sloping of the acromium, which is likely the cause of Rush's rotator cuff impingement, and it uncovered a "degenerative cyst" in the "posterior aspect of the humeral head."

268.    Perhaps the downsloping…is Durst's "droopy muscle" characterization, but Durst nevertheless failed to treat it or explain what caused it.

269.    It was likely caused by the severe deterioration of Rush's body and muscle atrophy he has needlessly experienced over the past year plus in relation to his acutely painful lipomas—which significantly impairs Rush's normal daily functions (i.e. ability to promote good health via meaningful exercise, etc.).

270.    As such, this is illustrative of tangible residual physical injuries—perhaps permanent injuries that Rush continues to experience as a direct result of CMS denying him needed medical care.

271.    Also, Durst never mentioned the cist, what it was, what could be done to treat it, or if it was progressive or permanent.

272.    One thing is clear, however, Rush was diagnosed with "severe" pain and significantly impaired mobility, etc. and that is an objective serious medical condition that requires the minimal adequate medical care.

273.    CMS provided no medical care concerning his serious shoulder ailment despite objective knowledge.

274.    Also, Rush discovered that Durst documented a false medical entry in his medical records: (e.g. "Responded to motrin but med was stopped.")

275.    Rush specifically told Durst on 6-14-06 that the motrin was inadequate, but Durst consciously documented a false entry.

276.    Indeed, Rush even specified the exact same complaint on his 5-30-06 RMG, at the informal hearing with Rodwell, and again before Durst on 6-14-06, but Durst disregarded the documented records and Rush's clear and specific complaints.

277.    Durst appears to take bad faith efforts to cover the perfunctory denial of adequate pain meds with this false entry.

278.    This behavior shocks the conscience, and the records clearly show Rush consistently complaining that the motrin was inadequate.

279.    On 8-1-06, Rush received the second Formal Grievance hearing for EMG 44468 with Gail Eller heading the medical board and representing CMS.

280.    True to form, Eller continues to employ CMS custom/policy to perfunctorily deny Rush the needed medical treatment, just as she did on Rush's prior EMG #21535.

281.    For example, Eller stated that the MRI merely showed on arthritic shoulder, but we know the MRI showed no such condition.

282.    Moreover, there is a serious question if Eller is even qualified to interpret an MRI reading. If not, why is she offering an obstensible MRI interpretation?

283.    Nevertheless, Eller's statement was a conscious fabrication designed to mislead Rush and down play his recognized serious medical condition.

284.    Nothing else explains Eller's bizarre behavior or the recurring pattern of a custom/policy of adequate medical treatment being denied.

44

285. Additionally, when Durst's misplaced theory of a torn rotator cuff proved incorrect [(i.e. ruled out)], that returned Rush to his *original underlying complaint of acutely painful lipomas*, but Durst nor Eller would consider any other potential causes. They only ruled out the torn rotator cuff and were content to down play and disregard observable symptoms, and misstate facts in order to avoid addressing any needed treatment whatsoever for Rush's acutely painful and significantly impaired right shoulder.

286. Rush's EMG requested "warranted follow-up treatment/surgery", only because CMS staff engaged in a campaign of deception to mislead Rush and otherwise not disclose what the appropriate standard of treatment would actually be.

287. Surely some type of medical treatment would improve or correct Rush's acutely painful and debilitating condition, but CMS is busy engaged in creating pretexts and red herrings in order to avoid providing needed treatment. These acts are not simple medical negligence, but conscious decisions to deny needed medical care- not based on valid medical factors and are devoid of professional medical judgment –and consequently they do intentional cause Rush to needlessly suffer acute pain; significant impairment of his mobility and range of motion and normal daily functions; and it is significant and likely to cause permanent injuries and or a likely risk or future permanent injuries.

288. Rush exhausted his administrative remedies for this claim.

COUNT III: Denial of Reasonably Adequate Medial Care for Rush's Hepatitis C

289. Defendants CMS, Altman, and McDonald  intentionally or with gross reckless disregard to Rush's known and/or obvious serious medical condition, denied, inordinately delayed, and/or knowingly provided less efficacious, inadequate, or contraindicative medical care for Rush's diagnosed and chronic Hepatitis C/Liver Disease ("HCV") and its residual tangible injuries/symptoms. Defendants' acts or omissions were contrary to legitimate medical factors and despite knowledge of the need for adequate medical treatments (i.e. Interferon/Ribavirin therapy), Defendants did cause Rush to experience the following: (1) undue, significant pain and suffering, (2) undue permanent injuries (i.e. Liver cirrhosis,

etc), (3) a significant and likely risk to his future health and life, (4) a significantly diminished capacity to make a full recover, and (5) Undue diminished life expectancy. ("undue pain and suffering and permanent injuries")

290. Defendants' acts and omissions were intentionally employed via CMS's custom/policy to deny and/or delay Rush's needed medical treatments, and were perpetrated in bad faith and/or with the intent or knowledge that said acts –below- would cause Rush to experience undue pain and suffering and permanent injuries.

291. CMS knew or should have known that said custom/policy of denial and/or inordinate delay would likely cause Rush's HCV to progress and either cause Rush an unreasonable risk to his future health and/or unnecessarily increase his permanent injuries, undue pain and suffering and permanent injuries, and/or disqualify Rush from receiving any viable medical treatment whatsoever (i.e. lost chance of recovery)

292. Defendant employed said custom/policy *in bad faith* and devoid any legitimate medical factors or exercise of professional medical judgment.

293. Rush's Hep C disease was objectively known by defendants as a serious medical condition that required immediate and aggressive medical treatments for the following:

a. Because of the presence of HCV virus persisted for over six months and had advanced to "Chronic" stage,

b. Because of the presence of Hepatitis C virus in Rush's blood stream,

c. Because of the persistently high and rapidly rising liver enzyme levels,

d. Because of the very high and rapidly rising Viral Load count,

e. Because of the Rush's low and progressively worsening platelets, which is know or should have known to pose a substantial and unreasonable risk of internal hemorrhaging and related serious incidents,

f. Because Rush was repeatedly diagnosed with HCV and it was rapidly worsening and Rush was a high risk patient,

g. Because Rush demonstrated residual classic aggravated symptoms (e.g. jaundice and high ammonia levels in the blood stream),

h. Because Rush was enrolled as a Chronic-Disease Patient,

i. Because Rush was a high risk patient who was fast approaching a lost chance of any recovery (i.e. disqualification of treatments and or acute liver cirrhosis), and

j. Because these objective symptoms mandate –under the Center for Disease Control- immediate and aggressive medical treatments (i.e. Interferon/Ribavirin therapy).

294. For example, objective factors that the CDC employs to recommend antiviral therapy (i.e. Interferon/Ribavirin) are as follows:

a. Persistently elevated Alt liver enzymes levels,

b. Detectable HCV RNA for longer than six months, and

c. A liver biopsy that indicates either Portal or bridging fibrosis (i.e. stage one of four), or at least moderate degrees of inflammation.

295. Additionally, the identifying factors for a high risk patient are as follows:

a. Patient over forty years of age,

b. Patients with the most difficult genotype,

c. Patients who had relatively stable liver enzymes or platelets counts, but which began to increase their rates of negative progression, and

d. Patients who experience persistent and/or rapidly increasing viral load counts.

296. AS of August 2005, Rush had already met or greatly exceeded the CDC's standard for recommending antiviral therapy and these legitimate medical factors were aggravated because Rush was a high risk patient who was fast approaching a lost chance of recovery. For instance see the following:

a. As early as March 2003, Rush exhibited the classic and elemental markers indicative of HCV

Rush was 43 then (low platelets of 131 and high liver enzymes: AST 53 & Alt 91);

b. On March 2005, defendant FCM had recorded in Rush's medical records

Rush's diagnosis for HCV, but withheld that information from Rush;

c.      On 9-08-05, Labs re-confirmed Rush's HCV diagnosis and also illustrated

the high risk factors of rapidly progressive counts (e.g. liver enzymes ALT #1 at

91, ALT #2 at 145) (D.I. 27-28, Ex-B, 2006 Labs). [[Negative progression of

Rush's labs and his age of 45 are objective medical factors that required

immediate, aggressive HCV care then]; and

d. Rush's viral load was above one million and rapidly progressing.

297. Defendants have a duty to provide a community/adequate standard of medical care whether in a correctional setting or not.

298. This standard was outlined by the CDC and/or by the Liver Specialist, Doctor Hall.

299. CMS, McDonald, Altman, Plante, and Eller, however, refused to render any adequate standard of care, but alternatively denied it and/or rendered aggravating acts to destabilize Rush's rapidly worsening condition.

300. The standard dictated by Rush's advanced and rapidly worsening condition should have been for Defendants to immediately begin the antiviral therapy and any needed ancillary medical care to arrest the HCV progression and treat the disease, so that (1) It would limit unnecessary pain and suffering and permanent injuries, (2) would limit Rush's high risk of experiencing unnecessary residual tangible injuries, (3) would limit Rush's high risk of experiencing unnecessary serious or emergency collateral injuries (i.e. esophagus rupture or internal hemorrhaging, (4) would limit Rush's high risk of experiencing an unnecessary lost chance of recovery, and (5) would limit Rush's high risk of experiencing unnecessary liver cancer or type two diabetes.

48

301. The medical care provided by Defendants, however, was not only grossly inadequate and did not meet any acceptable standard of care, it is believed and therefore averred that Defendants actually sought to destabilize Rush's rapidly worsening condition and thus disqualify Rush from any chance of recovery, or did intentional cause Rush serious harm, and/or with gross reckless disregard did expose Rush to serious pain and suffering and permanent injuries.

302. Indeed, all of Rush's pertinent liver function numbers began a rapid negative progression, and instead of beginning immediate, aggressive HCV therapy, Defendants committed the following aggravating factors and/or bad faith deception in an effort to deny and/or create an inordinate delay and thus disqualify Rush from receiving any viable HCV therapy:

  a. Altman falsely stated that Rush's liver function numbers were improving and thus they did not indicate he needed treatments;

  b. McDonald repeatedly prescribed medications that were known or should have been known to be extremely contraindicative and thus cause Rush's condition to destabilize, however, at a time when CMS was concurrently claiming to be stabilizing Rush's condition (i.e. prescribed iron supplements and NSAIDS and/or allowed the continued use of NSAIDS while Rush exhibited aggravated symptoms of his HCV, and prescribe Ribavirin to be taken by itself contrary to the drug manufacture's posted warnings against such use);

  c. McDonald unilaterally disqualified Rush from and HCV protocol while concurrently claiming to have begun HCV therapy;

  d. Eller and Plante repeatedly promised to provide Rush the long belated Interferon Drug Therapy Education/Information required before the therapy could begin, but

failed to do so and CMS employed a sham Interferon Nurse allegedly qualified to

provide said Interferon Ed, but none existed at the time;

e. CMS manufactured false medical records to support a claim the Rush had refused

or denied the Interferon therapy, but this was definitively proven false; and

f. CMS falsely claimed to have scheduled Rush for the Interferon therapy, but had

actually disqualified Rush from receiving the therapy and did not alter this position

until well after Rush filed his complaint.

303. Defendants' acts and omissions combined to expose Rush to a substantial and

unreasonable risk to his future health, increased Rush's permanent injuries (i.e. cirrhosis),

nearly caused Rush a lost chance of recovery, and exposed him to a near fatal esophagus

hemorrhage.

304.  On 1-30-06, Rush had filed a formal medical grievance against defendants CMS,

and claimed CMS was creating an inordinate delay in providing Rush the needed HCV

care; (See D.I. 7-10, Ex Section II at D-1). Rush had begun to demand HCV therapy

shortly after CMS took over as the health care vendor in July 2005.

305.    Rush had repeatedly requested the HCV protocol from the previous infectious disease doctor,

Doctor Niaz, but Niaz refused to provide it.

306. Subsequently, CMS began its contract as Delaware's prison medical vendor in mid-July 2005, so

CMS was well aware of Rush's diagnosis and risk factors then.

307.    On 3-01-06 thru 3-14-06, labs reconfirmed  Rush's HCV diagnosis. (See D.I. 7-10, Ex Section

II at Item B 1-3).

308.     Rush's labs again disclosed his rapid negative progression: Liver enzymes AST at 67, ALT at

145 & positive HCV diagnosis. (See D.I. 7-10, Ex, Section II at B 1 -2), but Defendants failed to

initiate the HCV protocol, before Rush was exposed to permanent injury and a life threatening

hemorrhage.

309. Rush's HCV had been categorized as "Chronic" back on 03-18-06, but Rush had to secure his medical records on 05-13-06 to find out this information, because CMS withheld his HCV diagnosis.

310. On 03-31-06 labs disclosed positive high count for AFP Tumor marker at 9.5 (See D.I. 7-10, Ex, Section II at B-8) and Niaz finally ordered the requisite liver biopsy, though it was not performed until 12-15-06.

311. Rush's viral load was upwards of 4 million on 5-12-06, but the significance of this very high viral load was also withheld by CMS.

312. Consequently, Rush had already exceeded the objective criteria recommended by the CDC to begin antiviral therapy, but CMS continued to employ the same dogged denials and also employed various bad faith pretexts to create an inordinate delay.

313. For instance, CMS –contrary to the minimal standard of medical care for HCV- refused to disclose to Rush the significance of his diagnosis, liver damage level, Rush's high risk category, Rush's rapidly decreasing chance of successful HCV treatments, or the Intreferon/Ribaviron risks and benefits for over the intervening year and this added CMS's campaign to create an inordinate delay and/or a pretext to deny Rush needed HCV therapy.

314. On 5-30-06, Rush filed a formal medical grievance (i.e. #46223) in which Rush charged that CMS refused to provide Rush the HCV drug information ("Interf. Ed"), in bad faith to create an inordinate delay in beginning the actual HCV treatments.

315. Rush was promised the requested Interf Ed by Debby Rodweller on 08-30-06, by Gail Eller on 09-27-06, and at the Formal Grievance Hearing (e.g. #466223), on 10-04-06, but CMS refused to provided it until 03-27-07.

316. CMS employed said refusal to create an inordinate delay in providing Rush the needed HCV therapy; however, it is believed and therefore averred that CMS did not actually have any qualified nurse for this function despite repeatedly representing that it did and that it would schedule Rush to see her for the purpose of receiving the Interferon Ed, so its repeat representations were offered in bad faith.

317. Indeed, according to Rush's medical records, Rush allegedly received the required Interf. Ed on 09-09-06, so as far as CMS was concerned it was denying Rush the HCV therapy until he received Interferon Ed, which he had already received. Thus, CMS's delay was made in bad faith.

318. Rush sought to eliminate CMS's pretext and acquired the Interferon Ed information unilaterally from the drug manufacturing company, but CMS merely employed an alternative pretext.

319. For instance, on 10-06-06, Rush filed a Formal Notice to CMS that he (a) no longer needed CMS to provide the Interf. Ed. because he had acquired it directly from Roche pharma and (b) Rush requested immediate commencement of the HCV treatments. (See D.I. 7-10, Ex, Section II at D-4).

320. On 10-20-07 Defendant Altman responded to Rush's demand for the Interferon treatments, but Altman falsely claimed that Rush's Liver Function numbers were improving, thus Rush did not require the demanded care. (D.I. 7-10, Ex E-1). (i.e. Bad faith deception).

321. It is believed and therefore averred that Altman offered misstatements of fact in order to deceive Rush, justify CMS's denial of the needed medical treatments, and realize CMS's custom/policy of said denial.

322. On or about 11-18-06, one month after Altman's false claims of "improving" numbers, Niaz conducted a Clinic and concurrently announced Rush's platelets were too low to begin the liver biopsy or the HCV treatments (i.e. contraindicative), (See D.I. 7-10 Ex, Section II at C 1-2 at items 5-18).

323. Thus, one CMS employee states Rush's numbers are too good to begin HCV therapy and another states that they are too bad to begin HCV therapy, but both cannot be correct. The common denominator; however, is that both representations were employed to deny Rush HCV therapy that CMS knew or should have known he desperately needed.

324. Moreover, Niaz's claim was refuted on 1-22-07 by an Outside Hep C/Liver Specialist, Doctor Scott Hall. Hall noted that the low platelets needed to be monitored during the Interferon treatments, but that" *there is no contraindication… to consideration of the hepatitis C therapy going forward… I do not feel that Rush needs any further testing or follow up*." (See CMS's Res. At EX-b) (emphasis added).

52

325. Therein, Rush's hypothyroidism was also considered by the liver specialist and he determined that it would not preclude the HCV treatments. Moreover, that Rush's rapidly falling platelets mandated immediate, aggressive HCV treatments, but CMS/McDonald ignored the liver specialist's report/recommendation and employed more of the same dogged denial and delays.

326. On 11-21-06, Rush challenged CMS's pretexts via letter to Altman. (See D.I. 7-10, Ex, Section II at D-5), and on 12-01-06, Altman abandoned his 10-20-07 "improving" liver function numbers and adopted the **new** "Low platelets" are too bad to begin care. (Id at II , D-6).

327. Rush's labs disclosed low platelet counts, however, as early as March 2003 and thereafter, between mid-2005 and May 2006, these same "low platelets" began a rapid negative progression in late 05 and early 2006, but CMS did nothing to address the matter then nor until its various pretexts began to fail scrutiny.

328. For instance, as soon as defendants' first delaying tactic failed and Rush demanded the HCV treatments, miraculously defendants became concerned with the low platelets. (I.e. 03-27-03 labs, 2005 labs, March 2006 Labs, and May 2006 Labs).

329. Moreover, instead of commencing immediate, aggressive HCV treatments, ironically defendants' response is more of the same: denial/delay of care and a campaign to destabilize Rush's condition.

330. Indeed, CMS was specifically made aware of Rush's progressively worsening platelet levels since Rush brought the issue to their attention in January 2006, but CMS refused to provide any medical care to stabilize the problem and exposed Rush to a near fatal esophagus hemorrhage.

331. Defendants committed the following aggravating factors and/or bad faith deception in an effort to deny and/or create an inordinate delay and thus disqualify Rush from receiving any viable HCV therapy:

a. Altman falsely stated that Rush's liver function numbers were improving and thus they did not indicate he needed treatments;

b. McDonald repeatedly prescribed medications that were known or should have been known to be extremely contraindicative and thus cause Rush's condition to

destabilize, however, at a time when CMS was concurrently claiming to be

stabilizing Rush's condition (i.e. prescribed iron supplements and NSAIDS and/or

allowed the continued use of NSAIDS while Rush exhibited aggravated symptoms

of his HCV, and prescribe Ribavirin to be taken by itself contrary to the drug

manufacture's posted warnings against such use);

c. McDonald unilaterally disqualified Rush from and HCV protocol while

concurrently claiming to have begun HCV therapy;

d. Eller and Plante repeatedly promised to provide Rush the long belated Interferon

Drug Therapy Education/Information required before the therapy could begin, but

failed to do so and CMS employed a sham Interferon Nurse allegedly qualified to

provide said Interferon Ed, but none existed at the time;

e. CMS manufactured false medical records to support a claim the Rush had refused

or denied the Interferon therapy, but this was definitively proven false; and

f. CMS falsely claimed to have scheduled Rush for the Interferon therapy, but had

actually disqualified Rush from receiving the therapy and did not alter this position

until well after Rush filed his complaint.

332.  On 12-14-06, Rush received the belated liver biopsy that Niaz had ordered on 3-25-06.

333.   Defendants' failed for over a year to treat Rush's hypothyroidism, but when he demanded the

HCV therapy McDonald used this matter as yet another pretext to deny/delay HCV care.

334.  McDonald's pretext was refuted by Hall, however, –liver specialist- on 1-22-07 and Doctor

Vandusen also concurred on 05-25-07. (See CMS's Res. At Ex-B & D.I. 7-10, Ex Section II at A-3,

items 2-11).

335.  On 1-22-07, outside specialist Scott Hall, M.D. ("Hall") unequivocally and conclusively refuted

each and every one of defendants pretexts, and Hall explicitly stated that there was nothing to prevent

Rush "from going forward" and "testing or follow up" was not needed. (See CMS's Res. At Ex-B).

336. But McDonald still refused to begin Rush's needed HCV therapy and still denied said treatments to Rush despite the obvious need and despite a liver Specialist's recommendation to begin it.

337. On 3-27-07, CMS finally provided the Interf. Ed to Rush and he signed the accompanying "Informed Consent" form, which verifies when the Interferon Ed was not conducted until 03-27-08 and demonstrates that Niaz's medical entry was false  (See DOC's Resp. at Ex-D).

338.  On 5-25-07, Rush met with defendant Vandusen who entered the following: "*Scheduled ASAP with Dr. McDonald to resolve issue of starting Hep C meds,*" because McDonald had not begun the needed therapy and it was obvious to Vandusen that Rush's condition was fast deteriorating and in need of immediate, aggressive medical care to arrest the disease.  (See CMS's Res. At Ex-C).

339.  Doctor Vandusen left the employment of CMS thereafter.

340.  Rush was experiencing an acute outbreak of jaundice  between 05-14-07 and early June 2007, which was likely a precursor and or a warning of Rush's upcoming esophagus rupture, but these classic symptoms of an aggravated nature were ignored.

341. Moreover, McDonald allowed Rush to be prescribed contraindicative Iron supplements and NSAIDS and knew or should have known that these contraindicative drugs would seriously aggravate Rush's rapidly worsening condition (i.e. unnecessarily expose Rush to undue pain and suffering and permanent injuries, and/or destabilized his condition).

342. Yet CMS failed to address Rush's obvious serious symptom and no entry appears in Rush's medical records on 5-25-07 of the acute jaundice.

343.  On 6-24-07 (circa) Rush experienced a needless and/or preventable massive hemorrhage to his esophagus as a direst result of his failing liver and quickly deteriorating condition. Post op definitively revealed this fact. (See CMS's Resp. at Ex.-E);

    [Thus, Rush was exposed to a near fatal emergency episode some

    five months after Hall's 1-22-07 recommendation to begin HCV

    treatments.  CMS's claim to have worked to "stabilize" Rush's

condition on Feb. 13, March 24, April 18, May 25, and August 2007,

is dubious. Rush's esophagus did not rupture until late June 2007 and

Hall explicitly stated No contraindication or nothing present to preclude

Rush's HCV treatment from beginning –on 1-22-07. ]

344.    This near fatal internal hemorrhage was a direct result of Defendants' acts and omissions (i.e.

aggravating and contraindicate prescriptions and failure to begin the HCV therapy and arrest the

progression). It was avoidable, but McDonald alternatively employed his master's (i.e. CMS's)

custom/policy to deny Rush the needed medical care and thus put Rush's life in jeopardy.

345.    On 8-18-07, Rush's first HCV Clinic since his June near fatal esophagus rupture, McDonald

confirmed the post op's findings: esophagus was likely caused by Rush's HCV/LDC condition.

McDonald then noted alarming facts that should have alerted any physician who was actually

conducting meaningful "monitoring" : (a) That Rush's blood showed elevated protein levels and that

this was a classic symptom and/or precursor to the esophagus incident, and (b) That the massive doses of

Motrin -these very same doctors who were so good at "monitoring" Rush's condition- had actually

aggravated Rush's condition because it is a prohibited class of drugs for Rush's advanced HCV/LDC

condition.

346.    Despite a near fatal internal hemorrhage and despite the known effects of NSAIDS to destabilize

chronic/precarious HCV conditions, McDonald failed to discontinue Rush's prescriptions for said

contraindicative NSAIDS meds and thus continued to intentionally inflict harm upon Rush and

intentionally attempted to destabilize Rush's now precarious condition.

347.    On 8-18-07 McDonald unilaterally declared that Rush was no longer a candidate for any HCV

treatments due to the level of liver cirrhosis's. McDonald entered the following in Rush's medical

records: "Not a candidate…cirrhosis…VPLTCT."

348.    Also, McDonald refused to reschedule Rush for any further Hep C Chronic Care Clinics as noted by the intentional omission to reschedule. (D.I. 19-20, Ex-C); however, subsequently claimed that he had actually scheduled to begin the HCV therapy for Rush.

349.    Rush definitively proved that CMS's/McDonald's claim to have scheduled Rush to begin HCV therapy (i.e. medical entry) was false; and thus McDonald's bad faith attempt to continue his deception regarding the denial of Rush's needed HCV therapy demonstrates McDonald's culpability and knowledge of his deliberate indifference.

350.    CMS employed McDonald's false entries to the same effect and it is believe and therefore averred that CMS either directed the manufacture of said false medical entries and/or knew or should have known of the false medical entries.

351.    Thus as of 08-18-07 CMS had declared its outright denial of Hep C care to Rush, because Rush's liver was too far gone, but Rush had previously requested the Hep C care from CMS since 1-30-06.

352.    On 8-22-07, Vandusen intervened to thwart McDonald's clearly harmful acts and noted: "Stop NSAIDS" "Schedule repeat ammonia level" and "Have Deb R. schedule follow up ccc. (See CMS's Resp. at Ex-C).

353.    Consequently since 08/22/08 CMS has denied any and all medical treatment for Rush's diagnosed, acutely painful Lipomas and atrophied right shoulder, and they both unnecessarily impair – significantly- Rush's normal daily activities and range of motion and cause him undue pain and suffering.

354.    Despite knowledge and previous treatment for the Lipomas and right shoulder (i.e. pain medications), CMS simple denies all forms of medical care and still denies Rush the recommended excision of the Lipomas absent and contrary to legitimate medical factors.

355.    On 8-23-07, Vandusen noted in the Plan: Medication changes section of the Clinic report: "Stop Protocol", Stop NSAIDS" F/U 2 months 10-19-07."

356.  McDonald never even bothered to discontinue the counter indicative NSAIDS on 08-18-07 despite confirmation that Motrin aggravated Rush's condition and destabilized it, and despite Rush's near fatal internal hemorrhage.

357.  It is believed and therefore averred that CMS's profits are inescapably tied to minimizing costs – prescription drug costs- and that CMS denied HCV therapy to Rush that it knew or should have known he required in order to create a windfall profit (i.e. custom/policy of cost avoidance).

358.  In short, CMS/Defendants knew or should have known as early as August 2005 that Rush's condition demanded immediate, aggressive HCV therapy, but alternatively Defendants employed a campaign of deception and bad faith to deny HCV therapy to Rush, which did cause Rush to experience an avoidable near fatal internal hemorrhage, significant increased permanent injuries (i.e. liver cirrhosis), and diminished life expectancy contrary to legitimate medical factors and with deliberate intent to harm Rush and/or gross reckless disregard to a known significant threat to Rush's health and life.

359.  Defendants  acted or omitted to act with deliberated indifference and/or with gross reckless disregard to a known and objective serious threat to Rush's life in any of the following ways:

    a. By disregarding legitimate medical and high risk factors that demanded immediate and aggressive medical therapy;

    b. By disregarding the persistently high –and rapidly rising liver- enzyme numbers and/or the rapidly progression of Rush's particular HCV;

    c. By intentionally creating an inordinate delay, *with bad faith* and contrary to known legitimate medical factors, in providing the needed medical therapy and intentionally and or with gross reckless disregard exposed Rush to significant pain and suffering or a serious and unreasonable risk to Rush's future health and life (i.e. Near fatal esophagus rupture/internal hemoraging);

    d. By intentionally employing a camping of deception, misinformation, and bad faith to realize said custom/policy to deny medical therapy to Rush –therapy required to save Rush's life- and/or

create an inordinate delay and permit Rush's disease to progress and disqualify him from any chance of viable treatments;

e. By failing to employ adequate policies/procedures to meet the emergency medical needs of Rush's known serious medical condition; and

f. By intentionally employing multiple illegitimate pretexts to justify Defendants denial and/or inordinate delays in providing needed medical care to Rush; and

g. By failing to correct a known systemic failure to meet the emergency and/or known medical needs of Rush despite the knowledge that a failure to do so would likely violate Rush's constitutional rights.

360. Items (a) thru (g) at paragraph 289-359 were employed by Defendants intentionally and without any legitimate medical reasons and/or with gross reckless disregard to a known objective serious medical need and with bad faith and a failure to exercise professional medical judgment.

medical judgment—in order to realize a custom/policy of cost-avoidance (i.e. Deny needed treatment for non-medical reasons).

420. CMS is aware of the fatally progressive nature of Rush's Hep C, is aware of his progressively permanently damaged liver, etc., and intentionally disregards these significant and tangible threats to Rush's health and well being.

421. CMS's deliberate illegitimate delays has resulted in a rapidly progressive and permanent organ damage and needlessly place Rush in a significantly greater risk for irreversible injury, likely treatment failure/disqualification, and premature death.

422. Rush has exhausted all the available administrative remedies regarding CMS's denial of Hep C treatments, inordinate stalling tactics, scheduling ghost doctor's visits, and reprisal for exercising his right to seek redress via grievances, and denial of access to the courts.

423. All defendants knew or should have known that their acts or omissions to act violated Rush's constitutional rights and did cause him intentional and/or likely significant harm/permanent injuries.

## STATEMENT OF CLAIMS

### First Cause of Action

36|. ~~e~~ acts and/or omissions to act of defendants CMS,. Altman, Maloney, Plante, and ~~John Doe, MD                       ,~~ Eller ~~Durst, FCM and Alie~~ stated in paragraphs 16 thru 220; defendants CMS, ~~Durst,~~ and Eller—Durst, and Altman—stated in paragraphs 289 thru 360 –violated Rush's Eight and Fourteenth Amendment Rights to be free from cruel and unusual punishment and wonton infliction of pain in a manner deliberate and/or with gross reckless disregard when:

a) Defendants disregarded the obvious and classic systems of late-stage, acutely painful lipomas and denied Rush the doctor's ordered minimum

needed care—denied Rush adequate pain meds for an inordinate extended period—and by needlessly exposing Rush to a progressive disease for an inordinate period causing the growths to significantly enlarge—which will now result in tissue damage and scarring once removed.

b) Defendants disregarded Rush's multiple requests and medical grievances to remove the painful lipomas;

c) Defendants disregarded two different doctor's orders for surgical removal of the painful lipomas despite an "urgent" code;

d) Defendants disregarded the known and obvious progressive nature of Rush's lipomas over a prolonged period and needlessly exposed Rush to pain, suffering, permanent injury, impairment of normal daily Functions, significant threat to future health, and severe emotional and mental distress.

e) Defendants employed a custom/policy to deny or create inordinate delay in providing limpoma removal/pain meds, however, absent any legitimate medical factors and absent an exercise of professional medical judgment;

f) Defendants knowingly employed a continuous pattern of inadequate medical care and/or grossly systematic breakdown in medical care, both of which were obvious and likely to violate Rush's constitutional rights, yet defendants refused to take any meaningful corrective action;

g) Defendants knowingly employed a continuous pattern—often times in clear bad faith—of inordinately delaying needed medical care for non-medical reasons;

h) Defendants knowingly constructed arbitrary and capricious obstacles and or devices to frustrate Rush from receiving medical care including mock doctor's exams, ghost doctor's schedulings, denial of grievance procedure, forcing Rush to repeatedly file redundant requests for needed care—which had already been ordered or diagnosed by a doctor—and treating Rush with explicit contempt, scorn, hostility, with retaliation, and as a nuisance;

i) Defendants employed actual improper impediments and/or denied Rush the medical grievance procedure in violation of protected rights;

j) Defendants arbitrarily and capriciously morphed medical criteria as a pretext or justification to deny or delay the known needed care for non-medical reasons;

k) Defendants employed a pattern to downplay the obvious and known serious nature of Rush's conditions that was in clear conflict with classic symptoms and known medical factors;

l) Defendants continued a course of treatment and/or non-treatment that they knew was ineffective, dangerous, and exposed Rush to unnecessary pain, suffering, permanent injury, and a significant risk of residual future injury;

m) Defendants arbitrarily and capriciously—with bad faith—knowingly under-diagnosed Rush's serious medical conditions, which findings were contrary to legitimate and observable medical factors in an effort to hide the true

nature/damage and/or needed course of treatment from Rush;

n) Defendants made and or entered false statements in Rush's file—in bad faith—of creating a viable treatment plan, but actually offered a mock treatment plan devoid of any legitimate professional medical judgment;

o) Defendants consciously disregarded Rush's classic symptoms and or several doctors' diagnosis of his fatal disease (Hep C);

p) Defendants consciously disregarded Rush's particular rapid progress-sive deterioration of Hep C red flag indicators and/or severe tangible organ damage and denied Rush any adequate treatment;

q) Defendants consciously disregarded Rush's progressive and deteriorating rish factors that undermine and/or disqualify one from receiving suces-sful treatments;

r) Defendants intentionally and with clear bad faith created an inordinate delay and/or created unnecessary obstacles to thwart or deny actual treatment of Rush's Hep C;

s) Defendants employed a custom/policy to deny known needed treatment for Rush's Hep C through bad faith deception and deliberate dis-information, which was contrary to legitimate and observable medical factors;

t) Defendants acts and omissions to act above at 16-424 (a) and (s) were perpetrated in a culpable and or gross reckless manner, were devoid any legitimate medical factor or exercise of professional medical judgment, and did needlessly expose Rush to unnecessary pain, suffering, permanent injury, significant impairment of normal daily functions, significant tangible threat to future health, significant deterioration of Rush's health, and significant threat of causing organ damage, failure, and or premature death.

## Second Cause of Action

362. The culpable acts and/or omissions to act of defendants CMS, Maloney, Plante,

Rodweller, and Eller—stated in paragraphs 16 thru 360 above violated Rush's Eighth and

Fourteenth Amendment rights to be free from cruel and unusual punishment and wonton

infliction of pain, Fifth and Fourteenth Amendment Rights to due process of law and access to

the courts; Eighth Amendment Right to equal protection of the law; First Amendment Right to

freedom of speech; and the Privileges and Immunities Clause of Article IV of the United States

Constitution in a manner deliberate, reckless with malice, and disregard (Plaintiff also

incorporates Firs Cause of Action herein) when:

a) Defendants intentionally violated Emergency Medical Grievance procedures and employed a custom/policy to disregard EMG procedures and specifically disregarded Rush's emergency medical incidents;

b) Defendants intentionally denied Rush meaningful access to the medical grievance procedure in a bad faith effort to deny Rush access to seek redress to the courts;

c) Defendants intentionally retaliated against Rush for and due his exercise of protected right to grieve and or seek redress at the courts;

d) Defendants were aware of (i) denial of grievance procedure, (ii) systematic breakdown in emergency Medical Grievances, (iii) retaliation and/or adverse actions against Rush for his grievance activity and (iv) the likely result of an outright denial or prohibition of access to the courts—which will obviously and likely result in violating Rush's constitutional rights—however, defendants refused to make meaningful corrective action to stem the violations; and

e) Defendants acts and omissions to act listed at 360 a) thru (d) were committed with actual malice and intent to harm, and were devoid of any legitimate medical or penological objectives.

## RELIEF REQUESTED

WHEREFORE, Plaintiff Rush requests that the Court grant the following relief:

A. Issue a declaratory judgment stating:

1. That defendants (listed at 3 thru 15, 16, 221, and 289 above) knowingly and intentionally subjected Rush to cruel and unusual punishment and wonton infliction of pain in a manner deliberate, reckless, and with gross reckless disregard to Rush's serious medical conditions through their acts and omissions to act in regard to Rush's objectively known serious medical needs.

2. That defendants (at A. 1) intentionally and or with gross negligence needlessly caused Rush permanent injuries, pain and suffering, severe mental and emotional distress, impairment of normal daily functions, loss chance of recovery, and likely tangible threat of risk to future health and or premature death.

3. That corporate defendants— FCM and CMS—employed a custom/policy of cost avoidance to deny and/or create inordinate delay in providing needed treatment, however, absent legitimate medical factors and that resulted in significant aggravation of Rush's conditions.

4. That defendants violated Rush's protected right to seek redress to grievance process and the courts through intentional denial of process and through adverse acts that equate to prohibited retaliation.

5. That FCM and or CMS defendants were knowledgeable of employees' acts at A 1-4, were knowledgeable of their likely violations of Rush's

   Constitutional rights, but refused to take corrective action
   and or did actually condone and encourage these intentional
   violations.

6. That the effective date of discovery for Rush's Hep C (i.e.
that there were viable treatments available) on or about
December, 2005.

7. ~~That defendant FCM's and defendant employees (i.e. Alie and Niaz) bad faith deception, dirty hands, and breach of contract that created the extraordinary abrupt termination of their contract/services effectively acts to nullify any alleged failure to notify.~~

B. Issue an Injunction Ordering the following:

1. Health care provider CMS immediately schedule and provide
Rush with surgical removal of any and all lipoma growths, and
Repair any resulting tissue, nerve, muscle, or blood vessel damage,
And provide any appropriate post-op physical therapy.

2. That the health care provider—CMS—immediately provide Rush
for an outside—specialist—consultation regarding his right
shoulder (e.g. cist & degenerative condition) and provide the
recommended care, post-op, and or physical therapy for same.

3. That the health care provider—CMS—immediately provide
adequate pain relievers for his painful lipoma/shoulder condition.

4. That CMS immediately and consistently provide adequate Hep C
treatments (e.g. Interferon, etc.) and monitor and treat any related
aggravated conditions or damaged organs.

5. That CMS immediately and consistently monitor, record, and
adequately inform Rush of the damage present—its progress or
digression—relating to his Hep C.

C. Award Compensatory Damages for violation of specified constitutional rights, pain

and suffering, permanent injury, permanent disfigurement, mental and emotional distress,

depression, significant impairment of Rush's normal daily functions, significant deterioration of

body and internal organs, and likely premature death and or disability in an amount and character

equivalent to what is proven at trial and is awarded jointly and or severally against all named

defendants.

D. Award Punitive Damages against all named defendants—both jointly and/or

severally—in accord with their specific, and individual, and or conspiratorial acts of deliberate

Indifference, deliberate acts of malice, intentional intent to harm, injure, or retaliate against Rush, and gross reckless disregard for Rush's acute pain, suffering, and mental and emotional distress, and/or for the repeated deliberate acts of deception and bad faith employed to realize the deliberate indifference.

E.  Grant any other relief as it may appear that Rush is entitled to.

Respectfully submitted,


David Rush
SBI 173418
DCC, W-1, D-16
1181 Paddock Rd.
Smyrna, DE  19977

8/20/2008
Date